ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsarroyo.com
CRAIG W. SMITH (164886)
csmith@robbinsarroyo.com
SHANE P. SANDERS (237146)
ssanders@robbinsarroyo.com
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ARAVIND BHONAGIRI, Derivatively on Behalf of NUTANIX, INC., <br><br> Plaintiff, <br><br> v. <br><br> DHEERAJ PANDEY, DUSTON M. WILLIAMS, DAVID SANGSTER, TYLER WALL, JEFFREY T. PARKS, MICHAEL P. SCARPELLI, STEVEN J. GOMO, RAVI MHATRE, JOHN MCADAM, SUSAN L. BOSTROM, CRAIG CONWAY, SUDHEESH N. VADAKKEDATH, LOUIS J. ATTANASIO, and KENNETH W. LONG III, <br><br> Defendants, <br><br> -and- <br><br> NUTANIX, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Nutanix, Inc. ("Nutanix" or the "Company") against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in hundreds of millions of dollars in damages to Nutanix's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Nutanix to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Nutanix provides enterprise cloud software and virtual computing platforms that customers use for constructing private clouds. The Company purports to deliver rapid, high-performance information technology environments on demand, giving application owners a true cloud-like experience. These software solutions include enterprise applications, databases, virtual desktop infrastructure, unified communications, and big data analytics. Customers can purchase pre-configured Nutanix appliances, buy pre-configured appliances from other manufacturers, or deploy the Company's software on validated third-party servers. Nutanix also offers technical support in the form of tiered subscription and support programs. The Company has end customers across a range of industries, including automotive, consumer goods, education, energy, financial services, healthcare, manufacturing, media, public sector, retail, technology, and telecommunications. The Company generates revenue primarily from the sale of its enterprise cloud platform.

3.      Between March 2, 2018 and February 28, 2019, Nutanix's officers and directors repeatedly made statements that Nutanix was investing heavily in growth and increasing its sales and marketing activities while maintaining high profit margins. As a result of these representations, Nutanix's fiduciaries steered investors into believing the Company's artificially inflated financial

1   expectations.

2       4.      Contrary to these statements, and as the Company's executives revealed on February 28,

3   2019, Nutanix was engaging in "inadequate marketing spending for pipeline generation and slower than

4   expected sales hiring."  The Company's "pipeline generation" is driven by Nutanix's lead generation

5   spending, which "ultimately, significantly impacts booking, billings and revenue," as the Company

6   admits.  Nutanix, however, actually held lead generation spending flat between the fourth fiscal quarter

7   of 2017 and the third fiscal quarter of 2018, and later decreased lead generation spending between the

8   fourth fiscal quarter of 2018 and the second fiscal quarter of 2019.  Also on February 28, 2019, during

9   an earnings conference call with investors and analysts, Nutanix's executives further revealed that the

10  Company had fallen behind in its sales hiring goals.

11      5.      Several analysts reacted negatively to the Company's disclosure, highlighting Nutanix's

12  failure to properly invest in sales personnel and lead generation, downgrading Nutanix stock, and

13  lowering its price targets.  For example, on March 1, 2019, Oppenheimer released a report downgrading

14  Nutanix stock.  The report stated that Oppenheimer "think[s] Nutanix has tried to do too much (massive

15  portfolio expansion, cloud rollout, M&A, etc.) with too little (under investment in sales/go-to-market)

16  for too long (recent year) and this has caught up with it."  The Company's weak forecast was the

17  reflection of an "emptied pipeline" and too few additions to the sales team, per the report.

18      6.      In the wake of the February 28, 2019 disclosure, Nutanix's stock plunged more than 32%,

19  or $16.39 per share on March 1, 2019, to close at $33.70 per share compared to the previous trading

20  day's closing of $50.09 per share, erasing over $2.4 billion in market capitalization.

21      7.      Rather than providing the market with correct information, or correcting Nutanix

22  fiduciaries' misleading statements, certain Company fiduciaries used their knowledge of material,

23  nonpublic information to benefit themselves.  In particular, as officers and directors of Nutanix, they

24  were privy to material, nonpublic information about the Company's declining business metrics and

25  financial prospects.  Altogether, the insider selling fiduciaries sold over $131 million of stock since the

26  misleading statements began in March 2018.

27      8.      Further, as a direct result of this unlawful course of conduct, Nutanix is now the subject

28  of numerous federal securities class action lawsuits filed in the U.S. District Court for the Northern

District of California on behalf of investors who purchased Nutanix's shares.

9.     Plaintiff brings this action against the Individual Defendants (as defined herein) to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Nutanix maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Nutanix, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

13.     A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of Santa Clara, and as such, this action is properly assigned to the San Jose division of this Court.

## THE PARTIES

**Plaintiff**

14.     Plaintiff Aravind Bhonagiri has continuously been a stockholder of Nutanix since June 6, 2018.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

15. Nominal Defendant Nutanix is a Delaware corporation with principal executive offices located at 1740 Technology Drive, Suite 150, San Jose, California. Accordingly, Nutanix is a citizen of Delaware and California. Nutanix is a software company that provides products, services, and cloud-based infrastructure to various industries worldwide in support of their technological operations and management. Shares of Nutanix's stock trade publicly on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "NTNX." As of July 31, 2018, the Company had approximately 4,000 employees.

**Defendants**

16. Defendant Dheeraj Pandey ("Pandey") cofounded Nutanix in September 2009. Defendant Pandey is Nutanix's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") and has been since the Company's inception, and served as President from September 2009 until February 2016. Defendant Pandey is named as a defendant in the related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendant Pandey knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success. Nutanix paid defendant Pandey the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|
| 2018 | $350,000 | $10,413,000 | $439,225 | $11,202,225 |

Defendant Pandey is a citizen of California.

17. Defendant Duston M. Williams ("Williams") is Nutanix's Chief Financial Officer ("CFO") and has been since June 2014. Defendant Williams is named as a defendant in the related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Williams knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success. While in possession of material, nonpublic

- 4 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

information concerning Nutanix's true business health, defendant Williams sold 300,000 shares of his stock for $16,237,575.38 in proceeds.  Nutanix paid defendant Williams the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2018 | $350,000 | $4,165,200 | $285,496 | $4,800,696 |

Defendant Williams is a citizen of California.

18.     Defendant David Sangster ("Sangster") is Nutanix's Executive Vice President, Engineering & Operations and has been since February 2018.  Defendant Sangster was also Nutanix's Executive Vice President, Support & Operations from February 2016 to February 2018, Senior Vice President, Operations from April 2014 to February 2016, and Vice President, Operations from December 2011 to April 2014.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Sangster sold 224,036 shares of his stock for $11,194,665.75 in proceeds.  Defendant Sangster is a citizen of California.

19.     Defendant Tyler Wall ("Wall") is Nutanix's Chief Legal Officer and has been since November 2017.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Wall sold 34,144 shares of his stock for $1,378,113.30 in proceeds.  Nutanix paid defendant Wall the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2018 | $238,636 | $10,389,000 | $111,895 | $10,739,531 |

Defendant Wall is a citizen of California.

20.     Defendant Jeffrey T. Parks ("Parks") is a Nutanix director and has been since December 2013.  Defendant Parks is also a member of the Audit Committee and has been since at least November 2017.  Defendant Parks knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Parks sold 1,867,264 shares of his stock for $70,860,576.44 in proceeds.

Nutanix paid defendant Parks the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2018 | $304,006 | $304,006 |

Defendant Parks is a citizen of California.

21.     Defendant Michael P. Scarpelli ("Scarpelli") is a Nutanix director and has been since December 2013. Defendant Scarpelli is also the Chairman of the Audit Committee and has been since at least November 2017. Defendant Scarpelli knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success. While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Scarpelli sold 50,000 shares of his stock for $3,049,465 in proceeds. Nutanix paid defendant Scarpelli the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2018 | $298,594 | $298,594 |

Defendant Scarpelli is a citizen of California.

22.     Defendant Steven J. Gomo ("Gomo") is a Nutanix director and has been since October 2017. Defendant Gomo is also a member of the Audit Committee and has been since at least November 2017. Defendant Gomo knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success. While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Gomo sold 5,312 shares of his stock for $278,908.68 in proceeds. Nutanix paid defendant Gomo the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2018 | $293,145 | $293,145 |

Defendant Gomo is a citizen of California.

23.     Defendant Ravi Mhatre ("Mhatre") is Nutanix's Lead Independent Director and has been since August 2015 and a director and has been since July 2010. Defendant Mhatre knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success. Nutanix paid

1 | defendant Mhatre the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2018 | $295,888 | $295,888 |

Defendant Mhatre is a citizen of California.

24.     Defendant John McAdam ("McAdam") is a Nutanix director and has been since August 2015.  Defendant McAdam knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant McAdam sold 30,000 shares of his stock for $1,441,343.43 in proceeds. Nutanix paid defendant McAdam the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2018 | $285,027 | $285,027 |

Defendant McAdam is a citizen of California.

25.     Defendant Susan L. Bostrom ("Bostrom") is a Nutanix director and has been since October 2017.  Defendant Bostrom knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.   Nutanix paid defendant Bostrom the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2018 | $777,218 | $777,218 |

Defendant Bostrom is a citizen of California.

26.     Defendant Craig Conway ("Conway") is a Nutanix director and has been since October 2017.  Defendant Conway knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  Nutanix paid defendant Conway the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2018 | $777,218 | $777,218 |

Defendant Conway is a citizen of California.

27.     Defendant Sudheesh N. Vadakkedath ("Vadakkedath") was Nutanix's President from February 2011 to July 2018.  Defendant Vadakkedath knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Vadakkedath sold 320,000 shares of his stock for $16,638,468 in proceeds.   Defendant Vadakkedath is a citizen of California.

28.     Defendant Louis J. Attanasio ("Attanasio") was Nutanix's Chief Revenue Officer from November 2017 to March 2019.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Attanasio sold 134,499 shares of his stock for $5,559,951.34 in proceeds.  Nutanix paid defendant Attanasio the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2018 | $578,314 | $41,556,000 | $651,901 | $42,786,215 |

Defendant Attanasio is a citizen of New Jersey.

29.     Defendant Kenneth W. Long III ("Long") was Nutanix's Vice President, Corporate Controller and Chief Accounting Officer from May 2013 to December 2018.  Defendant Long knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Long sold 92,002 shares of his stock for $5,147,177.52 in proceeds.  Defendant Long is a citizen of California.

30.     The defendants identified in ¶¶16-19, 27-29 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶16, 20-25 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶20-22 are referred to herein as the "Audit Committee Defendants."   The defendants identified in ¶¶17-22, 24, 27-29 are referred to herein as the "Insider Selling Defendants."   Collectively, the defendants identified in ¶¶16-29 are referred to herein as the "Individual Defendants."

# DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Nutanix and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nutanix in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Nutanix and not in furtherance of their personal interest or benefit.

32.    To discharge their duties, the officers and directors of Nutanix were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Nutanix were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(b)    refrain from selling Nutanix stock on the basis of nonpublic insider information;

(c)    properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(d)    remain informed as to how Nutanix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(e)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(f)     ensure that Nutanix was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

33.     Nutanix holds its fiduciaries to specific corporate governance principles beyond the requirements of law.  In particular, in its Corporate Governance Guidelines as adopted on August 29, 2015 and amended on May 29, 2019, Nutanix described the duties undertaken by the Board, and the active oversight role the Board played in the Company's business affairs.  The Corporate Governance Guidelines state that "[i]t is the principal duty of the Board to exercise its powers in accordance with its fiduciary duties to the Company and in a manner it reasonably believes to be in the best interests of the Company and its stockholders.  It is also the Board's duty to oversee senior management in the competent and ethical operation of the Company."

34.     The Individual Defendants, as officers or directors of Nutanix, were also bound by the Company's Code of Business Conduct and Ethics (the "Code"), adopted on August 19, 2015.  With respect to the Company's corporate books, financial accounting, and public disclosure, the Code requires:

**Overview**

As a public company, we are required to follow strict accounting principles and standards, to report financial information accurately and completely in accordance with these principles and standards, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with law.  The integrity of our financial transactions and records is critical to the operation of our business and is a key factor in maintaining the confidence and trust of our employees, security holders and other stakeholders.

**Compliance with rules, controls and procedures**

It is important that all transactions are properly recorded, classified and summarized in our financial statements, books and records in accordance with our policies, controls and procedures, as well as all generally accepted accounting principles, standards, laws, rules and regulations for accounting and financial reporting.  If you have responsibility for or any involvement in financial reporting or accounting, you should have an appropriate understanding of, and you should seek in good faith to adhere to, relevant accounting and financial reporting principles, standards, laws, rules and regulations and Nutanix's financial and accounting policies, controls and procedures.  This includes ensuring that all bookkeeping and records comply with the Foreign Corrupt Practices Act where applicable, as explained in greater detail in Nutanix's Anti-Corruption Compliance Policy and Guidelines.  If you are a director level employee or higher, you should seek to ensure

that the internal controls and procedures in your business area are in place, understood and followed.

**Accuracy of records and reports**

It is important that those who rely on records and reports—managers and other decision makers, creditors, customers and auditors—have complete, accurate and timely information. False, misleading or incomplete information undermines Nutanix's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely. Anyone representing or certifying as to the accuracy of such records and reports should make an inquiry or review adequate to establish a good faith belief in their accuracy.

Even if you are not directly involved in financial reporting or accounting, you are likely involved with financial records or reports of some kind—a voucher, time sheet, invoice or expense report. In addition, most employees have involvement with product, marketing or administrative activities, or performance evaluations, which can affect our reported financial condition or results. Therefore, Nutanix expects you, regardless of whether you are otherwise required to be familiar with finance or accounting matters, to use all reasonable efforts to ensure that every business record or report with which you deal is accurate, complete and reliable.

**Intentional misconduct**

- You may not intentionally misrepresent Nutanix's financial performance or otherwise intentionally compromise the integrity of Nutanix's reports, records, policies and procedures. For example, you may not: report information or enter information in Nutanix's books, records or reports that fraudulently or intentionally hides, misrepresents or disguises the true nature of any financial or non-financial transaction or result;

- establish any undisclosed or unrecorded fund, account, asset or liability for any improper purpose;

- enter into any transaction or agreement that accelerates, postpones or otherwise manipulates the accurate and timely recording of revenues or expenses;

- intentionally misclassify transactions as to accounts, business units or accounting periods; or

- knowingly assist others in any of the above.

*   *   *

**Obligation to Investigate and Report Potential Violations**

You should make appropriate inquiries in the event you may see, for example:

- financial results that seem inconsistent with underlying business performance;

- inaccurate financial records…;

- the circumventing of mandated review and approval procedures;

- transactions that appear inconsistent with good business economics;

- the absence or weakness of processes or controls; or

- persons within Nutanix seeking to improperly influence the work of our financial or accounting personnel, or our external or internal auditors.

Dishonest or inaccurate reporting can lead to civil or even criminal liability for you and Nutanix and can lead to a loss of public faith in Nutanix.  You are required to promptly report any case of suspected financial or operational misrepresentation or impropriety.

**Keeping the Audit Committee Informed**

The Audit Committee plays an important role in ensuring the integrity of our public reports.  If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors.  In particular, the Chief Executive Officer and senior financial officers such as the Chief Financial Officer and Vice President of Accounting should promptly bring to the attention of the Audit Committee any information of which he or she may become aware concerning, for example:

- the accuracy of material disclosures made by Nutanix in its public filings;

- material weaknesses or significant deficiencies in internal control over financial reporting;

- any evidence of fraud that involves an employee who has a significant role in Nutanix's financial reporting, disclosures or internal controls or procedures; or

- any evidence of a material violation of the policies in this Code regarding financial reporting.

35.    The Code also prohibits buying and selling the Company's stock based on insider information:

**Prohibition on Insider Trading**

You may not directly or indirectly—through, for example, significant others, family members or controlled entities—buy or sell stocks or other securities of Nutanix or any other company based on nonpublic information obtained from your work at Nutanix.  In addition, you may not "tip" others by providing them nonpublic information under circumstances that suggest that you were trying to help them make an investment

decision.  These obligations are in addition to your obligations with respect to nonpublic information generally, as discussed above.

Under U.S. securities laws, it is unlawful for any person who has "material" nonpublic information about a company to trade in the stock or other securities of that company or to disclose such information to others who may trade.  Material nonpublic information is information about a company that is not known to the general public and that a typical investor would consider important in making a decision to buy, sell or hold securities.  Violations of U.S. securities laws may result in civil and criminal penalties, including disgorgement of profits, civil judgments, fines and jail sentences.

You should be aware that stock market surveillance techniques are becoming increasingly sophisticated, and the probability that U.S. federal or other regulatory authorities will detect and prosecute even small-level trading is significant.  Insider trading rules are strictly enforced, even in instances when the financial transactions seem small.

You may not make an unauthorized disclosure of any nonpublic information acquired in the course of your service with Nutanix or misuse or material nonpublic information in securities trading.  Any such actions will be deemed violations of Nutanix's Insider Trading Policy.  All employees should be familiar with Nutanix's policy regarding Insider Trading.  If you have any questions at all regarding trading in Nutanix's securities, contact the Legal Department for guidance.

**Breaches of Duties**

36.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Nutanix, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

37.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements to the public, improper practices that wasted the Company's assets, and caused Nutanix to incur substantial damage.

38.     The Individual Defendants, because of their positions of control and authority as officers and directors of Nutanix, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Nutanix has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

39.     In addition to these duties, under the Audit Committee Charter in effect since August 19, 2015, the Audit Committee Defendants, defendants Gomo, Parks, and Scarpelli, owed specific duties to Nutanix to assist the Board in overseeing "[t]he Company's accounting and financial reporting processes and internal control over financial reporting, as well as the audit and integrity of the Company's financial statements," among other things.

40.     Specifically, according to the Audit Committee Charter, the Audit Committee must review and discuss with management the Company's financial statements, stating:

> **Review Financial Statements.**   The Audit Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:
>
> • The scope and timing of the annual audit of the Company's financial statements.
>
> • The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosure in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.
>
> *     *     *
>
> • The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.
>
> • Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles.
>
> • Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative [generally accepted accounting principles ("GAAP")] methods on the financial statements.
>
> • The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.
>
> • Any significant changes required or taken in the audit plan as a result of any material control deficiency.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

- Any significant disagreement between management and the independent auditor.

41.     The Audit Committee Charter charges the Audit Committee with assessing and managing risk and the quality and adequacy of the Company's controls and processes that materially affect its public statements.  The Audit Committee Charter provides:

> The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

*   *   *

> **Access.**  The Audit Committee shall be given full access to the chairperson of the Board, management, the independent auditor and, if applicable, the internal auditors, if applicable, as well as the Company's books, records, facilities and other personnel.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

43.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Nutanix, regarding the Individual Defendants' management of Nutanix's operations and the Company's investment in sales and marketing growth; (ii) facilitate the Insider Selling Defendants' illicit sale of over $131 million of  their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Nutanix and the profits, power, and prestige that the Individual Defendants enjoyed as a result of

holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

44. The Individual Defendants engaged in a conspiracy, common enterprise, or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

45. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

46. The Individual Defendants accomplished their conspiracy, common enterprise, or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

47. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

48. Nutanix provides an enterprise cloud platform that converges computing, virtualization, storage, networking, desktop, governance, and security services in one integrated solution delivered through software. The Company targets customers across a broad range of industries, including automotive, consumer goods, education, energy, financial services, healthcare, manufacturing, media, public sector, retail, technology, and telecommunications. As of July 31, 2018, Nutanix had a base of over 10,600 end customers.

49. Nutanix primarily sells its platform through distributors, resellers, and original equipment manufacturers ("OEMs"). The Company's OEM partners license its software and package it with their

hardware, Nutanix-branded appliances, or other configurations.  The OEM partners also sell associated support offerings, which Nutanix jointly supports.  Nutanix offers varying levels of customer support through its global support centers.  Approximately 79% of the Company's total revenue comes from the sale of its enterprise cloud platform.  The Company also sells renewals of previously purchased software licenses, hardware appliances, and software entitlement and support subscriptions.

50.     On September 18, 2017, Nutanix filed its Annual Report on Form 10-K for the fiscal year ending July 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants Pandey, Williams, Long, Gomo, McAdam, Mhatre, Parks, and Scarpelli signed the 2017 Form 10-K.  The 2017 Form 10-K outlined the Company's sales and marketing efforts moving forward, stating that Nutanix expected to increase investments in sales and marketing and expand the Company's global sales and marketing teams.

51.     On November 30, 2017, Nutanix held an earnings conference call with investors and stock analysts to discuss earnings and operations for the first fiscal quarter of 2018 ending on October 31, 2017.  During the call, Company executives discussed Nutanix's transition from a hardware seller to a software subscription model, as well as the impact this change would have on the Company's business and financial prospects.  Defendant Pandey described this shift as the Company's new "software-centric approach to go-to-market and financial reporting."  Defendant Williams explained that the transition would result in significantly higher gross margins with no impact on future growth rates.  In particular, defendant Williams stated:

> All things being equal, the direct impact of this specific change would result in significantly higher software content and significantly higher gross margins with no change to our growth in gross profit dollars.  Probably the most important point to make here is that this change will have absolutely no impact to our future growth rates of our software and support billings, that being the portion of our business today that represents 74% of our billings.  Over time, we would also hope to gain additional selling leverage that naturally comes from focusing on software-only transactions.

**IMPROPER STATEMENTS**

52.     Beginning in March 2018, the Individual Defendants made repeated improper statements about the Company's investments in growth and increase in sales and marketing activities in order to accomplish the Company's stated goal of transitioning to the "software-centric approach."  In truth, the

Individual Defendants breached their fiduciary duties by engaging in or causing the concealment of Nutanix's reallocation of lead generation spending to other priorities, causing a large disruption in the Company's sales execution and slowing its sales growth.  Lead generation spending is vital to the Company because, according to defendant Williams, it "is a key component to building [sales] pipeline, which ultimately, significantly impacts booking, billings and revenue."  However, as revealed on February 28, 2019, the Company did not increase its lead generation spending, but rather held the spending flat, and later actually reduced spending.  As a result, the Individual Defendants were able to improperly claim that Nutanix had improved its profit margins through business acumen, rather than through the Company's decrease in expenditure on important drivers of revenue growth.

53.     On March 1, 2018, after close of trading, Nutanix issued a press release announcing its financial results for the second fiscal quarter of 2018, ended January 31, 2018.  Nutanix reported revenues of $286.7 million, up 44% from the $199.2 million reported in the same fiscal quarter of 2017. The press release reported a record number of new customers and a growing number of large deals. Defendants Pandey and Williams each commented on the second quarter results, stating as follows:

> "We had an outstanding quarter that demonstrated our strong execution across many business initiatives. Our shift toward a software-centric strategy is on track and we aligned our sales compensation in February to support this transition," said Dheeraj Pandey, Chairman, Founder and CEO of Nutanix. "Our continued success with Global 2000 customers, the strength of our large deal execution and record number of new customers prove that we are reducing friction for our customers and providing them with a consumer-grade experience that is unmatched."

> "We are proud of our performance in Q2. During the quarter, we saw record results across all geographies, with particularly strong performances from our EMEA and APJ regions. Our 57% billings year-over-year and our 45% increase in non-GAAP gross profit year-over-year drove a better than expected bottom line," said Duston Williams, CFO of Nutanix. "Our software and support billings also rose significantly during the quarter, demonstrating our progress as we transition to a software-centric business model. Our strong execution on our strategic initiatives, together with our successful convertible debt offering, put us in a strong position for the future."

54.     On March 15, 2018, Nutanix filed its Quarterly Report on Form 10-Q for the second fiscal quarter of 2018 (the "Q2 2018 Form 10-Q") with the SEC.  The Q2 2018 Form 10-Q provided extensive detail about the Company's continued investment in sales and marketing.  In particular, Nutanix stated that it planned "to continue to invest in sales and marketing," intended to "grow [its]

global sales and marketing team," and expected "sales and marketing expense to continue to increase in absolute dollars."  With respect to these sales and marketing initiatives, the Q2 2018 Form 10-Q provided the following:

> We continue to invest heavily in the growth of our business, including the development of our solutions and build-out of our global sales force…. We have also expanded our international sales and marketing presence by continuing to build out our global teams. We intend to continue to invest in our global engineering team to enhance the functionality of our operating system, introduce new products and features and build upon our technology leadership, as well as continue to expand our global sales and marketing teams.
>
> *   *   *
>
> We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000 in committed value.  We have significantly increased our sales and marketing personnel, which grew by approximately 30% from January 31, 2017 to January 31, 2018…. We intend to continue to grow our global sales and marketing team to acquire new end-customers and to increase sales to existing end customers.
>
> *   *   *
>
> We expect sales and marketing expense to continue to increase in absolute dollars as we increase the size of our global sales and marketing organizations.  Our sales and marketing expense may fluctuate as a percentage of total revenue.
>
> *   *   *
>
> The increase in product revenue for the three and six months ended January 31, 2018 reflects increased domestic and international demand for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities.
>
> *   *   *
>
> Sales and marketing expense increased for the three and six months ended January 31, 2018, compared to the same prior year periods, due primarily to higher personnel costs and sales commissions, as our sales and marketing headcount increased by 30% from January 31, 2017 to January 31, 2018.  Additionally, as part of our efforts to penetrate and expand in global markets, we have continually increased our marketing activities related to brand awareness, promotions, trade shows, and partner programs.

55.     On May 24, 2018, Nutanix issued a press release announcing its financial results for the third fiscal quarter of 2018, ended April 30, 2018.  Nutanix reported software and support billings growth of 67% year-over-year.  Nutanix also reported it had expanded gross margins while executing on

its transition to a software-defined business.  Defendant Pandey commented in the press release stating, "Investment in our innovation engine is delivering strong results…. Our continued industry-leading Net Promoter Score proves that a relentless focus on our customers drives our continued success."  The press release also quoted defendant Williams, providing as follows:

> Demand for our solution remains strong as we saw 67 percent growth in software and support billings and 55 percent growth in software and support revenue.  We had strong success in our hiring in the quarter that positions us to deliver on our future growth plans, as we outlined at our March Investor Day," said Duston Williams, CFO of Nutanix. "The continued growth in our software and support billings and gross margin expansion in the quarter demonstrates we are successfully executing on our transition to a software-defined business model."

56.    Also on May 24, 2018, Nutanix held an earnings conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, defendant Pandey reported "accelerated growth," "strong across the board, with billings, revenue and gross margins all ahead of consensus."  Regarding the Company's transition to a software-centric business model, defendant Pandey added that the Company has "managed change immensely well."  Defendant Williams also commented, saying "we were pleased with our results that reflected continued strong growth," and highlighted the Company's hiring performance, stating as follows:

> During the quarter, we added over 60 new sales teams, which is critical to our planned growth for future periods.  We were very pleased with our hiring performance in the quarter.  And although not yet at our planned headcount, we did significantly exceed what we thought was possible when guiding Q3, including, the addition of almost 85 employees from our 2 recent acquisitions, Netsil and Minjar.  This strong hiring performance drove expenses to $232 million in Q3, exceeding the high end of our guidance by $12 million.

57.    On June 12, 2018, Nutanix filed its Quarterly Report on Form 10-Q for the third fiscal quarter of 2018 (the "Q3 2018 Form 10-Q") with the SEC.  With respect to the Company's sales and marketing initiatives, the Q3 2018 Form 10-Q made substantially the same statements as the Q2 2018 Form 10-Q.  In particular, the Form Q3 2018 10-Q provided the following:

> We continue to invest heavily in the growth of our business, including the development of our solutions and build-out of our global sales force.  The number of our full-time employees increased from 2,672 as of April 30, 2017 to 3,709 as of April 30, 2018. ... We have also expanded our international sales and marketing presence by continuing to build

out our global teams.  We intend to continue to invest in our global engineering team to enhance the functionality of our operating system, introduce new products and features and build upon our technology leadership, as well as continue to expand our global sales and marketing teams.

\* \* \*

We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000 in committed value.  We have significantly increased our sales and marketing personnel, which grew by approximately 40% from April 30, 2017 to April 30, 2018. ... We intend to continue to grow our global sales and marketing team to acquire new end customers and to increase sales to existing end customers.

\* \* \*

We expect sales and marketing expense to continue to increase in absolute dollars as we increase the size of our global sales and marketing organizations.  Our sales and marketing expense may fluctuate as a percentage of total revenue.

\* \* \*

The increase in product revenue for the three and nine months ended April 30, 2018 reflects increased domestic and international demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities.

\* \* \*

Sales and marketing expense increased for the three and nine months ended April 30, 2018, as compared to the prior year periods, due primarily to higher personnel costs and sales commissions, as our sales and marketing headcount increased by 40% from April 30, 2017 to April 30, 2018.  Additionally, as part of our efforts to penetrate and expand in global markets, we continue to increase our marketing activities related to brand awareness, promotions, trade shows, and partner programs.

58.     On August 30, 2018, Nutanix issued a press release announcing its financial results for its fourth fiscal quarter and fiscal year 2018, ended July 31, 2018.  For the fourth fiscal quarter of 2018, Nutanix reported 66% year-over-year growth in software and support billings and 78% Non-GAAP gross margins as the Company continued its shift to a software-centric business.  The press release quoted defendants Pandey and Williams, stating as follows:

"We ended the year on a high note with a record quarter on many fronts, positioning us extremely well for the future. We will continue to invest in talent and hybrid cloud technology while incubating strategic multi-cloud investments such as Netsil, Beam, and now Frame," said Dheeraj Pandey, Chairman, Founder and CEO of Nutanix. "Frame increases our addressable market, brings another service to our growing platform, and

adds employees with insurgent mindsets who will help us continue to challenge the status quo."

"***The company's strong achievement of 78 percent non-GAAP gross margin, the best in our history, is the direct result of our successful execution toward a software-defined business model,***" said Duston Williams, CFO of Nutanix. "We're also tracking above our target performance we set using the 'Rule of 40' framework, demonstrating our ability to balance growth and cash flow."

59.     That same day, Nutanix held an earnings conference call with investors and analysts to discuss the Company's earnings and operations.  During the conference call, defendant Pandey repeated the positive results for the fourth quarter of 2018, stating:

Q4 was another fantastic quarter and a great bookend to our fiscal 2018.  We grew our software and subscription business steadily throughout the year, with Q4 year-over-year billings growth of 66% and Q4 year-over-year revenue growth of 49%.  We delivered record performance in several areas, including delivering non-GAAP gross margins of nearly 78% and growing our deferred revenue balance by 71% for the – from the prior year.

*     *     *

In fiscal '18, we delivered close to $1.2 billion in software and support billings, growing 54% year-over-year and added over 3,600 new customers.

60.     Defendant Pandey further highlighted the Company's large amount of new customers and large deals, stating:

Coming to some color in Q4, this quarter, we added approximately 1,000 new customers, bringing our total number to 10,610.  In this last fiscal year, we added nearly as many customers as we had when we IPO-ed 2 years ago.  We now count 710 Global 2000 companies as customers, adding approximately 40 in Q4 2018 and 140 overall in fiscal '18.  Q4 also brought continued momentum in large deals with 46 deals worth more than $1 million; 9 of which were worth more than $3 million and 2 of which were worth more than $5 million.  We closed 201 deals worth more than $1 million in fiscal '18, up from 144 in fiscal '17, and now have 26 customers with a lifetime spend of more than $10 million, up from 11 in fiscal '17.

61.     On September 24, 2018, Nutanix filed its Form 10-K for the fourth quarter and full fiscal year 2018 (the "2018 Form 10-K") with the SEC.  Defendants Pandey, Williams, Long, Bostrom, Conway, Gomo, McAdam, Mhatre, Parks, and Scarpelli signed the 2018 Form 10-K.  With respect to the Company's sales and marketing initiatives, the 2018 Form 10-K made substantially the same statements as the Q3 2018 Form 10-Q.  In particular, the 2018 Form 10-K stated as follows:

We continue to invest heavily in the growth of our business, including the development of our solutions and build-out of our global sales force. ... We have also expanded our international sales and marketing presence by continuing to build out our global teams. We intend to continue to invest in our global engineering team to enhance the functionality of our platform, introduce new products and features and build upon our technology leadership, as well as continue to expand our global sales and marketing teams.

\* \* \*

We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000. ... We intend to continue to grow our global sales and marketing team to acquire new end customers and to increase sales to existing end customers.

\* \* \*

We expect sales and marketing expense to continue to increase in absolute dollars as we increase the size of our global sales and marketing organizations. Sales and marketing expense may fluctuate as a percentage of total revenue.

\* \* \*

The increase in product revenue reflects increased domestic and international demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities.

\* \* \*

Sales and marketing expense increased year-over-year both for fiscal 2017 and fiscal 2018 due primarily to higher personnel-related costs and sales commissions, as our sales and marketing headcount increased by 42% year-over-year in both fiscal 2017 and 2018. ... Additionally, as part of our efforts to penetrate and expand in global markets, we continue to increase our marketing activities related to brand awareness, promotions, trade shows, and partner programs.

62.     On November 27, 2018, Nutanix issued a press release announcing its financial results for the first fiscal quarter of 2019, ended October 31, 2018. Nutanix reported revenue of $313.3 million, up from $275.6 million in the first quarter of fiscal year 2018, and $383.6 million in billings, up from $315.3 million in the first quarter of fiscal 2018. Further, the Company reported an increase in GAAP gross margins to 76.3% from 60.6% in the same period the prior year, and non-GAAP gross margins to 78.6% from 61.9% in the same period the prior year. Defendant Pandey commented in the press release, stating:

- 23 -

> Our results this quarter prove that our core business continues to grow strongly and put us on a solid path to meet our goal of at least $3 billion in software and support billings by 2021. … 51% of our billings in our first quarter were derived from subscriptions, up from 31% in the same quarter last year, and our subscription revenue grew 104% year-over-year. As we look ahead, we expect to continue this shift towards subscription, driving a cloud-like, pay-as-you-grow business model.

63.     That same day, Nutanix held an earnings conference call with investors and analysts, during which defendants Pandey and Williams provided more positive commentary about the Company's business metrics and financial prospects as the Company continued its transition to a software-centric business model.  In his opening remarks, defendant Pandey highlighted the "higher-than-guided revenue, better gross margins and lower operating expenses."  In particular, he stated:

> We had a great start to fiscal 2019, delivering another strong quarter, growing software and support billings by 50% year-over-year to $351 million and software and support revenue by 44% to $281 million.  Notably, subscription revenue increased 104% year-over-year, as we shift our business to an increasingly subscription-based consumption. The combination of higher-than-guided revenue, better gross margins and lower operating expenses drove our net loss per share to $0.13 per share, significantly better than our guidance of a loss between $0.26 and $0.28.

64.     During defendant Williams' opening remarks, he also emphasized the Company's improvement in gross margins, stating that "our non-GAAP gross margins grew in Q1 to 78.6%, up from 61.9% in the year-ago quarter and 77.7% in the prior quarter."  Furthermore, he stated he expected gross margins to be "between 78% and 79%" in the second quarter.

65.     During the question and answer section of the conference call, defendants Pandey and Williams were asked whether the Company's sales pipeline was "growing customers" because "competitors are affirming [their] strategy."  In his response, defendant Pandey made no mention of the Company's reduction in lead generation spending that was affecting the pipeline.  The following exchange took place between an analyst and defendant Pandey:

**Kathryn Lynn Huberty** – *Morgan Stanley, Research Division – MD and Research Analyst*

Question for … Dheeraj first.  You mentioned that hybrid multicloud is becoming a buzzword, and we've certainly heard it from just about every infrastructure hardware, software company this quarter.  So curious how you think it impacts your business.  Are you seeing your pipeline growing customers, coming to you because competitors are affirming your strategy?  Do your salespeople have to spend more time explaining the

difference between your strategy and some of the others?  Just how this evolves as more players follow your lead.

**Dheeraj Pandey** – *Nutanix, Inc. – Co-Founder, Chairman & CEO*

Yes, thanks, Katy.  Yes, I think we definitely go and talk from the position of our strength as opposed to a position of someone else's strength.  And many of the customers, we go and talk about their adjacency and our adjacency.  Their adjacency is on-prem right now.  And our adjacency is on-prem, which is software-defined infrastructure.  And then we go talk about disaster recovery as a service, like, hey, about the first crawl piece of this multicloud journey where we can do one-click failover and testing and failback and fix that, then all of a sudden, the app is mobile because we did all the work with runbook automation and shipping data and things like that.  So we basically start with our adjacencies and then, there's all these multicloud services that are very adjacent to Nutanix like desktops, it's very adjacent to what we have really understood and embraced in the last 7, 8 years.  We probably are one of the strongest companies to understand end user computing experiences across Citrix and VMware and now with Frame itself.  And now people are asking about Frame to be extremely multicloud, used by AWS credits, used by Azure credits.  I talked about one of our experiences with co-selling with Google G Suite itself.  So I think we are going and navigating this multicloud buzzword around our adjacencies so we don't talk fluff, I think, because most of the money is still coming from computed storage and networking and security and some of these workloads around that, like, files, like databases, like desktops.  So I think we asked our sellers and – to actually go and focus on workloads because workloads and applications is where most journeys actually begin.

66.     When asked about the fact that Nutanix's software and support billings came down in the quarter, defendant Williams asserted that it was to be expected, as reflected in the following exchange:

**Kathryn Lynn Huberty** – *Morgan Stanley, Research Division – MD and Research Analyst*

Understood.  And Duston, software and support billings came down a bit this quarter.  Is that just new seasonality as the business scales?  Or was there some impact of the subscription transition in the quarter?  If so, how much?

**Duston M. Williams** – *Nutanix, Inc. – CFO*

Yes – no, there really wasn't any impact to say on the subscription piece.  Actually, when you look at the length of these new licenses, the $20 million, it's slightly higher than the 3.6 average.  So there really wasn't any tilt to one year or anything like that in that.  But we had – and just looking and addressing billings in total, we had the guided billings down actually in Q1.  We came off a really strong Q3, a really strong Q4 into a seasonally soft Q1 so that we had guided $370 million to $390 million of total billings.  And obviously, we came in at roughly $384 million, so close to the top end of that range.  So it was kind of as expected there and the pieces kind of fell out as they did.

67.     On December 10, 2018, Nutanix filed its Quarterly Report on Form 10-Q for the first quarter of fiscal 2019 (the "Q1 2019 Form 10-Q") with the SEC.  With respect to the Company's sales and marketing initiatives, the Q1 2019 Form 10-Q made substantially the same statements as the 2018 Form 10-K.  Concerning the Company's sales and marketing efforts, the Q1 2019 Form 10-Q stated as follows:

> We continue to invest heavily in the growth of our business, including the development of our solutions and build-out of our global sales force.  The number of our full-time employees increased from approximately 3,010 as of October 31, 2017 to approximately 4,380 as of October 31, 2018. ... We have also expanded our international sales and marketing presence by continuing to build out our global teams.  We intend to continue to invest in our global engineering team to enhance the functionality of our platform, introduce new products and features and build upon our technology leadership, as well as continue to expand our global sales and marketing teams.
>
> *   *   *
>
> We expect sales and marketing expense to continue to increase in absolute dollars as we increase the size of our global sales and marketing organizations.  Sales and marketing expense may fluctuate as a percentage of total revenue.
>
> *   *   *
>
> The increase in product revenue for the three months ended October 31, 2018 reflects increased demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities.
>
> *   *   *
>
> Sales and marketing expense increased for the three months ended October 31, 2018, as compared to the prior year period, due primarily to higher personnel-related costs, including stock-based compensation expense, as our sales and marketing headcount increased by 40% from October 31, 2017 to October 31, 2018.  Additionally, as part of our efforts to penetrate and expand in global markets, we continue to increase our marketing activities related to brand awareness, promotions, trade shows and partner programs.

## THE TRUTH EMERGES

68.     The truth behind the Company's business prospects and the Individual Defendants' wrongdoing began to emerge on February 28, 2019, when Nutanix issued a press release announcing its financial results for its second fiscal quarter of 2019, ended January 31, 2019.  Nutanix reported revenues of $335.4 million, up from $286.7 million in the second quarter of fiscal year 2018, and $413.4

million in billings, up from $355.9 million in the second quarter of fiscal year 2018.   Defendant Williams, however, surprised the market when he revealed the repercussions of the Company's inadequate marketing spending and slow sales hiring stating, "Looking ahead, our third quarter guidance reflects the impact of inadequate marketing spending for pipeline generation and slower than expected sales hiring.  We took a critical look at these areas and have taken actions to address them."  With this hindsight, it became apparent that Nutanix's improved gross margins came from the Company's decision to reallocate lead generation spending, instead of its change in business model as the Officer Defendants represented.

69.     Also on February 28, 2019, Nutanix held an earnings conference call with investors and stock analysts to discuss the Company's second fiscal quarter 2019 results and financial prospects.  During this call, defendant Pandey revealed that "imbalances" in lead generation spending and the Company's failure to keep pace with sales hiring goals negatively impacted its sales pipeline.  Defendant Pandey stated:

> I'd like to take you through 3 key areas of our business where we're making adjustments to maximize our strong market opportunity.  First, we recently identified some imbalances in our lead generation spending that were beginning to impact our sales pipeline.  We recognize these imbalances in Q2 and have adjusted our lead generation spend accordingly.  Despite these, these actions will take some time to take effect and therefore, our Q3 guidance reflects the short term impact of these imbalances.  The changes we implemented are already showing early positive signs at the top of the funnel, and we expect to see increasing traction in our sales pipeline over the coming quarters.  Duston will provide more details on these imbalances and our actions taken later in the call.
>
> Second, over the past few quarters, we have not kept pace with our bullish sales hiring goals.  This plays a role in our sales pipeline development.  Hiring at this scale is an art and there's an ebb and flow to the process.  We've been putting more focus on this aspect of our execution as we don't foresee any macro weakness in the horizon.

70.     Defendant Williams further discussed the "imbalances" in the Company's lead generation spending and its effect on the sales pipeline.  Notably, defendant Williams explained that lead generation spending was "a key component to building pipeline, which, ultimately, significantly impacts bookings, billings and revenue."  Despite this admission, he stated that the Company "reallocated …

- 27 -

lead generation spending to other priorities," and as a result, held lead generation spending flat and later decreased it.  Concerning Nutanix's missed pipeline targets, defendant Williams stated:

> Now turning to the guidance for the third quarter.  And before getting into the line item detail, let me step back a bit and provide some additional context for our Q2 performance and our third quarter guidance.
>
> In Q2, while we were pleased with our progress with moving to a recurring subscription business as well as with our large deals and EMEA performance, we were disappointed to miss our pipeline targets.  Generally speaking, our Q2 quarter, that should afford us to build backlog and that did not happen this year.
>
> As Dheeraj discussed at the beginning of the call, we recently identified some imbalances in our lead generation spending that were beginning to impact our sales pipeline.  Lead generation spending is a key component to building pipeline, which, ultimately, significantly impacts bookings, billings and revenue.  In fiscal '18 – I'm sorry in fiscal '17, we had increased lead generation spend by 75% over the prior year.  This increase drove strong pipeline generation in fiscal '17 and fiscal '18 as well as improved efficiencies within the lead generation spend during fiscal '18.
>
> Encouraged by our overall company performance, in fiscal '18, we reallocated some of our lead generation spending to other priorities.  As a result, there was a 4 quarter period from Q4 '17 to Q3 '18 that we basically kept lead generation spend flat, all while the company continued to perform quite well.  Based on lead generation spend efficiencies we experienced in FY '18, we assumed further efficiencies would take place in FY '19 and we again reallocated capital away from lead generation spend during our planning process.
>
> In Q2, we noticed a pattern that some of our lead generation efficiencies that we had planned for were not being realized.  We began taking actions to reallocate capital back to lead generation spending, while at the same time dialing back on non-sales hiring.  We have continued these actions into Q3.
>
> Our quota-carrying sales reps also contribute to pipeline build, and our pipeline targets were further impacted by a shortage of sales reps in the first half of the fiscal year, resulting in an underspend by several million dollars.
>
> It's important to note that all this shifting of spend back to lead generation is not an insignificant amount, the magnitude of the shift is in a few tens of millions.  Although we started making this adjustment in Q2, we expect it to take a couple of quarters to show meaningful results.
>
> In the meantime, we will double down on driving further business from within our large existing Enterprise customer base, while the augmented lead generation spending works its way into the pipeline.

71.     Defendant Williams also provided guidance for the third fiscal quarter of 2019 significantly below street estimates.  Adding to his comments about the "magnitude of the shift" back to lead generation spending, he highlighted the significant impact the decrease in lead generation spending would have on the Company's financial prospects.  Specifically, the Company's guidance for revenue and gross margins came well below street estimates.  In particular, defendant Williams stated:

> This brings us to our guidance for Q3, where we expect significant impact from an imbalance in lead generation spending earlier in the year and slower-than-expected sales hiring.  However, we believe that our actions to address these factors, combined with better sales execution, will drive improved pipeline build into Q4, which we expect to leave us in a solid position as we enter FY '20.
>
> Now turning to specific details of the guidance.  On a non-GAAP basis, we expect – for Q3, we expect the following: billings between $360 million and $370 million; revenue between $290 million and $300 million; gross margins between 75% and 76%; operating expenses between $330 million and $340 million; and a per-share loss of approximately $0.60, using weighted average shares outstanding of $183 million.

72.     By contrast, as stated by Wells Fargo Securities in a February 28, 2019 analyst report, street consensus estimated revenue of $348 million, gross margins of 79%, non-GAAP operating expenses of $326.4 million, and non-GAAP earnings per share of a loss of $0.28 per share.

73.     In response to a question from an analyst about whether the impact to the results could be isolated exclusively to lead generation, defendant Pandey asserted that slow sales hiring and the lack of lead generation spending accounted for 80% of the lowered guidance.  In particular, Pandey stated:

> I think with sales hiring and lead generation, were the two inputs that were shy of, and most of it – in an 80-20 kind of argument, I think 80% of it can be contributed to these 2 actually. 20% obviously relates to better sales execution, with the same inputs, could have better outputs.

74.     On this news, Nutanix's stock price plunged more than 33%, or $16.39 per share, on March 1, 2019, to close at $33.70 per share compared to the previous trading day's closing of $50.09 per share, erasing over $2.4 billion in market capitalization in a single day.

## REASONS THE STATEMENTS WERE IMPROPER

75.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     that the Company did not intend to heavily increase its investments in sales and marketing during the relevant time period;

(b)     that the Company's lead generation spending remained flat or declined during the relevant time period;

(c)     that the Company's higher gross margins were driven by the reallocation of lead generation spending, rather than improved business operations; and

(d)     as a result of the foregoing, defendants' representations were materially false and misleading at all relevant times.

## INSIDER SALES BY DEFENDANTS

76.     Rather than providing the market with correct information, the Insider Selling Defendants, defendants Parks, Vadakkedath, Williams, Sangster, Attanasio, Long, Scarpelli, McAdam, Wall, and Gomo, used their knowledge of Nutanix's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Nutanix, defendants were privy to material, nonpublic information about the Company's true business health.  While in possession of this knowledge:

77.     Defendant Parks sold 1,867,264 shares of his personally held Nutanix stock for proceeds of over $70.8 million.  Defendant Parks' sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Parks' sales are also suspicious given that his stock sales represented over 97% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 1,969,755 |
| Shares Sold During the Sales Period ("SP") | 1,867,264 |
| Shares Disposed (Other) During SP | 2,200 |
| Total Shares Held During SP | 1,910,968 |
| Shares Remaining SP | 41,504 |
| **Total Proceeds from Sales** | **$70,860,576.44** |
| **% of Total Ownership Sold During SP** | **97.71%** |

78.     Defendant Vadakkedath sold 320,000 shares of his personally held Nutanix stock for proceeds of over $16.6 million.  Defendant Vadakkedath's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Vadakkedath's sales are also suspicious given that his stock sales represented over 40% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 461,356 |
|---|---|
| Shares Sold During SP | 320,000 |
| Shares Disposed (Other) During SP | 25,310 |
| Total Shares Held During SP | 792,356 |
| Shares Remaining SP | 447,046 |
| **Total Proceeds from Sales** | **$16,638,468.00** |
| **% of Total Ownership Sold During SP** | **40.39%** |

79.    Defendant Williams sold 300,000 shares of his personally held Nutanix stock for proceeds of over $16.2 million.  Defendant Williams' sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Williams' sales are also suspicious given that his stock sales represented over 52% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 89,227 |
|---|---|
| Shares Sold During SP | 300,000 |
| Shares Disposed (Other) During SP | 64,959 |
| Total Shares Held During SP | 575,588 |
| Shares Remaining SP | 210,629 |
| **Total Proceeds from Sales** | **$16,237,576.38** |
| **% of Total Ownership Sold During SP** | **52.12%** |

80.    Defendant Sangster sold 224,036 shares of his personally held Nutanix stock for proceeds of over $11 million.  Defendant Sangster's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Sangster's sales are also suspicious given that his stock sales represented over 86% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 0 |
|---|---|
| Shares Sold During SP | 224,036 |
| Shares Disposed (Other) During SP | 34,379 |
| Total Shares Held During SP | 258,415 |
| Shares Remaining SP | 0 |
| **Total Proceeds from Sales** | **$11,194,665.75** |
| **% of Total Ownership Sold During SP** | **86.70%** |

81.    Defendant Attanasio sold 134,499 shares of his personally held Nutanix stock for proceeds of over $5.5 million.  Defendant Attanasio's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Attanasio's sales are also suspicious given that his stock sales represented over 53% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 0 |
|---|---|
| Shares Sold During SP | 134,499 |
| Shares Disposed (Other) During SP | 115,501 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | |
|---|---|
| Total Shares Held During SP | 250,000 |
| Shares Remaining SP | 0 |
| **Total Proceeds from Sales** | **$5,559,951.34** |
| **% of Total Ownership Sold During SP** | **53.80%** |

82.    Defendant Long sold 92,002 shares of his personally held Nutanix stock for proceeds of over $5 million.  Defendant Long's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Long's sales are also suspicious given that his stock sales represented nearly 40% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 176,171 |
| Shares Sold During SP | 92,002 |
| Shares Disposed (Other) During SP | 10,724 |
| Total Shares Held During SP | 232,542 |
| Shares Remaining SP | 129,816 |
| **Total Proceeds from Sales** | **$5,147,177.52** |
| **% of Total Ownership Sold During SP** | **39.56%** |

83.    Defendant Scarpelli sold 50,000 shares of his personally held Nutanix stock for proceeds of over $3 million.  Defendant Scarpelli's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Scarpelli's sales are also suspicious given that his stock sales represented nearly 86% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 50,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 58,165 |
| Shares Remaining SP | 8,165 |
| **Total Proceeds from Sales** | **$3,049,465.00** |
| **% of Total Ownership Sold During SP** | **85.96%** |

84.    Defendant McAdam sold 30,000 shares of his personally held Nutanix stock for proceeds of over $1.4 million.  Defendant McAdam's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant McAdam's sales are also suspicious given that his stock sales represented nearly 40% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 45,331 |
| Shares Sold During SP | 30,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 76,856 |
| Shares Remaining SP | 46,856 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Total Proceeds from Sales | $1,441,343.43 |
|---|---|
| % of Total Ownership Sold During SP | 39.03% |

85.     Defendant Wall sold 34,144 shares of his personally held Nutanix stock for proceeds of over $1.3 million.  Defendant Wall's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Wall's sales are also suspicious given that his stock sales represented over 45% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 0 |
|---|---|
| Shares Sold During SP | 34,144 |
| Shares Disposed (Other) During SP | 40,856 |
| Total Shares Held During SP | 75,335 |
| Shares Remaining SP | 335 |
| Total Proceeds from Sales | $1,378,113.30 |
| % of Total Ownership Sold During SP | 45.32% |

86.     Defendant Gomo sold 5,312 shares of his personally held Nutanix stock for proceeds of $278,908.68.  Defendant Gomo's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.

87.     In sum, the Insider Selling Defendants sold over $131 million worth of stock at artificially inflated prices as detailed by the table below.

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| ATTANASIO Former Chief Revenue Officer | 12/19/2018 | 95,314 | $41.20 | $3,926,822.42 |
| | 12/19/2018 | 39,185 | $41.68 | $1,633,128.92 |
| | | 134,499 | Total (Sales) | $5,559,951.34 |
| | | | | |
| GOMO Current Director | 9/18/2018 | 5,312 | $52.51 | $278,908.68 |
| | | 5,312 | Total (Sales) | $278,908.68 |
| | | | | |
| LONG Former Chief Accounting Officer, Vice President, and Corporate Controller | 3/14/2018 | 32,002 | $54.36 | $1,739,657.52 |
| | 4/4/2018 | 30,000 | $50.22 | $1,506,513.00 |
| | 6/13/2018 | 30,000 | $63.37 | $1,901,007.00 |
| | | 92,002 | Total (Sales) | $5,147,177.52 |
| | | | | |
| MCADAM Current Director | 9/10/2018 | 8,146 | $51.15 | $416,666.27 |
| | 9/10/2018 | 6,854 | $51.83 | $355,262.70 |
| | 12/3/2018 | 12,967 | $44.52 | $577,351.78 |
| | 12/3/2018 | 1,933 | $45.22 | $87,409.68 |
| | 12/3/2018 | 100 | $46.53 | $4,653.00 |
| | | 30,000 | Total (Sales) | $1,441,343.43 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| **PARKS** **Current Director** | 3/2/2018 | 1,054,873 | $37.94 | $40,021,881.62 |
| | 3/2/2018 | 371,803 | $37.94 | $14,106,205.82 |
| | 3/2/2018 | 432,275 | $37.94 | $16,400,513.50 |
| | 12/17/2018 | 8,313 | $39.93 | $331,975.50 |
| | | **1,867,264** | **Total (Sales)** | **$70,860,576.44** |
| | | | | |
| **SANGSTER** **Current Chief** **Operating Officer** | 3/12/2018 | 40,049 | $49.63 | $1,987,695.95 |
| | 3/12/2018 | 27,422 | $50.70 | $1,390,325.56 |
| | 3/12/2018 | 32,611 | $51.34 | $1,674,144.38 |
| | 3/15/2018 | 4,900 | $53.56 | $262,453.80 |
| | 3/19/2018 | 6,625 | $52.66 | $348,859.91 |
| | 4/2/2018 | 7,017 | $47.94 | $336,374.63 |
| | 4/2/2018 | 900 | $48.80 | $43,923.96 |
| | 5/1/2018 | 5,088 | $50.73 | $258,105.08 |
| | 5/1/2018 | 2,829 | $51.73 | $146,339.64 |
| | 6/1/2018 | 2,529 | $54.41 | $137,591.26 |
| | 6/1/2018 | 1,801 | $55.44 | $99,843.30 |
| | 6/1/2018 | 3,586 | $56.60 | $202,978.00 |
| | 6/19/2018 | 700 | $60.03 | $42,024.01 |
| | 6/19/2018 | 5,084 | $61.00 | $310,124.51 |
| | 6/19/2018 | 2,582 | $61.62 | $159,094.58 |
| | 6/19/2018 | 500 | $62.95 | $31,474.00 |
| | 7/2/2018 | 1,133 | $50.92 | $57,689.30 |
| | 7/2/2018 | 5,409 | $51.60 | $279,100.61 |
| | 7/2/2018 | 1,375 | $52.27 | $71,869.05 |
| | 8/1/2018 | 7,417 | $49.30 | $365,634.37 |
| | 8/1/2018 | 500 | $49.83 | $24,914.00 |
| | 9/4/2018 | 2,000 | $54.94 | $109,886.00 |
| | 9/4/2018 | 5,916 | $56.02 | $331,420.24 |
| | 9/18/2018 | 1,500 | $49.13 | $73,696.05 |
| | 9/18/2018 | 6,771 | $49.94 | $338,173.53 |
| | 9/18/2018 | 100 | $50.57 | $5,057.00 |
| | 10/1/2018 | 7,617 | $43.50 | $331,344.07 |
| | 10/1/2018 | 300 | $44.12 | $13,236.51 |
| | 11/1/2018 | 2,001 | $41.40 | $82,845.20 |
| | 11/1/2018 | 2,500 | $42.41 | $106,037.00 |
| | 11/1/2018 | 3,415 | $43.35 | $148,036.84 |
| | 12/3/2018 | 7,317 | $44.55 | $325,974.55 |
| | 12/3/2018 | 500 | $45.53 | $22,766.00 |
| | 12/3/2018 | 100 | $46.54 | $4,654.00 |
| | 12/19/2018 | 3,211 | $40.12 | $128,836.56 |
| | 12/19/2018 | 4,598 | $41.33 | $190,018.79 |
| | 12/19/2018 | 300 | $41.80 | $12,540.00 |
| | 1/2/2019 | 3,150 | $41.45 | $130,559.63 |
| | 1/2/2019 | 4,767 | $41.97 | $200,088.15 |
| | 2/1/2019 | 7,716 | $51.65 | $398,516.74 |
| | 2/1/2019 | 200 | $52.10 | $10,419.00 |
| | | **224,036** | **Total (Sales)** | **$11,194,665.75** |
| | | | | |
| **SCARPELLI** **Current Director** | 6/20/2018 | 50,000 | $60.99 | $3,049,465.00 |
| | | **50,000** | **Total (Sales)** | **$3,049,465.00** |
| | | | | |
| **VADAKKEDATH** | 3/5/2018 | 40,000 | $38.73 | $1,549,200.00 |

| | | | | |
|---|---|---|---|---|
| **Former President** | 3/19/2018 | 40,000 | $52.37 | $2,094,800.00 |
| | 4/2/2018 | 40,000 | $48.28 | $1,931,200.00 |
| | 4/16/2018 | 40,000 | $53.58 | $2,143,200.00 |
| | 5/7/2018 | 40,000 | $54.19 | $2,167,600.00 |
| | 5/21/2018 | 40,000 | $58.41 | $2,336,400.00 |
| | 6/4/2018 | 20,000 | $56.44 | $1,128,868.00 |
| | 6/18/2018 | 20,000 | $60.66 | $1,213,200.00 |
| | 7/6/2018 | 40,000 | $51.85 | $2,074,000.00 |
| | | 320,000 | **Total (Sales)** | **$16,638,468.00** |
| **WALL**<br>**Current Chief Legal**<br>**Officer** | 12/28/2018 | 34,144 | $40.36 | $1,378,113.30 |
| | | 34,144 | **Total (Sales)** | **$1,378,113.30** |
| **WILLIAMS**<br>**Current Chief Financial**<br>**Officer** | 5/31/2018 | 167,600 | $53.56 | $8,976,421.36 |
| | 6/1/2018 | 56,662 | $54.40 | $3,082,288.14 |
| | 6/1/2018 | 75,738 | $55.18 | $4,178,866.87 |
| | | 300,000 | **Total (Sales)** | **$16,237,576.38** |
| | | | | |
| | **Total** | **3,057,257** | **Total (Sales)** | **$131,786,245.84** |

## DAMAGES TO NUTANIX

88.     As a result of the Individual Defendants' improprieties, Nutanix disseminated improper, public statements concerning the Company's sales and marketing efforts and improved business prospects.    These improper statements have devastated Nutanix's credibility as reflected by the Company's almost $4.3 billion, or 51.42%, market capitalization loss.

89.     Nutanix's performance issues also damaged its reputation within the business community and in the capital markets.   In addition to price, Nutanix's current and potential customers consider a company's ability to accurately value its business prospects and evaluate its sales and growth potential. Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions.   Nutanix's ability to raise equity capital or debt on favorable terms in the future is now impaired.   In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

90.     Further, as a direct and proximate result of the Individual Defendants' actions, Nutanix has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)      costs incurred from defending and paying any settlement or judgment in the federal securities class actions; and

(b)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to Nutanix.

91.      In addition, since the Insider Selling Defendants utilized the Company's nonpublic information to sell their stock, they must disgorge any profits from these sales back to Nutanix.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.      Plaintiff brings this action derivatively in the right and for the benefit of Nutanix to redress injuries suffered, and to be suffered, by Nutanix as a direct result of breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Nutanix is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.      Plaintiff will adequately and fairly represent the interests of Nutanix in enforcing and prosecuting its rights.

94.      Plaintiff has continuously been a stockholder of Nutanix since June 6, 2018.

95.      The current Board of Nutanix consists of the following nine individuals: defendants Bostrom, Conway, Gomo, McAdam, Mhatre, Pandey, Parks, Scarpelli, and non-defendant Brian Stevens.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

96.      As alleged above, defendants Pandey, Bostrom, Conway, Gomo, McAdam, Mhatre, Parks, and Scarpelli breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding Nutanix's business practices, financials, financial prospects, and disclosure controls.  Accordingly, all of these Director Defendants face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

97.      Defendants Gomo, Parks, and Scarpelli, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides

that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

98.     Defendants Gomo, McAdam, Parks, and Scarpelli each sold Nutanix stock under highly suspicious circumstances.  As members of the Board, including members of the Audit Committee, these defendants possessed material, nonpublic Company information and used that information to benefit themselves.  These defendants sold stock based on this knowledge of material, nonpublic Company information regarding the Company's reduction in sales and marketing spending and the impending decrease in the value of their holdings of Nutanix.  Accordingly, defendants Gomo, McAdam, Parks, and Scarpelli face a substantial likelihood of liability for breach of their fiduciary duty of loyalty.  Any demand upon these defendants is futile.

99.     The principal professional occupation of defendant Pandey is his employment with Nutanix, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above (over $11 million in total compensation in 2018).  Accordingly, defendant Pandey lacks independence from the current Board due to his interest in maintaining his position as CEO at Nutanix.  This lack of independence renders defendant Pandey incapable of impartially considering a demand to commence and vigorously prosecute this action.  Demand is futile as to defendant Pandey.

100.    Defendant Bostrom's occupation is serving as a professional board member.  She currently sits on the boards of six companies—Anaplan, Cadence Design System, Druva, GitLab, Nutanix, and ServiceNow—and holds no executive positions.  Since retiring from her position at Cisco Systems in 2011, defendant Bostrom has also served as a director of Apttus, Spredfast, Marketo, Rocket

Fuel, and Varian Medical Systems.  In 2018 alone, defendant Bostrom earned over $1.5 million in compensation from her directorship positions.  Given the lucrative compensation defendant Bostrom earns from these directorships and her lack of any other employment, defendant Bostrom will not take steps that will jeopardize her chances to serve on boards, whether currently or in the future.  One such action would be initiating litigation against the Individual Defendants, including Company cofounder, defendant Pandey.  A reputation for willingness to sue founders of companies or other fiduciaries will make it less likely that defendant Bostrom will be selected to serve on boards in the future, jeopardizing her substantial and, on information and belief, primary source of income.  Accordingly, there is a reason to doubt defendant Bostrom can disinterestedly and independently consider a demand.

101.    Defendant Mhatre is the Founding Partner and Managing Director of Lightspeed Venture Partners ("Lightspeed"), a global technology venture capital firm.  Lightspeed was one of Nutanix's earliest investors, participating in each of Nutanix's Series A, B, and C financing rounds prior to the Company's initial public offering ("IPO"), and was Nutanix's largest stockholder as of October 18, 2018.  At the time of Nutanix's IPO, Lightspeed's stake in Nutanix was worth approximately $1 billion, a more than hundred-fold return on its investment.  Additionally, immediately prior to the Company's IPO, Nutanix acquired software company PernixData, Inc., a Lightspeed portfolio company.  Lightspeed received additional Nutanix equity in Nutanix's acquisition of PernixData, Inc.  Accordingly, defendant Mhatre has made or stands to make a substantial amount of money from Lightspeed's investment in Nutanix.  This investment was made possible by defendant Pandey, the Company's cofounder.  Defendant Mhatre will not vote to initiate litigation against defendant Pandey due to defendant Pandey being responsible for defendant Mhatre's company, Lightspeed, making hundreds of millions of dollars.

102.    Defendant Mhatre will also not vote to initiate litigation against defendant Pandey, a cofounder of Nutanix, due to the reputational damage it would cause Lightspeed.  If defendant Mhatre, and as a result Lightspeed, acquired a reputation for suing founders, it would dissuade founders of other companies from partnering with Lightspeed.  This loss of business is too great a risk for defendant Mhatre.

103.    Plaintiff has not made any demand on the other stockholders of Nutanix  to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Nutanix is a publicly held company with over 185 million shares outstanding and thousands of stockholders as of May 31, 2019;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    The Individual Defendants owed and owe Nutanix fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Nutanix the highest obligation of good faith, fair dealing, loyalty, and due care.

106.    The Individual Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty.

107.    The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company did not intend to heavily increase its investments in sales and marketing during the relevant time period; (ii) the Company's lead generation spending remained flat or decreased during the relevant time period; and (iii) the Company's higher gross margins were driven by the reallocation of lead generation spending, rather than improved business operations.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

108.    The Director Defendants, as directors of the Company, owed Nutanix the highest duty of loyalty.  These defendants breached their duty of loyalty by at least recklessly permitting the improper activity concerning Nutanix's business and financial prospects.  The Director Defendants knew or were reckless in not knowing that: (i) the Company did not intend to heavily increase its investments in sales and marketing during the relevant time period; (ii) the Company's lead generation spending remained flat or decreased during the relevant time period; and (iii) the Company's higher gross margins were driven by the reallocation of lead generation spending, rather than improved business operations.

1   Accordingly, these defendants breached their duty of loyalty to the Company.

2   109.   The Audit Committee Defendants breached their fiduciary duty of loyalty by approving

3   the statements described herein which were made during their tenure on the Audit Committee, which

4   they knew or were reckless in not knowing contained improper statements and omissions.  The Audit

5   Committee Defendants failed in their duty to appropriately review financial results, as required by the

6   Audit Committee Charter in effect at the time.

7   110.   The Insider Selling Defendants breached their duty of loyalty by selling Nutanix stock on

8   the basis of the knowledge of the improper information described above before that information was

9   revealed to the Company's stockholders.  The information described above was material, nonpublic

10   information concerning the Company's future business prospects.  It was a proprietary asset belonging to

11   the Company, which the Insider Selling Defendants used for their own benefit when they sold Nutanix

12   common stock.

13   111.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary

14   obligations, Nutanix has sustained significant damages, as alleged herein.  As a result of the misconduct

15   alleged herein, these defendants are liable to the Company.

16   112.   Plaintiff, on behalf of Nutanix, has no adequate remedy at law.

17   ## <u>COUNT II</u>

18   **Against the Individual Defendants for Waste of Corporate Assets**

19   113.   Plaintiff incorporates by reference and realleges each and every allegation contained

20   above, as though fully set forth herein.

21   114.   As a result of Individual Defendants' failure to properly supervise and monitor the

22   adequacy of Nutanix's disclosure controls and procedures, the Individual Defendants have caused

23   Nutanix to waste its assets by paying improper compensation and bonuses to certain of its executive

24   officers and directors that breached their fiduciary duty.

25   115.   As a result of the waste of corporate assets, the Individual Defendants are liable to the

26   Company.

27   116.   Plaintiff, on behalf of Nutanix, has no adequate remedy at law.

28

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Nutanix.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Nutanix.

119.    The Insider Selling Defendants sold Nutanix stock while in possession of material, nonpublic information that artificially inflated the price of Nutanix stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

120.    Plaintiff, as a stockholder and representative of Nutanix, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

121.    Plaintiff, on behalf of Nutanix, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Nutanix, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.    Directing Nutanix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nutanix and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1          1.     a proposal to control insider selling;

2          2.     a proposal to strengthen the Company's oversight of its disclosure procedures
3 concerning the Company's sales and marketing initiatives;

4          3.     a proposal to strengthen the Board's oversight of new business initiatives,
5 including lead generation;

6          4.     a proposal to strengthen the Board's supervision of operations and develop and
7 implement procedures for greater stockholder input into the policies and guidelines of the Board; and

8          5.     a provision to permit the stockholders of Nutanix to nominate at least three
9 candidates for election to the Board;

10     C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state
11 statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on,
12 or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure
13 that plaintiff on behalf of Nutanix has an effective remedy;

14     D.     Awarding to Nutanix restitution from defendants, and each of them, and ordering
15 disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all
16 ill-gotten gains from insider selling by defendants;

17     E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable
18 attorneys' fees, accountants' and experts' fees, costs, and expenses; and

19     F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

21     Plaintiff demands a trial by jury.

22 Dated: July 1, 2019             ROBBINS ARROYO LLP
23                        BRIAN J. ROBBINS
                            CRAIG W. SMITH
24                        SHANE P. SANDERS

25                          /s/*Brian J. Robbins*
                           BRIAN J. ROBBINS

26                        5040 Shoreham Place
27                        San Diego, CA 92122
                        Telephone: (619) 525-3990
28                        Facsimile (619) 525-3991
                        E-mail: brobbins@robbinsarroyo.com

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

csmith@robbinsarroyo.com
ssanders@robbinsarroyo.com

Attorneys for Plaintiff

1365469

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Aravind Bhonagiri, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 6/30/2019

_____
ARAVIND BHONAGIRI