1  ROBBINS LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsllp.com
   CRAIG W. SMITH (164886)
3  csmith@robbinsllp.com
   SHANE P. SANDERS (237146)
4  ssanders@robbinsllp.com
   5040 Shoreham Place
5  San Diego, CA 92122
   Telephone: (619) 525-3990
6  Facsimile: (619) 525-3991

7  Lead Counsel for Plaintiffs

8  [Additional Counsel on Signature Page]

9                UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12  IN RE NUTANIX, INC. STOCKHOLDER          )  Lead Case No. 3:19-CV-03817-WHO
    DERIVATIVE LITIGATION                    )
13                                           )  (Consolidated with Case No. 3:19-cv-03821-
                                             )  WHO)
14  _____ )
                                             )
15  This Document Relates To:                )  VERIFIED CONSOLIDATED AMENDED
                                             )  STOCKHOLDER DERIVATIVE
16     ALL ACTIONS.                          )  COMPLAINT FOR BREACH OF
                                             )  FIDUCIARY DUTY, WASTE OF
17                                           )  CORPORATE ASSETS, UNJUST
                                             )  ENRICHMENT, VIOLATION OF THE
18                                           )  SECURITIES EXCHANGE ACT OF 1934,
                                             )  AND CONTRIBUTION
19                                           )
    _____ )  DEMAND FOR JURY TRIAL
20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ...................................................................2

JURISDICTION AND VENUE ...........................................................................................11

INTRADISTRICT ASSIGNMENT ......................................................................................11

THE PARTIES ......................................................................................................................11

    Plaintiffs .........................................................................................................................11

    Nominal Defendant ........................................................................................................12

    Defendants ......................................................................................................................12

    Relevant Non-Parties .....................................................................................................17

DUTIES OF THE INDIVIDUAL DEFENDANTS .............................................................20

    Fiduciary Duties .............................................................................................................20

    Breaches of Duties .........................................................................................................24

    Additional Duties of the Audit Committee Defendants .................................................25

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION....................26

FACTUAL BACKGROUND ................................................................................................28

    Company Background .....................................................................................................28

    Lead Generation .............................................................................................................29

    Sales Personnel ..............................................................................................................30

    Nutanix's "Core" Hyper-converged Infrastructure Technology ...................................32

    Nutanix's Sales Pipeline Becomes Substantially Depleted by April or May 2018....................34

    The Individual Defendants Concealed the Company's Flat Lead Generation Spending and "Massive" Sales Force Attrition..................................................................38

IMPROPER STATEMENTS.................................................................................................40

    The November 2017 False and Misleading Statements....................................................41

    The December 2017 False and Misleading Statements ...................................................41

    The March 2018 False and Misleading Statements ........................................................43

    The May 2018 False and Misleading Statements ..........................................................45

    The June 2018 False and Misleading Statements ..........................................................47

The August 2018 False and Misleading Statements ..................................................48

The September 2018 False and Misleading Statements ...........................................49

The November 2018 False and Misleading Statements...........................................50

The December 2018 False and Misleading Statements ...........................................50

REASONS THE STATEMENTS WERE IMPROPER .......................................................51

AS THE TRUTH BEGINS TO EMERGE, DEFENDANTS CONTINUE  TO MISLEAD THE MARKET...................................................................................................56

The Individual Defendants Reveal that Nutanix Underspent on Lead Generation and Under Hired Sales Personnel, but Downplay the Impact of Their Actions ..............................56

Defendants Finally Reveal the Impact of Nutanix's Underinvestment in Lead Generation and Under Hiring of Sales Personnel is Far Worse than Previously Disclosed ..................63

INSIDER SALES BY THE INDIVIDUAL DEFENDANTS ...........................................65

DAMAGES TO NUTANIX ...................................................................................................71

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS .........................................71

Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct ...............................................................................72

COUNT I – Against the Individual Defendants for Breach of Fiduciary Duty.........................78

COUNT II – Against the Individual Defendants for Waste of Corporate Assets......................79

COUNT III – Against the Individual Defendants for Unjust Enrichment.................................80

COUNT IV – Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14A-9 for Causing the Company to File a Materially Misleading Proxy Statement ...............................................................................................80

COUNT V – Against Defendants Pandey and Williams for Contribution for  Violations of Sections 10(b) and 21D of the Exchange Act .................................................................81

PRAYER FOR RELIEF .........................................................................................................82

JURY DEMAND .....................................................................................................................84

Plaintiffs, by their attorneys, submit this Verified Consolidated Amended Stockholder Derivative Complaint ("Complaint") for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Contribution for violations of Sections 10(b) and 21D of the Exchange Act.  Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to plaintiffs, which are based on personal knowledge.  This Complaint is also based on plaintiffs' counsel's investigation of all of the allegations in the Complaint, which included, among other things: (a) review and analysis of public filings made by Nutanix, Inc. ("Nutanix" or the "Company") and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain officers and directors of Nutanix named as defendants herein (the "Individual Defendants," as defined below) and other related non-parties; (c) review and analysis of news articles, shareholder communications, and postings on Nutanix's website concerning the Company's public statements; (d) pleadings, papers, and documents filed with, and publicly available from, lawsuits filed against Nutanix, including the related pending consolidated securities fraud class action against the Company (and two individual defendants who are also named as defendants in this derivative action), captioned *In re Nutanix, Inc. Securities Litigation*, Master File No. 3:19-cv-01651-WHO (N.D. Cal.) (the "Securities Action"); (e) economic analysis of securities movements; (f) transcripts of Nutanix's investor calls; and (g) review and analysis of other publicly available information concerning Nutanix and the Individual Defendants.

Plaintiffs' allegations are further borne out and corroborated by statements from at least *twelve* confidential witnesses in the Securities Action, which statements are referenced and incorporated herein. As described below, plaintiffs' counsel identified and used publicly available information to ascertain with a high degree of confidence the identities of certain witnesses referenced in the Securities Action, and confirmed that those witnesses would have had access to the information described in the Securities Action in statements attributed to them so as to make their statements credible.  In addition, plaintiffs' counsel confirmed with lead counsel in the Securities Action that lead counsel is not aware of any facts or other information that would suggest the confidential witness statements alleged in the operative Second Amended Complaint for Violations of the Federal Securities Laws filed in the Securities Action on April

17, 2020 ("Securities Action Complaint") are untrue, and that lead class counsel otherwise has no reason to doubt the veracity of those witness statements. Moreover, the Court is already familiar with many of the confidential witnesses and their statements, having reviewed and considered many of the same witness statements in evaluating the Securities Action defendants' motion to dismiss the first amended complaint. Plaintiffs believe and are confident that substantial additional evidentiary support exists for the allegations set forth herein and that such evidentiary support will be further developed after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiffs on behalf of nominal defendant Nutanix against certain of its current and former officers and directors for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, violations of Section 14(a) of the Exchange Act, and Contribution for violations of Sections 10(b) and 21D of the Exchange Act. The wrongdoing and violations of law alleged in this Complaint have caused and continue to cause Nutanix to incur hundreds of millions of dollars in damages to its reputation, goodwill, and standing in the business community, as well as to face significant potential liability for violations of state and federal law.

2.     As Nutanix's corporate fiduciaries, the Individual Defendants owed the Company fiduciary duties to direct the Company's business and affairs lawfully and to protect and preserve Nutanix's valuable corporate assets. This notwithstanding, the Individual Defendants caused Nutanix to engage in an unlawful scheme designed to artificially inflate the trading price of Nutanix and, in turn, the Company's shareholders' equity.

3.     Founded in 2009, Nutanix provides enterprise cloud software and virtual computing platforms that customers use for constructing private clouds. The Company purports to deliver rapid, high-performance information technology environments on demand, giving application owners a true cloud-like experience. These software solutions include enterprise applications, databases, virtual desktop infrastructure, unified communications, and big data analytics. Customers can purchase pre-configured Nutanix appliances, buy pre-configured appliances from other manufacturers, or deploy the Company's software on validated third-party servers. Nutanix also offers technical support in the form of tiered subscription and support programs. The Company has end customers across a range of industries,

including automotive, consumer goods, education, energy, financial services, healthcare, manufacturing, media, public sector, retail, technology, and telecommunications.  The Company generates revenue primarily from the sale of its enterprise cloud platform and operates within a highly competitive environment.

4.     Due to the competitive environment in which the Company operates, the Company's "lead generation"[1] activities are critical to fill its pipeline[2] and increase sales.  According to the Individual Defendants' public statements, lead generation activities include "digital marketing," activities "through web traffic," "executed campaigns," "brand awareness, promotions, trade shows and partner programs," and "all sorts of events," including promotional "meetings."  Defendant Duston M. Williams ("Williams") has confirmed that "[l]ead generation spending is a key component to building pipeline, which ultimately significantly impacts bookings, billings and revenue."

5.     In 2017, cloud computing technology was shifting from hardware to software, prompting consumers to switch to a less expensive and easier to maintain public cloud product accessible through the internet.  While Nutanix could offer customers private cloud networks through operating systems that run on privately-owned hardware, the Company did not yet have a *public* cloud product.  Therefore, it was unable to compete with its top competitors that offered such public cloud products, such as Amazon Web Services ("AWS") and Microsoft's Azure.

---

[1] Lead generation is the process of identifying and cultivating potential customers to purchase a business's products or services.  The terms lead generation, "lead gen," demand generation, "demand gen," pipeline generation, and "pipeline gen" are synonymous and were used interchangeably by the Individual Defendants.  Lead generation is distinguishable from "marketing" because lead generation is a subset of marketing.  Lead generation activities comprise approximately 70% of Nutanix's total marketing expense, with the rest of the marketing expense made up of salaries and travel.  Marketing expense comprises approximately one-third of Nutanix's total "Sales and Marketing Expense," as reported in the Company's financial statements.  The other two-thirds of "Sales and Marketing Expense" relates to sales expense, which is primarily made up of salaries for sales representatives and their bonuses/commissions.

[2] A sales pipeline is the set of stages a prospective customer moves through as they progress from a sales lead to a customer who purchases the product.  Nutanix's sales pipeline was its sole source of revenue and, thus, was vital to the Individual Defendants' ability to manage and forecast sales growth.  According to the Individual Defendants, Nutanix "probably need[s] about 3x the pipeline" for it to deliver on its sales forecast.

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

6.      Facing a liquidity crunch, the Individual Defendants made an undisclosed and conscious "decision" during their "planning process" for the Company's 2018 fiscal year (August 1, 2017 through July 31, 2018) ("FY2018") and 2019 fiscal year (August 1, 2018 through July 31, 2019) ("FY2019") to keep critical spending for lead generation activities "flat" so that Nutanix could divert those funds to the research and development ("R&D") of its public cloud product, Xi.   Nutanix was in the process of developing Xi to compete with rival cloud competitors.   Nutanix needed to quickly bring Xi to market because potential customers had already been migrating to competitors' public cloud products.   Indeed, analysts recognized in early 2018 that introducing a cloud-based product "w[ould] be critical to Nutanix's long-run success."

7.      To compensate for the anticipated decline in the sales pipeline as a result of diverting necessary lead generation funds to R&D, the Individual Defendants secretly changed the Company's sales strategy in FY2018 to focus on selling Nutanix products to *existing* Enterprise customers (larger customers with higher dollar value sales), as opposed to smaller Commercial and mid-market *new* accounts, because it was far less expensive to generate sales leads from existing customers who had already been educated on Nutanix products.   Nutanix targeted existing Enterprise accounts to permit Nutanix to present the façade of a healthy pipeline and increasing revenue, even though potential new mid-size and Commercial accounts were far greater in number.

8.      While the Individual Defendants were secretly keeping lead generation spending "flat" and focusing on sales to *existing* customers, they falsely told investors the opposite, stating that Nutanix had "continually *increase*d our marketing activities related to brand awareness, promotions, trade shows and partner programs" (e.g., lead generation activities), and had "strong growth in spending," resulting in a "record number of *new* customers" and "year-over-year growth accelerated" for new customers.   They also flatly denied to analysts that new customer growth had slowed, stating, for example: "No, I don't think [customer growth is] impacted."

9.      With defects in Xi causing release delays, Nutanix's pipeline predictably declined as sales to existing customers dried up, while the Company was not generating many sales leads for new customers.

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

10.     According to the accounts of confidential witnesses ("CWs") detailed in the Securities Action Complaint, by April or May 2018, the sales pipeline was at least 20-30% below the Company's internal targets, and it was obvious that the pipeline was "pretty dry."  One witness recounted Nutanix's annual sales kickoff meeting ("SKO") for FY2018 held in Las Vegas in early August 2018, attended by defendants Williams and Dheeraj Pandey ("Pandey"), where the Individual Defendants announced on stage that only 50% of the Company-wide sales force had made their quota for FY2018 and, thus, the sales pipeline was suffering and in serious trouble.

11.     Also according to the CWs in the Securities Action Complaint, while the Individual Defendants were secretly diverting lead generation spending to R&D, many Company sales representatives were leaving Nutanix in droves between November 30, 2017 and May 30, 2019—and typically after only one year of employment (as compared to competitors such as VMware, Inc. ("VMware") whose average employment term was 2.2 years)—demoralized by unachievable sales quotas and the lack of resources needed to close deals.  The Individual Defendants concealed this sales force attrition from investors, instead touting every quarter that Nutanix had "significantly increased our sales and marketing personnel," with purported "strong success in our hiring in the quarter that positions us to deliver on our future growth plans."  The Individual Defendants' statements gave investors the false impression that Nutanix was meeting its internal sales hiring goals necessary to achieve forecasted revenue growth.

12.     The Individual Defendants knowingly concealed from investors that Nutanix's purported strong sales hiring was woefully inadequate because a large portion of the Company's hiring ended up merely replacing the sales representatives who were leaving, rather than growing the sales force needed to achieve targeted revenue growth.  Indeed, as the Individual Defendants ultimately admitted on February 28, 2019, "over the past few quarters, [Nutanix has] not kept pace with our bullish sales hiring goals," which "plays a role in our sales pipeline development" and, thus, the Company was impacted "by a shortage of sales reps in the first half of the fiscal year, resulting in an under-spend by several million dollars."

13.     Nutanix's inadequate investment in lead generation and pervasive sales attrition caused a massive decline in sales productivity, which, in turn, caused revenue to decline.  According to defendant

Pandey, the key "inputs [of sales productivity] are salespeople and pipeline spend, the demand gen spend." Thus, as the two key inputs to successful sales productivity—lead generation and salespeople—were kept flat or declining, the Individual Defendants knew that sales were also declining. Yet, as sales productivity was continuing to suffer, the Individual Defendants told investors the opposite was true—that Nutanix had "experienced record sales productivity."

14.     To hide its dwindling pipeline and declining sales from investors, Nutanix engaged in an undisclosed and unsustainable practice of pulling sales from existing customers expected to close in the next quarter to meet quarterly forecasts into the current quarter. As one witness in the Securities Action Complaint explained, by pulling future orders into the present quarter, ensuing quarters would be depleted of expected orders in the pipeline. Thus, to allow Nutanix to continue increasing its revenue forecasts every quarter, the Individual Defendants had to repeat their deceptive pull-in practice in the following quarter. Nutanix sales personnel referred to this practice as "draining the swamp."

15.     Nutanix's pull-in scheme, however, was not sustainable because the Individual Defendants were not engaging in lead generation activities to increase business from *new* customers. Inevitably, Nutanix hit the point in February 2019 when the Company's existing customers were "over-procured" and there was no more pipeline left to pull in.

16.     The CWs in the Securities Action Complaint confirmed that Nutanix's depleted pipeline was reflected in the Company's internal Salesforce.com, Inc. ("Salesforce.com") system, which includes "all prospective deals," whether they are a lead or a new customer, the status of the opportunity, whether a proposal had been extended, whether the customer had made a commitment, whether the deal had closed, or if a deal had been lost. The CWs characterized Salesforce.com as the "source of truth" and the "Bible" for sales pipeline reporting, recalling that everything put into Salesforce.com had to be complete and accurate or "you would hear about it" from defendant Pandey.

17.     Defendants Pandey and Williams had direct access to the pipeline reports in Salesforce.com. In fact, multiple witnesses in the Securities Action Complaint confirmed that defendant Pandey accessed the Salesforce.com pipeline reports daily on his computer desktop through a Dashboard report created for him that contained real-time sales and pipeline data. Witnesses also confirmed that it was widely known throughout the Company that Pandey was the single-highest user of Salesforce.com.

Nutanix's former Director of Business Operations also attended meetings with defendants Pandey, Williams, and other executives after the end of each quarter where they discussed that revenue was declining in 2018.

18.     The Individual Defendants' knowledge of the Company's sales issues is also evidenced by other statements they made at the August 2018 SKO meeting.  For example, the Individual Defendants identified and raised Nutanix's depleted pipeline, as well as the fact that the Company's salespeople had been missing their quotas.  Thus, the Individual Defendants knew by at least April or May 2018 (and likely much sooner) that Nutanix's sales pipeline was materially depleted.

19.     The Individual Defendants were ultimately forced to reveal the truth in two partially corrective disclosures.  First, on February 28, 2019, Nutanix announced results for the second quarter of FY2019 ("Q2 FY2019") and provided weak guidance for the third quarter of FY2019 ("Q3 FY2019").  In explaining the reason for the weak third quarter guidance, the Individual Defendants admitted that Nutanix "***miss[ed] our pipeline targets***" for the second quarter of FY2019 because "***in fiscal 2018, we reallocated some of our lead generation spending to other priorities. As a result, there was a four quarter period from Q4 2017 to Q3 2018 that we basically kept lead generation spend flat***" and that in FY2019 "***we again reallocated capital away from lead generation spend during our planning process.***"  According to defendant Williams, "[t]he magnitude of the shift is in ***the few tens of millions***."

20.     The Individual Defendants further admitted on February 28, 2019 that "***over the past few quarters, [Nutanix has] not kept pace with our bullish sales hiring goals,***" which "plays a role in our sales pipeline development" and thus, Nutanix was impacted "by a shortage of sales reps in the first half of the fiscal year, resulting in an under-spend by several million dollars."  The Individual Defendants also stated that Nutanix suffered from poor sales execution due to insufficient staffing and sales training.

21.     In addition, the Individual Defendants admitted that, contrary to their public statements touting Nutanix's purported "new" customer growth, the Company had actually been focusing its efforts on "existing" larger customers because they were "easier" sales to make:

> Now, looking back at it, we probably ***over rotated a bit to the existing customer base*** and large customers there, where those efficiency dollars are easier to get and probably underspent a little bit on new customers, which those efficiencies are little tougher to get on new customers.

22.     In the wake of the February 28, 2019 disclosure, Nutanix's stock plunged more than 32%, or $16.39 per share on March 1, 2019, to close at $33.70 per share compared to the previous trading day's closing of $50.09 per share, erasing over $2.4 billion in market capitalization.

23.     Rather than providing the market with accurate information, or correcting Nutanix fiduciaries' misleading statements, certain Company fiduciaries used their knowledge of material, nonpublic information to benefit themselves.  In particular, after learning of the Company's declining business metrics and financial prospects, but before this information publicly emerged, the insider selling fiduciaries collectively sold over $178 million worth of Nutanix stock.

24.     As Nutanix eventually disclosed in the Company's 2019 Definitive Proxy Statement filed with the SEC on form DEF 14A on October 30, 2019 (the "2019 Proxy Statement"), the Individual Defendants missed their targeted number of new customer additions in the Company's FY2019 operating budget—which was adopted and approved in advance of the fiscal year by the Company and its Board of Directors (the "Board")—by over 30%, adding only 67.9% of the total new customers targeted in the Company's budget.  Analysts did not believe the Individual Defendants' story that Nutanix's sales execution issues just popped up out of nowhere in the second quarter, concluding that the Company's issues must have "been building up for several quarters" and just finally "came to a head" in Q2 FY2019. Indeed, William Blair stated in its March 1, 2019 report that "we believe these events have to some extent overwhelmed the salesforce, impacting productivity and efficiency and impairing new customer acquisition. We believe these issues must have been building up for several quarters, and in this past quarter they came to a head, as seen by the dramatically reduced pipeline."

25.     Soon after this news, Nutanix's top sales management abruptly departed the Company. During the February 28, 2019 conference call, Pandey announced that Chris Kaddaras, the current head of the Company's European sales, would be taking over the Americas region to "improve our sales execution," replacing Sherry Lautenbach ("Lautenbach"), Senior Vice President ("VP") of American Sales.

26.     Then, on March 6, 2019, Louis J. Attanasio ("Attanasio"), Nutanix's Chief Revenue Officer, to whom Lautenbach reported, notified Nutanix that he would be leaving Nutanix effective March 8, 2019 "to pursue other opportunities."  Attanasio, however, did not depart before he liquidated his entire

holdings of Nutanix stock on December 19, 2018—the same month that defendant Pandey admitted that Nutanix "realized that we actually have a pipeline problem," and right before the truth was revealed – selling 134,499 shares for proceeds of more than $5.5 million.

27.     Finally, on May 30, 2019, the Individual Defendants revealed that Nutanix had missed revenue and billing targets due to continuing sales execution issues that were far worse than what the Individual Defendants had previously represented on February 28, 2019, and Nutanix's Chief Product Development Officer, Sunil Potti ("Potti"), resigned.

28.     Upon the news, Nutanix's stock dropped from a closing price of $32.67 per share on May 30, 2019 to $28.07 on May 31, 2019, on unusually high trading volume, erasing over $454 million in market capitalization.

29.     Several analysts weighed in on the news.  William Blair analyst Jason Ader described Nutanix's situation as "definitely worse than we expected," while Raymond James analyst Simon Leopold reported that "[w]e think it could take several quarters for Nutanix to return to double digit year-over-year growth," as opposed to the "quarter or two" the Individual Defendants previously claimed.  Piper Jaffray analyst Andrew Nowinski reported that "[i]t is clear that this model is unsustainable, requiring massive amounts of spending just to support modest revenue growth, which we believe is attributable to competition."

30.     The Individual Defendants benefited from Nutanix's inflated stock price by using the Company's stock as currency to make key acquisitions that enabled the Company to accelerate its race to the public cloud, while also maintaining compliance with the "Rule of 40" metric – considered by the Individual Defendants and industry analysts as a key metric in evaluating the Company's performance. The Rule of 40 says that the revenue growth rate of a company plus the company's profits as a percent of revenue over the same period should equal at least 40.  For Rule of 40 purposes, the measure of profit used by tech firms in Nutanix's space – including Nutanix – is free cash flow.  The Individual Defendants repeatedly touted Nutanix's compliance with the Rule of 40 during quarterly investor calls.  Moreover, a portion of defendants Pandey's and Williams' annual performance bonuses for FY2019 was tied to the Company's compliance with the Rule of 40.

31.     By making the following stock acquisitions using the Company's inflated stock price, rather than with cash, the Individual Defendants were able to conserve cash flow and maintain compliance with the Rule of 40 (or otherwise avert hostile scrutiny regarding the Rule of 40), while getting public cloud products to market through acquisitions, including: (i) Netsil Inc., which closed on March 22, 2018 for $67.5 million, of which $63.8 million was financed using Nutanix stock to launch "Flow," a software-defined network solution designed to provide application-centric micro-segment security services to protect against threats not protected by traditional network firewalls; and (ii) Mainframe2, Inc. ("Frame"), which closed on August 8, 2018 for $130 million, of which $103.0 million was financed using Nutanix stock, to launch a cloud-based Windows desktop and application delivery service that competes directly with Citrix and VMware.

32.     Had the Individual Defendants used cash to make these acquisitions, Nutanix would have had negative free cash flows and either would have not met the Rule of 40, or would have faced extreme scrutiny from analysts about the Company's cash flow and its compliance with the Rule of 40 at the same time that the Individual Defendants were concealing Nutanix's impending cash flow disaster from its reduced pipeline.

33.     Several analysts reacted negatively to the Company's disclosure, highlighting Nutanix's failure to properly invest in sales personnel and lead generation, downgrading Nutanix stock, and lowering its price targets.  For example, on March 1, 2019, Oppenheimer released a report downgrading Nutanix stock.  The report stated that Oppenheimer "think[s] Nutanix has tried to do too much (massive portfolio expansion, cloud rollout, M&A, etc.) with too little (under investment in sales/go-to-market) for too long (recent year) and this has caught up with it."  The Company's weak forecast was the reflection of an "emptied pipeline" and too few additions to the sales team, according to the report.

34.     Further, as a direct result of this unlawful course of conduct, Nutanix is now the subject of the Securities Action on behalf of investors who purchased Nutanix's shares.

35.     Plaintiffs bring this suit derivatively on Nutanix's behalf to seek redress for the Individual Defendants' Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, violations of Section 14(a) of the Exchange Act, and Contribution for violations of Sections 10(b) and 21D of the Exchange Act.

**JURISDICTION AND VENUE**

36.     Jurisdiction is conferred by 28 U.S.C. §1331.  The claims asserted herein arise under Sections 14(a), 10(b), and 21D of the Exchange Act.  This Court has exclusive subject matter jurisdiction over the federal securities laws claims under Section 27 of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

37.     In addition, as to Plaintiff Aravind Bhonagiri ("Plaintiff Bhonagiri") and Plaintiff Ashwin Juneja ("Plaintiff Juneja"), jurisdiction is also conferred by 28 U.S.C. §1332.  Complete diversity among Plaintiffs Bhonagiri and Juneja and all of the defendants exists, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

38.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

39.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Nutanix maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Nutanix, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**INTRADISTRICT ASSIGNMENT**

40.     This action is deemed related to the Securities Action, and was therefore assigned to the San Francisco division of this Court on September 17, 2019.

**THE PARTIES**

**Plaintiffs**

41.     Plaintiff Bhonagiri has continuously been a stockholder of Nutanix since June 6, 2018. Plaintiff Bhonagiri is a citizen of Pennsylvania.

42.     Plaintiff Juneja has continuously been a stockholder of Nutanix since September 17, 2018. Plaintiff Juneja is a citizen of Louisiana.

43.     Plaintiff TJ Park ("Plaintiff Park") has continuously been a stockholder of Nutanix since October 2016.

44.     Plaintiff Bhonagiri, Plaintiff Juneja, and Plaintiff Park are collectively referred to hereinafter as "Plaintiffs."

**Nominal Defendant**

45.     Nominal Defendant Nutanix is a Delaware corporation with principal executive offices located at 1740 Technology Drive, Suite 150, San Jose, California 95112.  Accordingly, Nutanix is a citizen of Delaware and California.  Nutanix is a software company that provides products, services, and cloud-based infrastructure to various industries worldwide in support of their technological operations and management.   Shares of Nutanix's stock trade publicly on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "NTNX."  As of July 31, 2019, the Company had approximately 5,340 employees.

**Defendants**

46.     Defendant Pandey cofounded Nutanix in September 2009.  Defendant Pandey is Nutanix's Chief Executive Officer ("CEO") and Chairman of the Board and has been since the Company's inception. He previously served as the Company's President from September 2009 until February 2016.  Defendant Pandey is named as a defendant in the Securities Action which alleges he violated Sections 10(b) and 20(a) of the Exchange Act.  Defendant Pandey knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  Nutanix paid defendant Pandey the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2019 | $483,333 | $6,460,000 | - | $6,943,333 |
| 2018 | $350,000 | $10,413,000 | $439,225 | $11,202,225 |

Defendant Pandey is a citizen of California.

47.     Defendant Williams is Nutanix's Chief Financial Officer ("CFO") and has been since June 2014.  Defendant Williams is named as a defendant in the Securities Action which alleges he violated Sections 10(b) and 20(a) of the Exchange Act.  Defendant Williams knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Williams sold 600,000 shares of his Nutanix stock for $26,846,206.38 in unlawful insider trading proceeds.  Nutanix paid defendant Williams the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2019 | $441,667 | $3,944,000 | - | $4,385,667 |
| 2018 | $350,000 | $4,165,200 | $285,496 | $4,800,696 |

Defendant Williams is a citizen of California.

48.     Defendant David Sangster ("Sangster") is Nutanix's Chief Operating Officer and has been since March 2019.  Defendant Sangster was also Nutanix's Executive VP, Engineering & Operations from February 2018 to March 2019; Executive VP, Support & Operations from February 2016 to February 2018; Senior VP, Operations from April 2014 to February 2016; and VP, Operations from December 2011 to April 2014.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Sangster sold 237,845 shares of his Nutanix stock for $11,693,612.60 in unlawful insider trading proceeds.  Nutanix paid defendant Sangster the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2019 | $394,167 | $3,944,000 | - | $4,338,167 |
| 2018 | $326,667 | $2,950,350 | $259,044 | $3,536,061 |

Defendant Sangster is a citizen of California.

49.     Defendant Tyler Wall ("Wall") is Nutanix's Chief Legal Officer and has been since November 2017.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Wall sold 46,276 shares of his Nutanix stock for $1,878,259.85 in unlawful insider trading proceeds.  Nutanix paid defendant Wall the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|--------------|----------------------------------------|-------|
| 2019 | $391,667 | - | - | $391,667 |
| 2018 | $238,636 | $10,389,000 | $111,895 | $10,739,531 |

Defendant Wall is a citizen of California.

50.     Defendant Jeffrey T. Parks ("Parks") is a Nutanix director and has been since December 2013.  Defendant Parks is also a member of the Audit Committee and has been since at least November 2017.  Defendant Parks knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.   While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Parks sold 2,319,681 shares of his Nutanix stock for $87,879,845.78 in unlawful insider trading proceeds.  Nutanix paid defendant Parks the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|-------------|--------------|-------|
| 2019 | $331,545 | $331,545 |
| 2018 | $304,006 | $304,006 |

Defendant Parks is a citizen of California.

51.     Defendant Michael P. Scarpelli ("Scarpelli") was a Nutanix director from December 2013 until June 3, 2020.  Defendant Scarpelli was also the Chairman of the Audit Committee since at least November 2017.   Defendant Scarpelli knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Scarpelli sold 200,000 shares of his Nutanix stock for $8,401,602.25 in unlawful insider trading proceeds.  Nutanix paid defendant Scarpelli the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|-------------|--------------|-------|
| 2019 | $324,698 | $324,698 |
| 2018 | $298,594 | $298,594 |

Defendant Scarpelli is a citizen of California.

52.     Defendant Steven J. Gomo ("Gomo") has served as an advisor to Nutanix since January 2015 and as a Company director since June 2015, with memberships on both the Audit Committee and

- 14 -

Nominating and Corporate Governance Committee.  Defendant Gomo knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Gomo sold 5,312 shares of his Nutanix stock for $278,908.68 in unlawful insider trading proceeds.  Nutanix paid defendant Gomo the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2019 | $249,232 | $249,232 |
| 2018 | $293,145 | $293,145 |

Defendant Gomo is a citizen of California.

53.    Defendant Ravi Mhatre ("Mhatre") is Nutanix's Lead Independent Director and has been since August 2015 and a director and has been since July 2010.  Defendant Mhatre knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  Nutanix paid defendant Mhatre the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2019 | $338,391 | $338,391 |
| 2018 | $295,888 | $295,888 |

Defendant Mhatre is a citizen of California.

54.    Defendant John McAdam ("McAdam") was a Nutanix director from August 2015 to December 13, 2019.  Defendant McAdam knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant McAdam sold 45,000 shares of his Nutanix stock for $2,041,353.93 in unlawful insider trading proceeds.  Nutanix paid defendant McAdam the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2019 | $242,347 | $242,347 |
| 2018 | $285,027 | $285,027 |

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1  Defendant McAdam is a citizen of California.

2      55.    Defendant Susan L. Bostrom ("Bostrom") is a Nutanix director and has been since October

3  2017.  Defendant Bostrom knowingly or recklessly made improper statements in the Company's public

4  filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved

5  operational success.  Nutanix paid defendant Bostrom the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2019 | $242,347 | $242,347 |
| 2018 | $777,218 | $777,218 |

Defendant Bostrom is a citizen of California.

      56.    Defendant Craig Conway ("Conway") is a Nutanix director and has been since October

2017.  Defendant Conway knowingly or recklessly made improper statements in the Company's public

filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved

operational success.  Nutanix paid defendant Conway the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2019 | $237,796 | $237,796 |
| 2018 | $777,218 | $777,218 |

Defendant Conway is a citizen of California.

      57.    Defendant Sudheesh N. Vadakkedath ("Vadakkedath") was Nutanix's President from

February 2016 to July 2018; Senior VP, Worldwide Sales and Business Development from April 2014 to

February 2016; VP of Worldwide Sales from October 2013 to April 2014, and Director of Sales from

February 2011 to October 2013.  Defendant Vadakkedath knowingly, recklessly, or with gross negligence

made improper statements in the Company's public filings concerning the Company's: (i) investment in

sales and marketing growth; and (ii) improved operational success.  While in possession of material,

nonpublic information concerning Nutanix's true business health, defendant Vadakkedath sold 620,000

shares of his Nutanix stock for $26,998,868 in unlawful insider trading proceeds.  Defendant Vadakkedath

is a citizen of California.

      58.    Defendant Attanasio was Nutanix's Chief Revenue Officer from November 2017 to March

2019.  While in possession of material, nonpublic information concerning Nutanix's true business health,

defendant Attanasio sold 134,499 shares of his Nutanix stock for $5,559,951.34 in unlawful insider trading proceeds.  Nutanix paid defendant Attanasio the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2019 | $469,697 | - | - | $8,620,000 | $9,089,697 |
| 2018 | $578,314 | $41,556,000 | $651,901 | - | $42,786,215 |

Defendant Attanasio is a citizen of New Jersey.

59.     Defendant Kenneth W. Long III ("Long") was Nutanix's VP, Corporate Controller and Chief Accounting Officer from May 2013 to December 2018.  Defendant Long knowingly or recklessly made improper statements in the Company's public filings concerning the Company's: (i) investment in sales and marketing growth; and (ii) improved operational success.  While in possession of material, nonpublic information concerning Nutanix's true business health, defendant Long sold 152,002 shares of his stock for $7,299,107.52 in proceeds.  Defendant Long is a citizen of California.

60.     The defendants identified in ¶¶46-49 and 57-59 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶46 and 50-56 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶50-52 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶47-52, 54, and 57-59 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶46-59 are referred to herein as the "Individual Defendants."

**Relevant Non-Parties**

61.     The plaintiffs in the Securities Action cited twelve confidential witnesses in support of their allegations.

62.     CW1[3] was a former Nutanix Commercial Account Manager for the Midwest region from December 2016 to January 2019.  CW1 was responsible for managing customer relationships, educating and selling Nutanix products to existing customers, and liaising between sales and marketing and engineering.

---

[3] Confidential witnesses identified and discussed in the Securities Action Complaint are referred to herein as "CW__."

63.   CW2 was a former Nutanix executive in Worldwide Support Business Operations from February 2016 to late 2016, and then an executive of the Company's Customer Success program from late 2016 until March 2018.  As an executive of the Customer Success program, CW2 reported to the Executive VP of Customer Success, Indir Sidhu, who reported to defendant Pandey.  In the role as executive of the Customer Success Program, CW2 was responsible for overseeing the Company's customer success program in which customers paid a fee for receiving support for Nutanix products.

64.   CW3 was a former Nutanix Commercial Account Manager from May 2018 to July 2019 reporting to Alex Garwood ("Garwood") up until December 2018 and then to another individual named Brian until the end of this witnesses' employment.  Both Garwood and Brian reported to Lautenbach, Senior VP of American Sales until March 2019.  In this role, CW3 was responsible for educating potential customers on Nutanix and closing sales deals for the northern California and the Pacific Northwest region, including Alaska.

65.   CW4 was the former Director of Digital Marketing at Nutanix from January 2018 until May 2019, reporting to the VP of Growth and Demand Marketing, Gleb Brichko, who reported to the Senior VP of Corporate Marketing, Julie O'Brien ("O'Brien").  O'Brien reported to Ben Gibson, Nutanix's Chief Marketing Officer, who reported to defendant Pandey.  In this role, CW4 was responsible for developing lead generation strategies using digital and website marketing.

66.   CW5 was a former Nutanix Global Account Manager from December 2017 to June 2019, reporting initially to Robert Stroud ("Stroud") until July or August 2018 when Stroud was replaced by Roman Kochanowsky, both of whom were Sales Directors for Nutanix's Northeastern region reporting to Anton Granic who reported to Lautenbach.  In this role, CW5 was responsible for handling larger potential customer accounts, including account planning, strategizing and pursing potential customers, educating them on Nutanix technology and ultimately selling to them.

67.   CW6 was a former Nutanix Senior Product Manager from June 2018 to June 2019 reporting to a Director at Nutanix who reported to a VP who reported to the Company's Chief Operating Officer, defendant Sangster.  In this role, CW6 was responsible for hardware and software service support.

68.   CW7 was a former Nutanix Account Manager from September 2015 to July 2017 and a former Nutanix Global Account Manager from August 2017 to August 2018 in the San Francisco "Bay

area."  In CW7's role as an Account Manager, CW7 was responsible for managing relationships with customers for between twenty and fifty accounts across many types of customers.  In CW7's role as a Global Account Manager, CW7 managed fewer but larger customers and more strategically significant customer accounts.  CW7 (like all of Nutanix's other sales staff) sold the "entire suite" of Nutanix products, acting as a "resource broker" for any marketing or engineering support, and being available to provide answers to any other types of questions that customers may have.

69.  CW8 was a former Director of Business Operations and Project Management and Services from January 2017 until June 2018, responsible for leading the globally disbursed program management and business operations team, including directing the management of projects ranging up to two million dollars, managing the profit and loss for such projects, ensuring efficient delivery of Nutanix products and services, developing and managing long-range forecasts and financial plans for Nutanix, driving operations and process improvements and managing and improving NetSuite and Salesforce.com systems.

70.  CW9 was a former Regional Sales Director in California during the second half of the class period in the Securities Action (between November 30, 2017 and May 30, 2019, inclusive) responsible for overseeing the Southern California Commercial sales team.  CW9 reported to Elaine Yee ("Yee") who reported to Lautenbach.

71.  CW10 was a former Senior Manager, Strategy and Marketing Analytics from June 2018 to March 2019, responsible for tracking the marketing spend against the budget, including for the marketing department headcount, overhead costs and demand generation activities.  Prior to that, CW10 worked in Finance as a Senior Financial Analyst from approximately December 2013 to June 2018.  After March 2019, CW10 returned to the Finance group as a Senior Financial Analyst from April 2019 until CW10 left Nutanix in September 2019.

72.  CW11 was a former Account Executive on the West Coast from March 2018 to February 2019, responsible for Commercial sales in CW11's territory and who reported to a Regional Sales Director.

73.  CW12 was a former Territory Account Manager in the "TOLA" region comprised of Dallas/Fort Worth, Texas, Oklahoma and Louisiana from August 2017 to July 2019, responsible for Commercial customer account sales.

74.     Plaintiffs here used publicly available information to ascertain with a high degree of confidence the identities of CW3, CW4, CW7, CW8, CW9, CW10, CW11, and CW12 in the Securities Action Complaint.  Plaintiffs confirmed the witnesses would have had access to the information described in the Securities Action Complaint in statements attributed to them.  Based upon their own independent investigation, Plaintiffs were able to confirm the alleged job titles, employment duties, and dates of employment of those confidential witnesses, which support the inference that they would, in fact, be privy to the information alleged in the Securities Action Complaint to have been derived from their statements. Moreover, this Court considered and evaluated many of the same statements made by CWs 1-7 in analyzing defendants' motion to dismiss the first amended complaint in the Securities Action.  In addition, plaintiffs' counsel confirmed with lead counsel in the Securities Action that lead class counsel is not aware of any facts or other information that would suggest the confidential witness statements alleged in the Securities Action Complaint are untrue, and otherwise has no reason to doubt the veracity of those statements.  Plaintiffs intend to compel witness testimony (if necessary) when discovery proceeds in this action and believe that additional evidentiary support will be forthcoming after further investigation and discovery.

75.     Although the accounts of CWs referenced herein are based on allegations from the Securities Action Complaint, their accounts are corroborated by other factual sources, including publicly available material concerning Nutanix and the Individual Defendants.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

76.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Nutanix and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nutanix in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Nutanix and not in furtherance of their personal interest or benefit.

77.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and

untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC and all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78. To discharge their duties, the officers and directors of Nutanix were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Nutanix were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(b) properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(c) remain informed as to how Nutanix conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(d) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e) ensure that Nutanix was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; and

(f)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth herein.

79.     Nutanix holds its fiduciaries to specific corporate governance principles beyond the requirements of law.  In particular, in its Corporate Governance Guidelines as adopted on August 29, 2015 and amended on May 29, 2019, Nutanix described the duties undertaken by the Board, and the active oversight role the Board played in the Company's business affairs.  The Corporate Governance Guidelines state that "[i]t is the principal duty of the Board to exercise its powers in accordance with its fiduciary duties to the Company and in a manner it reasonably believes to be in the best interests of the Company and its stockholders.  It is also the Board's duty to oversee senior management in the competent and ethical operation of the Company."

80.     The Individual Defendants, as officers or directors of Nutanix, were also bound by the Company's Code of Business Conduct and Ethics (the "Code"), adopted on August 19, 2015.  With respect to the Company's corporate books, financial accounting, and public disclosure, the Code requires:

**Overview**

As a public company, we are required to follow strict accounting principles and standards, to report financial information accurately and completely in accordance with these principles and standards, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with law.  The integrity of our financial transactions and records is critical to the operation of our business and is a key factor in maintaining the confidence and trust of our employees, security holders and other stakeholders.

**Compliance with rules, controls and procedures**

It is important that all transactions are properly recorded, classified and summarized in our financial statements, books and records in accordance with our policies, controls and procedures, as well as all generally accepted accounting principles, standards, laws, rules and regulations for accounting and financial reporting.  If you have responsibility for or any involvement in financial reporting or accounting, you should have an appropriate understanding of, and you should seek in good faith to adhere to, relevant accounting and financial reporting principles, standards, laws, rules and regulations and Nutanix's financial and accounting policies, controls and procedures.  This includes ensuring that all bookkeeping and records comply with the Foreign Corrupt Practices Act where applicable, as explained in greater detail in Nutanix's Anti-Corruption Compliance Policy and Guidelines.  If you are a director level employee or higher, you should seek to ensure that

the internal controls and procedures in your business area are in place, understood and followed.

**Accuracy of records and reports**

It is important that those who rely on records and reports—managers and other decision makers, creditors, customers and auditors—have complete, accurate and timely information. False, misleading or incomplete information undermines Nutanix's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely. Anyone representing or certifying as to the accuracy of such records and reports should make an inquiry or review adequate to establish a good faith belief in their accuracy.

Even if you are not directly involved in financial reporting or accounting, you are likely involved with financial records or reports of some kind—a voucher, time sheet, invoice or expense report. In addition, most employees have involvement with product, marketing or administrative activities, or performance evaluations, which can affect our reported financial condition or results. Therefore, Nutanix expects you, regardless of whether you are otherwise required to be familiar with finance or accounting matters, to use all reasonable efforts to ensure that every business record or report with which you deal is accurate, complete and reliable.

**Intentional misconduct**

- You may not intentionally misrepresent Nutanix's financial performance or otherwise intentionally compromise the integrity of Nutanix's reports, records, policies and procedures. For example, you may not: report information or enter information in Nutanix's books, records or reports that fraudulently or intentionally hides, misrepresents or disguises the true nature of any financial or non-financial transaction or result;

- establish any undisclosed or unrecorded fund, account, asset or liability for any improper purpose;

- enter into any transaction or agreement that accelerates, postpones or otherwise manipulates the accurate and timely recording of revenues or expenses;

- intentionally misclassify transactions as to accounts, business units or accounting periods; or

- knowingly assist others in any of the above.

*   *   *

**Obligation to Investigate and Report Potential Violations**

You should make appropriate inquiries in the event you may see, for example:

- 23 -

- financial results that seem inconsistent with underlying business performance;

- inaccurate financial records…;

- the circumventing of mandated review and approval procedures;

- transactions that appear inconsistent with good business economics;

- the absence or weakness of processes or controls; or

- persons within Nutanix seeking to improperly influence the work of our financial or accounting personnel, or our external or internal auditors.

Dishonest or inaccurate reporting can lead to civil or even criminal liability for you and Nutanix and can lead to a loss of public faith in Nutanix.  You are required to promptly report any case of suspected financial or operational misrepresentation or impropriety.

**Keeping the Audit Committee Informed**

The Audit Committee plays an important role in ensuring the integrity of our public reports. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors.  In particular, the Chief Executive Officer and senior financial officers such as the Chief Financial Officer and Vice President of Accounting should promptly bring to the attention of the Audit Committee any information of which he or she may become aware concerning, for example:

- the accuracy of material disclosures made by Nutanix in its public filings;

- material weaknesses or significant deficiencies in internal control over financial reporting;

- any evidence of fraud that involves an employee who has a significant role in Nutanix's financial reporting, disclosures or internal controls or procedures; or

- any evidence of a material violation of the policies in this Code regarding financial reporting.

**Breaches of Duties**

81.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Nutanix, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

82.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements to

the public, improper practices that wasted the Company's assets, and caused Nutanix to incur substantial damage.

83.     The Individual Defendants, because of their positions of control and authority as officers and directors of Nutanix, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Nutanix has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

84.     In addition to these duties, under the Audit Committee Charter in effect since August 19, 2015, the Audit Committee Defendants – defendants Gomo, Parks, and Scarpelli – owed specific duties to Nutanix to assist the Board in overseeing "[t]he Company's accounting and financial reporting processes and internal control over financial reporting, as well as the audit and integrity of the Company's financial statements," among other things.

85.     Specifically, according to the Audit Committee Charter, the Audit Committee must review and discuss with management the Company's financial statements:

> **Review Financial Statements.**   The Audit Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:
>
> • The scope and timing of the annual audit of the Company's financial statements.
>
> • The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosure in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.
>
> *   *   *
>
> • The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.
>
> • Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative [generally accepted accounting principles ("GAAP")] methods on the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any significant changes required or taken in the audit plan as a result of any material control deficiency.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

- Any significant disagreement between management and the independent auditor.

86.     The Audit Committee Charter charges the Audit Committee with assessing and managing risk and the quality and adequacy of the Company's controls and processes that materially affect its public statements.  In this respect, the Audit Committee Charter provides:

> The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.
>
> *     *     *
>
> **Access.**  The Audit Committee shall be given full access to the chairperson of the Board, management, the independent auditor and, if applicable, the internal auditors, if applicable, as well as the Company's books, records, facilities and other personnel.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

87.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

88.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Nutanix, regarding the Individual Defendants' management of Nutanix's operations and the Company's investment in sales and marketing growth; (ii) facilitate the Insider Selling Defendants' illicit sale of over $178 million worth of their personally held Nutanix shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Nutanix and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, engaged in the wrongful and unlawful conduct set forth herein.

89.     The Individual Defendants engaged in a conspiracy, common enterprise, or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

90.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

91.     The Individual Defendants accomplished their conspiracy, common enterprise, or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

92.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

# FACTUAL BACKGROUND

**Company Background**

93.     Nutanix provides an enterprise cloud platform that converges computing, virtualization, storage, networking, desktop, governance, and security services in one integrated solution delivered through software.  The Company targets customers across a broad range of industries, including automotive, consumer goods, education, energy, financial services, healthcare, manufacturing, media, public sector, retail, technology, and telecommunications.  As of July 31, 2018, Nutanix had a base of over 10,600 end customers.

94.     Nutanix primarily sells its platform through distributors, resellers, and original equipment manufacturers ("OEMs").  The Company's OEM partners license its software and package it with their hardware, Nutanix-branded appliances, or other configurations.  The OEM partners also sell associated support offerings, which Nutanix jointly supports.  Nutanix offers varying levels of customer support through its global support centers.  Approximately 79% of the Company's total revenue comes from the sale of its enterprise cloud platform.  The Company also sells renewals of previously purchased software licenses, hardware appliances, and software entitlement and support subscriptions.

95.     Nutanix has four categories of major competitors: (1) software providers, such as Red Hat, Inc. and VMware, that offer a broad range of virtualization, infrastructure and management products to build and operate enterprise clouds; (2) traditional IT systems vendors, such as Cisco Systems, Inc. ("Cisco"), Dell Inc. ("Dell"), Hewlett Packard Enterprise Company ("HPE"), Hitachi Data Systems ("Hitachi"), IBM, and Lenovo Group Limited, that offer integrated systems that include bundles of servers, storage and networking solutions, as well as a broad range of standalone server and storage products; (3) traditional storage array vendors, such as Dell, Hitachi, and NetApp, Inc. ("NetApp"), which typically sell centralized storage products; and (4) providers of public cloud infrastructure and services, such as Amazon.com, Inc., Google Inc., and Microsoft Corporation.  Some of these competitors are also vendors for Nutanix's hyper-converged infrastructure and software-defined storage products, including Cisco, Dell, and HPE.

**Lead Generation**

96.     Given the competitive environment in which Nutanix operates, it is critical that the Company actively promote its products in order to generate qualified sales leads to fill its pipeline and increase sales.  As Nutanix stated in its public filings, a "[k]ey element to [Nutanix's] growth strategy" is to "[i]nvest to acquire *new* end customers" by "increasing our investment in sales and marketing" to create market awareness and educate customers about Nutanix products.  In fact, Nutanix admits that "*[t]he majority of our sales and marketing investment is used to educate our end customers about the benefits our solution*, particularly as we continue to pursue large enterprises."  In other words, the "majority" of the Company's sales and marketing investment is to generate sales leads.

97.     According to statements made by former Nutanix employees in connection with the related Securities Action, the sales pipeline and every stage of the sales process at Nutanix were tracked in the Company's internal Salesforce.com and Clari Inc. ("Clari") systems.  CW1, CW2, CW3, CW5, CW7, CW8 and CW11 each independently recalled that sales personnel report and track every single update to Nutanix's pipeline in Salesforce.com.  CW1 and CW5 explained that Salesforce.com was Nutanix's internal software used to manage both existing and prospective accounts, as well as customer leads. According to CW1, information about every customer at any point in the sales cycle was entered into the Salesforce.com system, including whether a customer was potentially interested in buying from Nutanix, customers that had already purchased from Nutanix (and whom Nutanix wanted to sell more products to), and "all prospective deals."  Salesforce.com used "a special methodology" to categorize customers, i.e., whether they were a lead or a new customer, whether there was an opportunity with the customer and the status of that opportunity, including whether the opportunity was in "the discovery stage," if a proof of concept was being done, whether a proposal had been extended, if the deal was in negotiations, whether the customer had made a commitment, whether the deal had closed, or if a deal had been lost.

98.     Also in the Securities Action Complaint, CW1 and CW2 characterized Salesforce.com as the "source of truth" and the "single source of truth," respectively, regarding the state of the Company's pipeline.  Similarly, CW8 stated that Salesforce.com was the "Bible" for sales pipeline reporting and that everything put into Salesforce.com had to be complete and accurate or "you would hear about it" from defendant Pandey.  And according to CW1, if the potential deal was not in Salesforce.com, it did not exist.

- 29 -

99.     Despite that lead generation spending and sales people are admittedly the two "key" inputs of sales productivity, as discussed below, "during the planning process" for FY2018 and FY2019, the Individual Defendants secretly decided to keep lead generation spending "flat" and failed to keep pace with necessary internal sales personnel hiring goals due to significant undisclosed sales force attrition.

**Sales Personnel**

100.     In addition to lead generation, another critical component of sales productivity is sales personnel.

101.     CW1 stated in the Securities Action Complaint that throughout CW1's employment, Nutanix's sales personnel were organized into five regions (Southeast, Northeast, Northwest and California, Southwest and Central/Midwest).  Sales representatives reported to a district manager who reported to a regional manager that reported to Lautenbach.  Lautenbach then reported to Attanasio, who reported to Pandey.

102.     As Nutanix stated in its public disclosures, it takes on average about "four quarters," or an entire year, for a new sales representative to ramp up and become fully productive.  Confidential witnesses in the Securities Action confirmed this.  For instance, CW4 recalled that significant training is required for new sales hires, and that it usually takes sales team members until the start of their fourth quarter to fully ramp up and become productive.

103.     Moreover, according to CW1 in the Securities Action Complaint, the average sales cycle is approximately six to nine months, meaning it takes six to nine months from when a lead is generated to close a deal.  CW2 and CW3 corroborated that account, stating that the typical sales cycle from the time a lead is identified to when a deal is closed is on average approximately six months.

104.     CW1 also stated in the Securities Action Complaint that sales representatives were accountable for accurately forecasting sales for Nutanix, and that the forecasts Nutanix issues to the market were supposed to be based on the forecasts inputted into the Salesforce.com system.  CW1 provided quarterly forecasts to CW1's manager, who provided them to CW1's boss, who then reported them to Lautenbach.

105.     As CW1 testified in the Securities Action Complaint, in FY2018, Nutanix reorganized its sales group into three main sales teams—Enterprise and Global customers (large accounts), Commercial

customers and Inside Sales—with the Company's focus being mainly on Enterprise customers.  CW3 also recalled that Nutanix's sales organization was organized into three groups—small accounts, Commercial accounts and Enterprise accounts.  CW11 confirmed that Nutanix had two primary sales force segments: Commercial and Enterprise sales teams.  Defendant Pandey confirmed Nutanix's restructuring of the sales force to focus on Enterprise customers, stating: "[t]he focus is on global accounts and enterprise accounts strategic accounts."  CW1 stated that Nutanix defined Enterprise customers to be the Company's largest clients, such as Fortune 500 companies, that typically generated more revenue.

106.    As investors would eventually learn, the undisclosed "real" reason for Nutanix's aggressive focus on *existing*, rather than "new," customers, was that the Individual Defendants had secretly decided to keep lead generation spending flat so they could divert those funds towards R&D to accelerate the launch of the Company's cloud-based products.  It was far less expensive to generate sales leads from existing customers because those customers had already been educated on Nutanix products.  The problem for the Individual Defendants, however, was that there is a limited amount of sales that can be obtained from existing customers.

107.    Accordingly, the Individual Defendants' focus on existing customers could not generate sufficient long-term sales growth to meet sales projections, and Nutanix's pipeline declined throughout the relevant time period because the Company had not been investing in generating "new" customers.  To conceal its barren pipeline, Nutanix engaged in the unsustainable practice of pulling in sales expected to close in future quarters to meet forecasts.  Meanwhile, the Individual Defendants told investors throughout the relevant time period that they were *increasing* spending on lead generation activities, which resulted in obtaining record numbers of "new" customers and meeting or exceeding revenue goals.  The Individual Defendants knew none of that was true.

108.    The Individual Defendants gambled that mainly focusing on larger *existing* customers with higher-dollar sales that were cheaper to get would carry the day long enough for Nutanix to get its cloud-based technology to market, with investors none the wiser.  Defendants were wrong, and they were eventually forced to admit in February 2019 that this undisclosed strategy failed and that Nutanix "miss[ed] our pipeline targets" because of an "inadequate marketing spending for pipeline generation" and

"over rotat[ing] a bit to the existing customer base and large customers there, where those efficiency dollars are easier to get," which "ultimately significantly impacts bookings, billings and revenue."

109.    As discussed below, the sales personnel component of sales productivity also suffered throughout the relevant time period due to "massive" concealed attrition resulting from a lack of sufficient sales resources to execute and close deals, unreasonable and unrealistic sales quotas, mixed messages to customers due to confusion relating to Nutanix's introduction of too many new products, and general disorganization—all of which contributed to a further decline in Nutanix's sales pipeline.

**Nutanix's "Core" Hyper-converged Infrastructure Technology**

110.    According to the Company's public filings, Nutanix's "core" hyper-converged infrastructure ("HCI") appliance product and software defined storage solution allows customers "to virtualize various clouds – private, public, and edge – into one seamless cloud enabling enterprises to choose the right cloud for the right application."  Nutanix's "core" HCI platform is a hypervisor solution called "Acropolis," which purportedly starts with hyper-convergence, then adds native virtualization, enterprise storage, virtual networking, and platform services, including application mobility and security, into a single turnkey platform.

111.    Nutanix customers have the option to either buy the Company's HCI enterprise software and deploy it on a variety of qualified hardware platforms, or to purchase the software pre-installed on hardware through one of the Company's original equipment manufacturer ("OEM") partners or on the Nutanix-branded "NX" hardware line.

112.    Nutanix's main competitor in the HCI market was VMware.  According to CW1 in the Securities Action Complaint, after Dell acquired VMware in September 2016, VMware made significant improvements to the VX Rail product, including patching that could be done in fifteen minutes across multiple applications, making them much less cumbersome.  CW1 stated that as result of those improvements, Nutanix no longer had a competitive advantage over VMware.

113.    In 2018, Nutanix introduced three cloud-based products: Beam, Frame (which service was possible through Nutanix's acquisition of Mainframe2, Inc.) and Xi Cloud Services.  Xi Cloud Services is Nutanix's first public-cloud product.  According to CW2 in the Securities Action Complaint, Nutanix needed a cloud solution in order to compete because the majority of Nutanix's customers were moving to

1    the cloud.  Indeed, potential customers at the Company's .NEXT 2017 conference reportedly were already

2    starting the move to the public cloud.  Thus, analysts noted that "new offerings (like Calm and Xi) will be

3    critical to Nutanix's long-run success."

4           114.    At Nutanix's June 29, 2017 .NEXT 2017 conference, Defendants announced plans to

5    launch Xi Cloud Services in "*early* 2018." While Nutanix had previously developed private cloud

6    networks through operating systems that run on a customer's own hardware, Xi was targeted to rival AWS

7    and Microsoft's Azure on the public cloud.  However, during a November 20, 2017 conference call,

8    Defendants revealed that the Xi launch would be delayed at least another six months, until mid-2018,

9    because of delays with the release of its operating software update, AOS 5.5, as well as engineering issues.

10          115.    By April 2018, the launch of Xi was again called into doubt as Nutanix continued to

11   experience engineering issues, causing it to delay the launch until the end of 2018 or potentially early

12   2019.  According to CW6 in the Securities Action Complaint, the execution for Xi Cloud Services product

13   development was lacking, and the product development team did not have the resources to meet the

14   timelines for developing the product.  Ultimately, it was not until November 28, 2018, nearly one year

15   after the original launch date, that Xi was released, and even then only as "general[ly] availabl[e]."  By

16   the time Nutanix finally launched Xi, according to CW7 in the Securities Action Complaint, large accounts

17   with Apple Inc. and Salesforce.com had already decided to go with AWS because Nutanix did not have a

18   properly functioning cloud solution alternative.

19          116.    To compensate for the delays in launching Xi, Nutanix acquired Minjar, Inc. on March 16,

20   2018 for $19.3 million to launch "Beam," Nutanix's first software-as-a-service offering to purportedly

21   provide customers with visibility and analysis of their cloud consumption patterns, along with one-click

22   optimization across cloud environments.  On March 12, 2018, Nutanix announced an agreement to acquire

23   Netsil, of which "between 85% and 100% of the consideration" would be paid in stock.  Then, on August

24   2, 2019, Nutanix announced an agreement to acquire Frame, a cloud-based Windows desktop and

25   application delivery service, which would be paid in a mix of cash and stock.

26          117.    According to CW11 in the Securities Action Complaint, Nutanix's 2018 acquisitions were

27   made too quickly and "all making fluff" so Nutanix could claim it had cloud products to keep up with

28   VMware, AWS and others.  In reality, however, these new products did not work except in a small number

1   of instances.  CW11 stated that Nutanix tried to do too much too soon: while it took VMware upwards of

2   five years to build its cloud solution, Nutanix tried to do it in one year, resulting in an ineffective product.

3   CW11 described Xi and Nutanix's other cloud-based products as "vaporware" that only served to further

4   confuse the sales force about Nutanix's products.

5   **Nutanix's Sales Pipeline Becomes Substantially Depleted by April or May 2018**

6        118.    By April or May 2018, Nutanix's sales pipeline was significantly depleted.  By August

7   2018, there were hardly any sales left to pull in.  The Individual Defendants were aware of the Company's

8   pipeline issues from quarterly "All-Hands" meetings and the SKO meetings and reports generated from

9   the Salesforce.com and Clari systems.

10        119.    In the Securities Action Complaint, CW1 recalled that the Commercial account pipeline

11   was essentially non-existent when CW1 was first moved there in January 2018.  Any potential leads were

12   "maybes" and the sales force was left to go find its own leads.

13        120.    But by April or May 2018, according to CW1, it was "very obvious" that Nutanix's pipeline

14   was drying up and in trouble.  By August 2018, the pipeline was at least 25-30% below the Company's

15   targets.  Both CW3 and CW8 had a similar recollection of the pipeline's depletion by at least May 2018.

16   CW3 characterized the pipeline as "pretty dry" by that time, and CW8 stated that the pipeline (as reported

17   in Salesforce.com) was at least 20-30% below the Company's targets as of March or April 2018.

18        121.    CW11 stated in the Securities Action Complaint that by November 2018, the pipeline

19   "would have looked bad."  This knowledge was based on CW11's own pipeline and participation in weekly

20   calls with the sales people from CW11's region, where they discussed all prospective deals and their

21   respective statuses.  Prior to the weekly meetings, all prospective deals were distributed to call participants

22   in an email.  CW11 stated that there were also emergency calls with CW9 and Yee for the entire Western

23   Region throughout every quarter to discuss how the quarter was shaping up in terms of sales.

24        122.    In the Securities Action Complaint, CW1 also recalled that Nutanix has its SKO in early

25   August after the fiscal year-end on July 31.  CW1 recalled that the August 2018 SKO meeting was held

26   in Las Vegas, and that Attanasio, Lautenbach, Pandey, Williams, Sudheesh Nair ("Nair"), the Company's

27   President, and others attended this SKO.  During the 2018 SKO, while on stage, Attanasio told the entire

28   Nutanix sales organization that only 50% of the sales force had made their quota for FY2018 and, thus,

the sales pipeline was suffering and in serious trouble.  In fact, according to CW1, by August 2018, the funnel was "way too low," and Nutanix had no way to fix it due to its disorganized and inept sales organization and lack of new leads, particularly in Commercial.  CW1 described the depleted pipeline as a "big problem" for Nutanix.

123.   At the August 2018 SKO, Attanasio and Lautenbach announced on stage that they were going to put programs in place in an attempt to replenish the pipeline and assign more reasonable quotas to salespeople.  The new programs Attanasio and Lautenbach implemented consisted of having all salespeople performing daily "call blitz's," where they were assigned five *existing* customer accounts to call that day to try to sell them add-on products.  The goal, according to CW1 in the Securities Action Complaint, was to get two viable leads out of this.  In CW1's view, this "smelled like desperation."

124.   According to CW1 in the Securities Action Complaint, these programs that Attanasio and Lautenbach instituted were not effective because Nutanix did not use the right metrics, accounts were not properly assigned to the sales representatives (e.g., accounts assigned were in different states), and the sales organization was in a general state of disarray (e.g., high turnover, insufficient resources, inexperience).  In many instances, Nutanix wanted sales representatives to sell add-ons to existing customers, but it turned out that the customer often already had what salespeople were supposed to try and sell them.

125.   The defendants were aware of Nutanix's declining sales productivity and the resulting decline in the Company's sales pipeline from their own decisions to keep lead generation flat, as well as from detailed reports from Salesforce.com and Clari and regular quarterly All-Hands and War Room meetings and other sales meetings throughout the quarters.

126.   Defendants Pandey and Williams admittedly comprise Nutanix's "chief operating decision maker [which] ... allocates resources and assesses financial performance[.]"  Indeed, in the Securities Action Complaint, CW1 described Defendant Pandey as a "very hands-on CEO" who undoubtedly would have been well-informed about the status of Nutanix's sales pipeline.  CW8 similarly described Pandey as a micro-manager and very hands on.

127.   CW5 echoed this sentiment, explaining in the Securities Action Complaint that this witness had, in fact, regularly met with defendant Pandey about CW5's pipeline relating to new customers and

sales leads for Global accounts.  During these customer meetings, CW5 briefed Pandey on the status of prospective financial institutional customers, which included an "executive briefing" presentation.  The presentation included virtually anything CW5 considered relevant for a likely meeting between Pandey and the prospective new customer, such as details regarding the customer representative, the strategic relationship Nutanix was trying to achieve with the customer, details of what the customer was trying to achieve and how Nutanix could help accomplish this, whether a deal was in development or had advanced to a proof of concept being submitted and what kinds of conversations had occurred with the customer, among other things.  The purpose of CW5's meetings with Pandey was to facilitate an "executive alignment" (i.e., between the customer and Pandey), so that the customer would feel taken care of and that Nutanix was "100% behind them."  According to CW5, defendant Williams was sometimes present for such customer meetings.  CW5 said defendant Pandey "absolutely" would have similarly accompanied other sales personnel to visit non-Global Accounts, because it was always a goal at Nutanix to get senior executives in front of customer executives.

128.  CW1 and CW8 further explained in the Securities Action Complaint that Defendants Pandey and Williams had access to pipeline reports in Salesforce.com, which could be run on a Company level, by region and even by individual salesperson.  CW8 stated that Pandey accessed Salesforce.com every day through a pipeline Dashboard report on Pandey's computer desktop that contained up-to-the-minute sales pipeline data.  According to CW8, it was widely known throughout the Company that Pandey was the single-highest user of Salesforce.com.

129.  CW1 similarly stated in the Securities Action Complaint that Pandey followed Nutanix's sales growth goals very closely using a Dashboard on Pandey's computer created for him, which reported on the sales pipeline and forecasts in real-time.  According to CW1, to access the Dashboard, which is launched on a web browser, all one needs to do is click on the icon and log in, and then the Dashboard pops up.  The Dashboard automatically refreshes at least daily.

130.  CW5 stated in the Securities Action Complaint that at Nutanix, it was "a never-ending drill" when it came to the sales pipeline, and that it seemed like "every other day" there were communications and calls with the sales management teams related to the pipeline.  CW5 further stated

1   that Nutanix's sales management were "fixed on metrics" related to the sales pipeline.  At the end of every

2   quarter, CW5 participated in daily deal review calls to discussing the status of deals.

3       131.    According to CW1 in the Securities Action Complaint, the decrease in sales pipeline, sales

4   attrition problems, and the lack of new Dell sales leads were discussed during quarterly All-Hands

5   meetings in 2018 attended by defendants Pandey and Williams, CW1 and Company employees.  CW1

6   testified that during the All-Hands meetings, Defendant Pandey stated the percentage of Nutanix revenue

7   and sales leads received from Dell and the Dell alliance partners employed by Nutanix discussed that Dell

8   was not providing any new leads and was compensating its sales force to sell VMware instead of Nutanix

9   products.

10       132.    Also at these quarterly All-Hands meetings in 2018, Nutanix account managers expressed

11   concerns about the lack of sales leads and the difficulties they were having closing deals.  Specifically,

12   CW1 recalled in the Securities Action Complaint that it was discussed at these All-Hands meetings that

13   there were not enough new deals in the Salesforce.com system, there was an inadequate number of new

14   leads or opportunities in the system and that the new opportunities that were in Salesforce.com were not

15   of sufficient monetary value to meet the Company's objectives, and thus, these areas needed to be

16   improved.

17       133.    As discussed above, CW1 explained that Attanasio discussed the Company's need to hire

18   more salespeople at the 2018 Quarterly All-Hands meetings.  CW1 also confirmed that at the August 2017

19   SKO meeting held in Las Vegas, Nair talked about quarterly War Room meetings while he was on stage

20   presenting to the Nutanix sales team.  According to CW1, Nair stated that Nutanix held War Room

21   meetings at the end of every quarter attended by Pandey to discuss big and/or complex deals to be pulled

22   in.  Pandey attended every SKO and was, thus, present when Nair informed the Company's salespeople

23   about the War Room meeting discussions concerning pull-ins.

24       134.    In addition to the quarterly All-Hands meetings, CW8 explained in the Securities Action

25   Complaint that throughout CW8's tenure, CW8 attended quarterly meetings with defendants Pandey and

26   Williams and other executives after the quarter end where they discussed revenue targets, among other

27   things.  CW8 stated that revenue was declining in 2018, but not as much as the pipeline was declining

28   because Nutanix had a backlog, which would have been discussed at these quarterly meetings.

135.     Finally, the fact that 50% of Nutanix's account managers had not met their sales quotas and the Company's sales pipeline was in serious trouble and depleted by 20-30% by August 2018 was specifically discussed at the August 2018 SKO.

**The Individual Defendants Concealed the Company's Flat Lead Generation Spending and "Massive" Sales Force Attrition**

136.     According to defendant Pandey, "in 2016 [Nutanix] had slowed down quite a bit in demand spending" until defendants "woke up in 2017," when they realized that the Company's pipeline was severely depleted and that the Company had to increase lead generation spending by 75% in the fiscal year of 2017.  Defendant Williams later confirmed that "[l]ead generation spending is a *key* component to building pipeline, which ultimately significantly impacts bookings, billings and revenue."  Thus, by their own admissions and past experience, the Individual Defendants knew lead generation spending was the driver of pipeline growth.

137.     Nonetheless, the Individual Defendants have *admitted* that "during our planning process" they "made a decision" for FY2018 and FY2019 to keep "lead generation spend flat."  According to the Individual Defendants, "a lot [of the reallocated lead generation money] went to engineering" to fund the development of the Xi Cloud Services product and/or acquire new products so that Nutanix could accelerate its efforts to enter the public cloud market.  The Individual Defendants further have admitted that the spending for lead generation was simply "inadequate" and material.  According to Williams, "[i]t's important to note that all this shifting of spend back to lead generation is not an insignificant amount.  The magnitude of the shift is in a few tens of millions."

138.     The Individual Defendants did not disclose to investors their decision to keep lead generation spending flat.  Rather, they falsely told the market throughout the relevant time period that Nutanix had "continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs" (e.g., "demand" or "lead" generation activities), and that the resulting "increase in product revenue ... reflects increased domestic and international *demand* for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities," thereby creating a duty to disclose their decision to keep demand generation spending flat.

139.     Rather than disclose actual *new* customer growth, which would have informed investors about the true health of the Company's pipeline, Nutanix misrepresented new sales from existing

- 38 -

customers as **new customer sales** in their public statements.  This was possible because when the Individual Defendants spoke about customer growth in their public statements, they referred to them as "end customers" in some statements, but referred to those same customers as "new" customers in other statements.  According to the Company's public statements, "[a] single organization or customer may represent multiple end customers for separate divisions, segments or subsidiaries."  Thus, when the Individual Defendants spoke to investors, they deceptively conflated existing end customers with new ones, leading investors to believe the Company's pipeline was strong and consistently achieving Nutanix's internal goals.  Moreover, despite the Company's pervasive sales force attrition, the Individual Defendants misleadingly stated that the Company purportedly had "significantly increased our sales and marketing personnel," had "strong success in our hiring in the quarter that positions us to deliver on our future growth plans," and executed "flawless[]" hiring.

140.    Nutanix reports to investors – on a quarterly and an annual basis – its sales expense and marketing expense as a single, collective line item on the Company's financial statements, labeled "Sales & Marketing Expense."  The Individual Defendants have confirmed in their public statements that lead generation spending is a key component of the Company's marketing expense.  Indeed, according to CW8 and CW10 as alleged in the Securities Action Complaint, lead generation expenses account for approximately 70% of the Company's total marketing expense as reported on the financial statements.

141.    CW8 stated that sales-related expenses were reported in the Sales and Marketing Expense line item in the Company's income statement.  According to CW10, the sales expense makes up a significantly larger portion of the overall Sales and Marketing Expense reported in the Company's income statement because the sales group's headcount is so much higher than the marketing group's headcount. In particular, CW10 stated that sales expense comprised the majority, or more than 60% of total Sales and Marketing Expense during the relevant time period.

142.    According to the Company's public filings, throughout the relevant time period, Nutanix spent a "significant" amount of money on sales hiring.  Nutanix's sales force hiring caused the Company's overall sales expense to increase every quarter in terms of whole dollars.  However, the Individual Defendants prevented investors from knowing that despite the Company's purported "significant" sales hiring, Nutanix was still way behind in meeting its internal sales goals due to "massive" sales force

attrition.  Thus, while the Individual Defendants told investors that Nutanix had increased sales force headcount by 30%-40% every quarter, they concealed that a large chunk of the Company's sales hiring spending was actually for the purpose of replacing sales representatives who had left Nutanix after just twelve months, on average, of being on the job.

143.    As defendant Williams would later admit on February 28, 2019, Nutanix was impacted "by a shortage of sales reps in the first half of the fiscal year, *resulting in an under-spend by several million dollars*."  Defendant Williams also was forced to admit that the Company "over-rotated" toward "the existing customer base," while it "underspent" on "new customers."  In the Company's 2019 Proxy Statement signed by defendant Pandey, the Company's directors (including defendant Pandey) admitted that Nutanix fell far short of its new customer goals.  Defendant Pandey further admitted that Nutanix "took too much on in terms of new products in 2018," and the "sales force in the channel being a little bit confused," which hurt the Company's overall sales and pipeline.

144.    Further, in a May 30, 2019, CRN news article, titled *Nutanix Blames Revenue, Earnings Miss on Transition to Subscription Model*,[4] defendant Williams admitted that the Company's sales representatives still had not received the necessary training to adequately explain and promote the Company's new subscription model: "Nutanix is also experiencing a slowdown in its sales cycle as the company's reps, along with its distributors, channel partners, and customers will require education on the new [subscription] model, although that will change as subscription pricing becomes the norm."

## IMPROPER STATEMENTS

145.    Beginning in November 2017, the Individual Defendants made repeated material misstatements and omissions of material facts in the Company's public filings, press releases, and other documents concerning Nutanix's (a) sales productivity; (b) lead generation spending; (c) sales personnel hiring; and (d) revenue and customer growth.  During the Company's "planning process" for FY2018, the Individual Defendants secretly diverted funds allocated for lead generation to R&D so that Nutanix could accelerate the development of its desperately needed public cloud-based products, all while falsely telling

---

[4]Joseph Kovar, *Nutanix Blames Revenue, Earnings Miss On Transition To Subscription Model*, CRN (May 30, 2019), https://www.crn.com/news/data-center/nutanix-blames-revenue-earnings-miss-on-transition-to-subscription-model.

investors that Nutanix was "increasing" its spending on lead generation activities, which was resulting in a strong, healthy sales pipeline and sales.

146.   These material misstatements and omissions gave the false impression to investors that Nutanix was increasing its investment in the sales pipeline by hiring sufficient sales personnel and increasing lead generation activities.  In truth, Nutanix was experiencing unprecedented sales force attrition and had flattened its spending on lead generation, while redirecting the Company's funds and other resources to engineering to focus on the development of its lagging public cloud-based products.

**The November 2017 False and Misleading Statements**

147.   On November 30, 2017, after the market closed, defendants Pandey and Williams held a conference call with investors and analysts to discuss the Company's first quarter 2018 financial results. During the question and answer portion of the call, in response to an analyst's inquiry about trends in customer growth, defendant Williams assured analysts and investors that the decline in "new" customer growth was immaterial and merely the product of seasonality:

> [Analyst:] [W]hat was your average billing per customer in the quarter? How has that trended[?] It also looks like the number of new customers that came into your installed base was lower than the past few quarters, so maybe you could comment on that as well.
>
> \*       \*       \*
>
> [Duston Williams:] ***On the customer account, I wouldn't look too much into that. Q1 is always little softer from a customer perspective, but we added a decent amount of customers there and Q2 will pop up naturally, which it usually does quite a bit from the Q1 level***.

148.   The market reacted favorably to these representations.  The Individual Defendants' assurance of stability drove up Nutanix's stock price from its previous close of $32.80 per share on November 30, 2017 to close at $36.06 per share on December 1, 2017—an increase of more than 9%.

**The December 2017 False and Misleading Statements**

149.   On December 13, 2017 Nutanix filed its quarterly report on Form 10-Q for the quarter ended October 31, 2017 (the "December 2017 10-Q") with the SEC.  Defendants Pandey and Williams signed the December 2017 10-Q.

150.   Despite that Nutanix had been flattening its spending on lead generation, the Individual Defendants stuck to the false narrative that the Company was increasing spending on its marketing

activities related to lead generation.  In the December 2017 10-Q, the Individual Defendants falsely stated: "Additionally, as part of our efforts to penetrate and expand in global markets, ***we have continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs.***"

151.   Analysts and investors reasonably understood these marketing activities—brand awareness, promotions, trade shows and partner programs—to be lead generation activities because Nutanix described these marketing activities as lead generation activities in its public filings.  But even without the Company's public filings, analysts' and investors' understanding would have otherwise been, and was also derived from, a common sense understanding of the terms "lead" and "generation" as used in this context.  Thus, it was not surprising when analysts from JMP Securities, as an example, reported that "[p]ipeline generation activities, such as CIO events, digital marketing, branding campaigns, and seminars have been underfunded."  Further, defendant Pandey described these marketing activities as lead generation activities during Nutanix's February 28, 2019 investor conference call.  In the Securities Action Complaint, CW1, CW4, CW9 and CW10 confirmed that Nutanix understood the stated marketing activities to be lead generation activities.

152.   The Individual Defendants also boasted that Nutanix had "significantly increased" its sales and marketing personnel, stating in the December 2017 10-Q:

**Investment in Growth**

We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000 in committed value. ***We have significantly increased our sales and marketing personnel, which grew by 32% from October 31, 2016 to October 31, 2017.*** We estimate, based on past experience, that sales team members typically become fully ramped around the time of the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of October 31, 2017, we considered 63% of our global sales team members to be fully productive, ***while the remaining 37% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team***. We are focused on actively managing this realignment, ***and expect continuing improvement over the coming quarters***. We intend to continue to grow our global sales and marketing team to acquire new end-customers and to increase sales to existing end-customers.

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

153.     In addition, the Individual Defendants boasted that the Company's increased demand and product revenue reflected Nutanix's supposed increased focus on sales and marketing:

> ***The increase in product revenue for the three months ended October 31, 2017 reflects increased domestic and international demand for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities. Our total end-customer count increased from 4,473 as of October 31, 2016 to 7,813 as of October 31, 2017.***

**The March 2018 False and Misleading Statements**

154.     On March 1, 2018, after the market closed, Nutanix held a conference call with analysts and investors to discuss the Company's second quarter 2018 financial results.   During the call, the Individual Defendants continued to tout Nutanix's increasing sales and falsely represent that the Company's pipeline was increasing.  For instance, defendant Williams boasted that Nutanix saw "record sales productivity" during the quarter, stating:

> Performance across all of our geographic regions were outstanding with all three regions recording record performances. EMEA and APAC were especially strong. EMEA's results exceeded its previous best quarter by well over 50%, while APAC exceeded its previous best quarter by over 35%. ***Both of these regions also experienced record sales productivity in the quarter.*** Bookings from international regions were 49% of total bookings in Q2 2018 versus 48% in Q2 2017.

155.     Defendant Pandey similarly highlighted that Nutanix had a "record number of new customers," and stated:

> Q2 was yet another strong quarter for Nutanix with billings, revenue, gross margin and EPS all better than our guidance and consensus. ***Q2 also saw us add a record number of new customers, bringing our total number to 8,870***. . . .  Q2 2018 was a fantastic quarter for our business overall, ***increasing our number of Global 2000 or G2K customers by 34 in the quarter ending with 642.***

156.     During the question and answer portion of the call, analyst Wamsi Mohan commented that Nutanix's "incremental new customer add was very strong" and questioned "what drove that strength."  In response, defendant Pandey falsely credited the strength to Nutanix's "***huge contribution to overall mid market customer acquisition***."

157.     The Individual Defendants' positive—albeit false—statements propelled Nutanix's stock price to $38.87 per share on March 2, 2018 from its previous close of $36.20 per share on March 1, 2018.

158.     During Nutanix's Analyst Day on March 12, 2018, Nutanix's executives again touted the purported increase in new customers.  For instance, defendant Attanasio boasted that Nutanix had achieved

a record number of new customers in the quarter, stating: "*And there's a milestone that we did this last quarter. And that said we had over 1,000 new clients, brand-new clients in the last quarter.*"

159.     Defendant Williams similarly highlighted Nutanix's new customers, stating: "But you step back, you take your calculator out and you do 22.5 minus this 8.2, divided by 14, and that's about 1,000 customers – new customers per quarter. *We just did over 1,000 in Q2.*"

160.     Following these misleading disclosures, Nutanix stock rose from a closing price of $49.10 per share on March 9, 2018 to a closing price of $51.48 per share on March 12, 2018.

161.     On March 15, 2018, Nutanix filed its quarterly report on Form 10-Q for the second fiscal quarter ended January 31, 2018 ("March 2018 10-Q") with the SEC.  Defendants Pandey and Williams signed the March 2018 10-Q.

162.     The March 2018 10-Q stated that the Company was increasing marketing activities relating to lead generation.  In particular, the March 2018 10-Q stated: "Additionally, as part of our efforts to penetrate and expand in global markets, *we have continually increased our marketing activities related to brand awareness, promotions, trade shows and partner programs.*"

163.     The March 2018 10-Q also misleadingly stated that Nutanix was ramping up its sales force and had "significantly increased" its sales and marketing personnel over the prior year.  Specifically, the March 2018 10-Q stated:

**Investment in Growth**

We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000 in committed value. *We have significantly increased our sales and marketing personnel, which grew by approximately 30% from January 31, 2017 to January 31, 2018*. We estimate, based on past experience, that sales team members typically become fully ramped around the time of the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of January 31, 2018, we considered approximately 65% of our global sales team members to be fully productive, *while the remaining approximately 35% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team*. We are focused on actively managing this realignment, *and expect continuing improvement over the coming quarters.* We intend to continue to grow our global sales and marketing team to acquire new end-customers and to increase sales to existing end-customers.

164.    In the March 2018 10-Q, the Individual Defendants attributed the Company's increased demand and product revenue to Nutanix's increased focus on sales and marketing, stating:

> ***The increase in product revenue for the three months ended January 31, 2018 reflects increased domestic and international demand for our solutions as we continued to penetrate and expand in global markets through increased sales and marketing activities. Our total end-customer count increased from over 5,300 as of January 31, 2017 to over 8,800 as of January 31, 2018.***

**The May 2018 False and Misleading Statements**

165.    On May 24, 2018, after the market closed, Nutanix issued a press release announcing the Company's financial results for the third fiscal quarter ended April 30, 2018.  In the release, the Individual Defendants boasted that Nutanix's "***strong success in [ ] hiring***" was driving the Company's growth.  In particular, the press release stated:

> ***"Demand for our solutions remains strong as we saw 67 percent growth in software and support billings and 55 percent growth in software and support revenue. We had strong success in our hiring in the quarter that positions us to deliver on our future growth plans***, as we outlined at our March Investor Day," said Duston Williams, CFO of Nutanix. "The ***continued growth in our software and support billings*** and gross margin expansion in the quarter demonstrates we are successfully executing on our transition to a software-defined business model."

166.    Later that same day, Nutanix held a conference call with analysts and investors to discuss its third quarter 2018 financial results.  During the call, the Individual Defendants continued to represent that Nutanix was on track to achieve its hiring goals and "planned growth."  Defendant Williams told investors and analysts that Nutanix was executing on its hiring plan and had hired a record number of new employees in third quarter 2018.  In particular, defendant Williams stated:

> Last quarter I mentioned we had fallen behind in our hiring and that we would and I quote here have a full court press on hiring in the second half of the fiscal year to try to make up for this headcount shortfall. ***Well we executed this full-court press flawlessly and ended up hiring more new employees in Q3 than in any previous quarter by a wide margin. During the quarter, we added over 60 new sales teams, which is critical to our planned growth for future periods.*** We were very pleased with our higher performance in the quarter and although not yet at our planned headcount we did significantly exceed what we thought was possible when guiding Q3.

167.    The Individual Defendants also reassured investors and analysts that Nutanix was focusing on advertising and *new* customer growth.  The following exchange took place during the question and answer portion of the call:

**Wamsi Mohan**

One for Duston, one for Dheeraj. Duston the new customer acquisition pace has slow down to about 4% year-on-year and that's been decelerating, but you also noted like increasing traction with the last several quarters on larger deals and even including software only. ***So has there been a change in focus towards larger deals versus new customer footprint? And your ramp and sales teams that you alluded to in this quarter, how should we expect that recurring going into next quarter as well?*** I have a follow-up for Dheeraj.

**Duston Williams**

Sure. Now if anything we are focusing a lot of things and ***we've actually had a renewed focus with the channel on new customer logos***. Actually we've got a rebate program in place now and …

**Dheeraj Pandey**

For the first time in the history of the company.

**Duston Williams**

… for the first time in the history of the company and we're really excited actually now this have to obviously get into actual bookings. ***But really excited about what's happening in the channel with the pipeline for new logos and things like that. So there has been -- if anything in acceleration or focus there from a new customer[.]***

168.    In response to an analyst's question about the impact of the Company's shift to software-only products on smaller customer growth, defendant Pandey stated that there was no negative impact and assured him there would be no impact.  The following exchange took place:

**Andrew Nowinski**

Great. Thanks for taking the question. So I just have maybe a follow-up on your new customer growth. So I understand the quarterly seasonality with Q1 and Q3 being the weakest, but if I go back to your Analyst Day, I think $1.8 billion of that $3 billion target was expected to come from non-Global 2000 customers, implying net add about a thousand per quarter. So I guess, while the transition to software-only certainly has led a larger deal sizes, are you concerned with the shift may have negatively impacted your smaller customer growth? And are you still comfortable with that $3 billion target?

*   *   *

**Dheeraj Pandey**

And it's an average over 3.5 year period, we are doing some really -- as I said, cool stuff in the channel with new logos. I don't think anything suffered because of success in larger deals and things like that. So we're comfortable that's going to bounce around. Let's see what happens in Q4, and then we will have a discussion.

**Andrew Nowinski**

Well, I guess, that was more focused on the software transition element. Has that had any impact on large customer versus small customer growth?

**Dheeraj Pandey**

*We don't think.*

**Duston Williams**

*No, I don't think its impacted.* Again, the customer can have anything they want. If they want an appliance they're going to get an appliance. *So there's no reason why that should impact smaller customers or smaller deals.*

**The June 2018 False and Misleading Statements**

169.     On June 12, 2018, Nutanix filed its Quarterly Report on Form 10-Q for the third quarter ended April 30, 2018 (the "June 2018 10-Q") with the SEC. Defendants Pandey and Williams signed the June 2018 10-Q.

170.     The June 2018 10-Q reiterated the false representation in previous quarterly reports that Nutanix was increasing marketing activities relating to lead generation. In particular, the June 2018 10-Q stated: "Additionally, as part of our efforts to penetrate and expand in global markets, *we continue to increase our marketing activities related to brand awareness, promotions, trade shows, and partner programs.*"

171.     The June 2018 10-Q also misleadingly stated that the Company was ramping up its sales force and had "significantly increased" its sales and marketing personnel over the prior year. Specifically, the June 2018 10-Q stated:

> We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000 in committed value. *We have significantly increased our sales and marketing personnel, which grew by approximately 40% from April 30, 2017 to April 30, 2018.* We estimate, based on past experience, that sales team members typically become fully ramped up around the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of April 30, 2018, we considered approximately 57% of our global sales team members to be fully ramped, *while the remaining approximately 43% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall*

- 47 -

*productivity of our sales team.* We are focused on actively managing this realignment and *expect continuing improvement over the coming quarters*. We intend to continue to grow our global sales and marketing team to acquire new end customers and to increase sales to existing end customers.

172.    In the June 2018 10-Q, the Individual Defendants attributed the Company's increased demand and product revenue to Nutanix's increased focus on sales and marketing, stating:

> *The increase in product revenue for the three and nine months ended April 30, 2018 reflects increased domestic and international demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities. Our total end customer count increased from over 6,100 as of April 30, 2017 to over 9,600 as of April 30, 2018.*

173.    On these disclosures, Nutanix stock increased from a closing price of $60.65 per share on June 12, 2018 to close at $63.50 per share the following trading day.

**The August 2018 False and Misleading Statements**

174.    On August 30, 2018, after the market closed, Nutanix held a conference call with analysts and investors to discuss its fourth quarter 2018 financial results.  During the call, the Individual Defendants continued to boast about Nutanix's sales productivity and increased spending.  In particular, defendant Williams highlighted Nutanix's "*strong growth in spending*" and "*ramped rep sales productivity,*" stating:

> *When we sit back and analyze our spending plans*, we take note of the following: *our strong growth in spending* will be completely self-funded by our free cash flow; *our ramped rep sales productivity has increased sequentially for the last three six-month periods ending Q4 2017, Q2 2018, and Q4 2018* and our customer repeat purchase multiples continue to increase.

175.    On the call, the Individual Defendants continued to represent that new customer growth was strong.  For instance, defendant Pandey boasted that Nutanix had "added over 3,600 new customers" in fourth quarter 2018, stating:

> *[We] added over 3,600 new customers*. *In fact, our year-over-year growth accelerated from the previous year* despite a much larger base and having generated a higher free cash flow than the year before.
>
> *    *    *
>
> Coming to some color in Q4, this quarter, *we added approximately 1,000 new customers bringing our total number to 10,610*. In this last fiscal year, we added nearly as many customers as we had when we IPO-ed two years ago. We now count 710 Global 2000

companies as customers, ***adding approximately 40 in Q4 2018 and 140 overall in fiscal 2018***[.]

176.     Analysts took the statements about Nutanix's "accelerated" and "record" new customer growth to mean that the Company was substantially contributing to its sales pipeline.  For example, on February 27, 2019, J.P. Morgan released a report, titled "Partner Feedback Underscores Consistent Year-End Demand Environment; FQ2(Jan) Setup Not Ideal Due To Tough Comp," which stated that "[w]e are seeing a ton of demand for [Nutanix platform] and in almost all of our districts," and "[Pipeline is] definitely fairly strong to where we were last year."

**The September 2018 False and Misleading Statements**

177.     On September 24, 2018, Nutanix filed its Annual Report on Form 10-K for the fiscal year-ended July 31, 2018 ("2018 10-K").  Defendants Pandey, Williams, Long, Bostrom, Conway, Gomo, McAdam, Mhatre, Parks, and Scarpelli signed the 2018 10-K.

178.     In the 2018 10-K, the Individual Defendants stated that Nutanix was increasing its lead generation marketing activities.  In particular, the 2018 10-K stated: "Additionally, as part of our efforts to penetrate and expand in global markets, ***we continue to increase our marketing activities related to brand awareness, promotions, trade shows, and partner programs.***"

179.     The Individual Defendants also misleadingly stated that the Company was ramping up its sales force and had "significantly increased" its sales and marketing personnel over the prior year.  Specifically, the 2018 10-K stated:

> We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000. ***We have significantly increased our sales and marketing personnel, which grew by approximately 42% from July 31, 2017 to July 31, 2018***. We estimate, based on past experience, that sales team members typically become fully ramped up around the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of July 31, 2018, we considered approximately 59% of our global sales team members to be fully ramped, ***while the remaining approximately 41% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team.*** We are focused on actively managing this realignment and ***expect continuing improvement over the coming quarters***. We intend to continue to grow our global sales and marketing team to acquire new end customers and to increase sales to existing end customers

- 49 -

180.     In the 2018 10-K, the Individual Defendants falsely attributed the Company's increased demand to Nutanix's increased sales and marketing activities, stating:

> ***Product revenue increased year-over-year for both fiscal 2017 and fiscal 2018. The increase in product revenue reflects increased domestic and international demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities. Our total end customer count increased from over 3,700 as of July 31, 2016 to over 7,000 as of July 31, 2017 and to over 10,600 as of July 31, 2018.***

**The November 2018 False and Misleading Statements**

181.     On November 5, 2018, the Director Defendants caused Nutanix to file a proxy statement for its 2019 annual meeting of shareholders pursuant to Section 14(a) of the Exchange Act (the "2018 Proxy Statement").

182.     In the 2018 Proxy Statement, Defendants represented that the Company was "focus[ed] on ... continued investment in acquiring new end customers," when, in fact, the opposite was true and the Company kept lead generation activities flat:

> The compensation committee believes that bookings from Global 2000 companies and new customer adds are important indicators of the success of key elements of our growth strategy, which includes ***our focus on*** expanding our position with the Global 2000 and ***continued investment in acquiring new end customers***.

**The December 2018 False and Misleading Statements**

183.     On December 10, 2018, Nutanix filed its quarterly report on Form 10-Q for the fiscal first quarter ended October 31, 2018 (the "December 2018 10-Q") with the SEC.  Defendants Pandey and Williams signed the December 2018 10-Q.

184.     While the Company was keeping lead generation activities flat, the December 2018 10-Q stated that Nutanix was increasing its marketing activities related to lead generation.  In particular, the December 2018 10-Q stated:

> Additionally, as part of our efforts to penetrate and expand in global markets, ***we continue to increase our marketing activities related to brand awareness, promotions, trade shows and partner programs***.

185.     The Individual Defendants also reiterated the false statement that Nutanix was ramping up its sales force and had "significantly increased" its hiring of sales and marketing personnel, stating in the December 2018 10-Q:

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

We plan to continue to invest in sales and marketing so that we can capitalize on our market opportunity, and as part of this, we intend to specifically expand our focus on opportunities with major accounts and large deals, which we define as transactions over $500,000. **We have significantly increased our sales and marketing personnel, which grew by approximately 40% from October 31, 2017 to October 31, 2018.** We estimate, based on past experience, that sales team members typically become fully ramped up around the start of their fourth quarter of employment with us, and as our newer employees ramp up, we expect their increased productivity to contribute to our revenue growth. As of October 31, 2018, we considered approximately 58% of our global sales team members to be fully ramped, **while the remaining approximately 42% of our global sales team members are in the process of ramping up. As we shift the focus of some of our new and existing sales team members to major accounts and large deals, it may take longer for these sales team members to become fully productive, and there may also be an impact to the overall productivity of our sales team.** We are focused on actively managing this realignment **and expect continuing improvement over the coming quarters.** We intend to continue to grow our global sales and marketing team to acquire new end customers and to increase sales to existing end customers.

186.    In addition, in the December 2018 10-Q, the Individual Defendants falsely attributed the Company's increased revenue and demand to increased sales and marketing activities, stating:

> **The increase in product revenue for the three months ended October 31, 2018 reflects increased demand for our solutions as we continue to penetrate and expand in global markets through increased sales and marketing activities. Our total end customer count increased from approximately 7,810 as of October 31, 2017 to approximately 11,490 as of October 31, 2018.**

## REASONS THE STATEMENTS WERE IMPROPER

187.    The statements in ¶¶145-186, above, which the Individual Defendants either directly made and/or caused Nutanix to make, were materially false and misleading.  The statements concerning Nutanix's increasing lead generation spending were false and misleading because the Individual Defendants had made decisions in the "planning process" for the 2018 and 2019 fiscal years to keep investment in the generation of new leads "flat" and reallocate lead generation spending to R&D.  As the Individual Defendants belatedly admitted, "during [the Company's] planning process" for FY2018 and FY2019, Nutanix "kept lead generation spend flat" and was focusing on large **existing** Enterprise accounts, rather than "new" customers.  Thus, contrary to the Individual Defendants' representations, Nutanix had not "*increased*" its "sales and marketing activities."

188.    Confidential witnesses in the Securities Action confirmed that the Company's spending on lead generation was inadequate and that Nutanix was overinvested in R&D.  For instance, CW2 stated that in FY2018, Nutanix was making "quite a bit" of investment in research and development – so much

so that Nutanix became "overinvested" in R&D.  CW5 stated in the Securities Action Complaint that during CW5's tenure (December 2017 to June 2019), Nutanix did not properly invest in the development of new sales accounts and most of Nutanix's sales were driven from *existing* accounts.  Likewise, CW4 stated that during CW4's tenure (January 2018 to May 2019), the Digital Marketing group did not have enough personnel to spend even the smaller amount of money that was allocated to it and that Digital Marketing was only allocated $830,000 per quarter in FY2018, which was increased to $2.3 million in January 2019 when it became clear that the quarter was not going to be good.  CW3 stated that in May 2018, when CW3 started at Nutanix, there were not many sales leads and leads were "pretty dry" and that throughout CW3's tenure (May 2018 to July 2019), this witnesses' colleagues on the Commercial Northwest team complained that they were not "getting help from the demand generation" group because Nutanix did not sponsor many events in CW3's territory.  CW9 similarly confirmed that during CW9's employment, demand generation spending had been reduced, resulting in fewer sales leads being available for the sales team.

189.    The statements concerning sales productivity were false and misleading when made because, as defendant Pandey admitted in February 2019, Nutanix's sales force's productivity was negatively impacted in a material way because the sales force was confused by Nutanix introducing too many new products all at once in 2018.  Thus, contrary to the Individual Defendants' statements, Nutanix had not implemented "strong growth in spending" relating to sales productivity, and Nutanix's sales force productivity was decreasing.  For example, for the quarter-ended January 31, 2018, Nutanix reported that "approximately 65% of our global sales team members to be fully ramped," yet for the quarter ended April 30, 2018, the Individual Defendants represented approximately 57%, or nearly 10% less, of the sales force was fully ramped.

190.    The statements touting the purported increase in sales personnel were false and misleading because they gave the false impression that the Company was on track to meet its internal sales hiring goals needed to achieve its internal pipeline and revenue goals when, in fact, it was not.  Indeed, the Individual Defendants **admitted** on February 28, 2019, "***over the past few quarters***, we have not kept pace with our bullish sales hiring goals."

191.     Confidential witnesses in the Securities Action confirm that the Individual Defendants' statements about increases in sales personnel were false and misleading when made.  According to CW1, CW2, CW7, and CW11 in the Securities Action Complaint, Nutanix was behind on its sales hiring because throughout the relevant time period, the Company was experiencing significant attrition of its sales personnel, 20-50% of whom were leaving on average after twelve to fourteen months—as compared to competitors such as VMware, whose average employment term was 2.2 years.  Due to the significant sales force attrition, Nutanix could not keep pace with the Company's internal hiring goals.  And the reason that between 35% and 43% of sales people were still ramping up was not due to the change in focus to Enterprise accounts (e.g., "major accounts and large deals"), but rather because Nutanix was experiencing "massive" attrition of its sales force across all regions at all levels, and the Company's sales productivity and the resulting sales and pipeline were substantially declining.

192.     Confidential witnesses confirmed in the Securities Action Complaint that Nutanix had high sales force attrition and/or insufficient sales staff, and thus, Nutanix was far from being on track to meet its hiring goals:

- CW1 stated there was an unusually large amount of turnover throughout CW1's employment at Nutanix (December 2016 to June 2018) and approximately 20% to 50% of sales personnel were leaving after only six to twelve months of employment.

- CW2 stated turnover in the sales department was an issue at Nutanix during CW2's employment.

- CW4 stated that throughout CW4's tenure (January 2018 to May 2019) the marketing department did not have enough personnel in the digital marketing group to spend even the smaller amount of money that was allocated to it during CW4's employment.

- CW5 stated that throughout CW5's employment (December 2017 to June 2019), Nutanix did not properly invest in the development of new sales accounts in terms of team sizes where a Global account team at Nutanix typically included CW5 and one engineer as compared to Cisco or Dell who staffed their global accounts with eight to twelve people.

- CW7 stated throughout CW7's tenure at Nutanix (September 2015 to August 2018), turnover was chronic and systemic throughout the Nutanix organization, at every level from senior leadership down to sales engineer where there were three different VPs in charge of the Bay Area from December 2017 to August 2018 and during CW7's three-year tenure at Nutanix, CW7 experienced "two generations" of sales personnel.  CW7 stated the average tenure at Nutanix for a salesperson was approximately twelve to sixteen months.

- CW9 stated that Nutanix was experiencing lots of turnover, including numerous director-level and above sales personnel over the course of CW9's tenure where in the five quarters that CW9 worked at Nutanix, CW9 had two different direct reports and there was at least one change in CW9's reporting hierarchy every quarter.

- CW11 stated that throughout CW11's employment (March 2018 to February 2019) Nutanix had "massive turnover" in the sales force, which required it to have to increase beyond the norm its sales hiring all at once, resulting in Nutanix having to replace productive, experienced sales people with new people who took a year to ramp up and become fully productive.

193.    The statements concerning revenue and customer growth were false and misleading because, as the Individual Defendants admitted, Nutanix was actually focusing on "existing" larger customers, rather than "new" customers, because those "dollars [we]re easier to get," and the Company "probably underspend a little bit on new customers."  The Individual Defendants also eventually admitted that Nutanix "kept lead generation spend flat" for FY2018 and FY2019 and reallocated lead generation spending to R&D.  Thus, Nutanix was not "focus[ed] on ... continued investment in acquiring new end customers," as had been publicly represented.  Further, defendant Pandey *admitted* that he knew Nutanix had a pipeline problem by at least December 2018 (the same time Attanasio dumped his Nutanix stock). As defendant Pandey acknowledged at the June 5, 2019 William Blair 2019 Growth Stock Conference:

> And then in *December of this last year, we realized that we actually have a pipeline problem that we've not focused enough*. And doing these large deals and these large customers is actually a double-edged sword. That's why in January, we started to really focus on the pipeline, the culture of the company. Both from sales and marketing point of view, we've had to change.

194.    Confidential witnesses in the Securities Action further confirm that the Individual Defendants' statements about revenue and customer growth were false and misleading when made. According to CW1, CW2, CW7, and CW8 in the Securities Action Complaint, Nutanix was only able to report the purported "increased" revenue and "demand" by employing the unsustainable practice of pulling in every quarter sales from future quarters predicated on extreme discounting.  Thus, Nutanix was not actually experiencing "increased" leads, i.e., "demand," as the Individual Defendants claimed.  The Individual Defendants' statements about revenue and customer growth also gave the misleading impression that Nutanix's pipeline was increasing when, in fact, it was decreasing because the Individual

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1  Defendants had diverted critical lead generation spending to R&D, Nutanix was experiencing significant

2  undisclosed sales force attrition, and Dell was providing the Company with fewer new sales leads.

3      195.    Further, the Individual Defendants' statements about the purported increase in "end-

4  customers" was materially misleading because, when read in context with the statements regarding

5  "*increased* domestic and international *demand*," "*penetrat*[ing] and *expand*[ing] into global markets," and

6  "*increased*" lead generation activities, it gave the false impression that Nutanix was adding *new* customers,

7  when, in fact, according to CW1 and CW5 in the Securities Action Complaint.  And as the Individual

8  Defendants later admitted, Nutanix was unable to obtain new customers due to the Individual Defendants'

9  "decision" to keep lead generation "flat" and sales force attrition, and most of Nutanix's sales were driven

10  from *existing* accounts.

11      196.    Confidential witnesses in the Securities Action confirm Nutanix was mainly closing sales

12  with "existing" customers, rather than "new" customers.  According to CW1 in the Securities Action

13  Complaint, by August 2018, approximately 80% of Nutanix's sales came from 15% of its customers who

14  were all existing customers, and according to CW5, most of Nutanix's sales were driven from *existing*

15  accounts. Moreover, new customers had been decreasing over the relevant time period such that, according

16  to the CWs in the Securities Action Complaint, by March or April of 2018, the sales pipeline was so

17  depleted it was at least 20-30% below the Company's internal targets:

- CW1 stated that by April or May 2018 it was "very obvious" that Nutanix's pipeline
  was drying up and in trouble and by August 2018, the pipeline was at least 25-30%
  below the Company's targets as at least half of the sales force missed its sales quotas
  prompting the Individual Defendants to state at the 2018 SKO that Nutanix would
  implement programs to help replenish the pipeline.

- CW3 stated that by May 2018, the pipeline was "pretty dry."

- CW8 stated the sales pipeline as reported in Salesforce.com was at least 20-30% below
  the Company's targets as of March or April 2018.

- CW11 stated that by November 2018, the pipeline "would have looked bad."

25      197.    The Individual Defendants' representation that smaller Commercial accounts had not

26  suffered and there was "no reason why [Nutanix's] shift to a software-only company] should impact

27  smaller customers or smaller deals," was false and misleading because smaller customers had in fact

28  suffered and were negatively impacted by the Company's shift.  According to CW1, CW3 and CW12 in

the Securities Action Complaint, as a result of Nutanix focusing all of its resources on large existing Enterprise customers, as of January 2018 there were barely any sales leads for smaller Commercial accounts. Indeed, according to CW1, CW3 and CW12, because sales representatives in charge of small Commercial customers did not have the necessary tools and resources to close deals, they were unable to meet sales quotas in FY2018 and FY2019.

### AS THE TRUTH BEGINS TO EMERGE, DEFENDANTS CONTINUE TO MISLEAD THE MARKET

**The Individual Defendants Reveal that Nutanix Underspent on Lead Generation and Under Hired Sales Personnel, but Downplay the Impact of Their Actions**

198.   On February 28, 2019, after the market closed, Nutanix announced its dismal financial results for the second quarter of the 2019 fiscal year and lower than expected guidance for Q3 FY2019. While the Individual Defendants had repeatedly told investors and analysts that Nutanix was increasing its investment in lead generation activities and keeping up with sales force hiring goals, the Individual Defendants revealed that Nutanix had actually been *underspending* on lead generation and *under hiring* sales personnel:

> "We were pleased with our large deal activity and our progress in moving toward a subscription model," said Duston Williams, CFO of Nutanix. "*Looking ahead, our third quarter guidance reflects the impact of inadequate marketing spending for pipeline generation and slower than expected sales hiring. We took a critical look at these areas and have taken actions to address them.*"

199.   Concerning Nutanix's lower than expected Q3 FY2019 guidance, the Individual Defendants stated:

**Q3 Fiscal 2019 Financial Outlook**

For the third quarter of fiscal 2019, Nutanix expects:

- Revenue between $290 million and $300 million;
- Billings between $360 million and $370 million;
- Non-GAAP gross margin between 75% and 76%;
- Non-GAAP operating expenses between $330 million and $340 million; and
- Non-GAAP net loss per share of approximately $0.60, using approximately 183 million weighted shares outstanding[.]

200.   The Individual Defendants attributed the lower than expected Q3 FY2019 guidance directly to underspending on lead generation and sales hiring, stating: "[l]ooking ahead, our third quarter

guidance reflects the impact of ***inadequate marketing spending for pipeline generation and slower than***

***expected sales hiring***.  We took a critical look at these areas and have taken actions to address them."

201.     During the conference call that followed that announcement, defendant Pandey disclosed

that Nutanix had been having trouble with "sales execution."  In particular, defendant Pandey stated:

> I would like to take you through three key areas of our business where we are making adjustments to maximize our strong market opportunity. First, ***we recently identified some imbalances in our lead generation spending that were beginning to impact our sales pipeline. We recognized these imbalances in Q2*** and have adjusted our lead generation spend accordingly. Despite these, these actions will take some time to take effect and therefore our Q3 guidance reflects the short-term impact of these imbalances. The changes we implemented are already showing early positive signs at the top of the funnel and we expect to see increasing traction in our sales pipeline over the coming quarters. Duston will provide more details on these imbalances and our actions taken later in the call.

> Second, ***over the past few quarters, we have not kept pace with our bullish sales hiring goals. This plays a role in our sales pipeline development***. Hiring at this scale is a norm and there is an ebb and flow to the process. We have been putting more focus on this aspect of our execution as we don't foresee any macro weakness in the horizon. **Finally, we are in the process of addressing a few opportunities to improve our sales execution in the Americas region. To address this, we have promoted Chris Kaddaras, our current Head of EMEA sales to lead both the Americas and EMEA sales organizations[.]**

202.     Defendant Williams confirmed that the Company missing its pipeline targets was the direct

result of Nutanix's underspending on lead generation, stating:

> ***In Q2***, while we were pleased with our progress with moving toward recurring subscription business as well as with our large deals in EMEA performance, **we were disappointed to miss our pipeline targets. Generally speaking, our Q2 was a quarter that should afford us to build backlog and that did not happen this year**.

> ***As Dheeraj discussed at the beginning of the call, we recently identified some imbalances in our lead generation spending that were beginning to impact our sales pipeline. Lead generation spending is a key component to building pipeline, which ultimately significantly impacts bookings, billings and revenue***. In fiscal 2018 I'm sorry, in fiscal 2017 we had increased lead generation spend by 75% over the prior year. This increase drove strong pipeline generation of fiscal 2017 and fiscal 2018, as well as improved efficiencies within the lead generation spend during fiscal 2018. Encouraged by our overall company performance, ***in fiscal 2018, we reallocated some of our lead generation spending to other priorities. As a result, there was a fourth quarter period from Q4 2017 to Q3 2018 that we basically kept lead generation spend flat***, all while the company continued to perform quite well.

> ***Based on the lead generation spend efficiencies we experienced in FY 2018, we assumed further efficiencies would take place in FY 2019 and we again reallocated capital away from lead generation spend during our planning process. In Q2, we noticed a pattern that some of our lead generation efficiencies that we had planned for were not being***

- 57 -

*realized. We began taking actions to reallocate capital back to lead generation spending, while at the same time, dialing back on non-sales hiring. We have continued these actions into Q3. Our quota-carrying sales reps also contributed to pipeline build and our pipeline targets were further impacted by a shortage of sales reps in the first half of the fiscal year, resulting in an under-spend by several million dollars. It's important to note that all this shifting of spend back to lead generation is not an insignificant amount. The magnitude of the shift is in a few tens of millions*.

Although we started making this adjustment in Q2, we expect it to take a couple of quarters to show meaningful results. In the meantime, we will double down on driving further business from within our large existing enterprise customer base, while the augmented lead generation spending works its way into the pipeline. This brings us to our guidance for Q3, where we expect significant impact from imbalance and lead generation spending earlier in the year, and slower-than-expected sales hiring. Expect the following, billings between $360 million and $370 million, revenue between $290 million and $300 million, gross margins between 75% and 76%, operating expenses between $330 million and $340 million, and a per-share loss of approximately $0.60, using weighted average shares outstanding of 183 million.

203.     During the question and answer portion of the call, analysts expressed concern that Nutanix introduced too many new products in 2018 and underspent on lead generation.  For instance, the following exchange took place:

**Jason Ader**

Yes, thank you. Guys, I wanted to – I know that lead-gen is going to dominate the conversation here. But, I wanted to understand a little bit more about whether you think number 1, you may have over rotated a little bit much to the – too much to the large enterprise, and also *whether you think it took too much on in terms of new products in 2018*, which may have affected the demand gen just from the standpoint of maybe the sales force in the channel being a little bit confused with all of these new products?

**Dheeraj Pandey**

[O]n the product portfolio, yes, I mean, obviously, I'm a big fan of Andy Grove and the way he wrote two chapters in the book, Let Chaos Reign and then Rein in Chaos. *So, we let chaos reign in the first half of '18 with product portfolio in terms of lack of crisp messaging and then obviously when we realized that we had to do a better job of messaging and classification and things of that nature*. I think the Core, Essentials, Enterprise has been a great sort of storytelling methodology for everybody and people need to realize that they can't just sell things because Beam is a thing and IoT is a thing and Calm is a thing, but they have to really think about the customer journey. And really empathize on behalf of the customer to say look, start with Core, then Essentials, then Enterprise. So, I think it's helped a lot in the last 4 months, 5 months. But yes, it comes up. *We are a high velocity company and sometimes we let chaos reign and then we go and rein in the chaos*. But I think the most important sort of – at least in my head is how our sales force has actually gone through two big transformations in the last 18 months, 24 months.

- 58 -

204.     In response to an inquiry about the cause of the lead generation inefficiencies, the Individual Defendants admitted that Nutanix had not only underspent on lead generation, but had also underspent on obtaining new customers and headcount for sales.  The following exchange took place:

**Rod Hall**

Yes, hi guys. Thanks for the question. I guess I wanted to go back to this lead generation issue, as I'm sure you expected to get a few questions on it. I'd just ask, if you could give us a little bit more color on why that efficiency deteriorated so much in this past quarter and maybe a little bit of an example of where these leads are coming from and have you changed the source of leads, anything like that? Then I have a follow-up to that.

**Duston Williams**

Yes, why don't I start, Rod and then I'm sure Dheeraj will want to pitch in here also. Let me just again kind of reiterate a few things that I had said in the script, and maybe a few more things, but if you back up again back to FY 2017, where we increased spending 75% year-over-year, effectively allowed us to build some pretty good backlog, pretty good pipeline in FY 2017 and into FY 2018. And then in 2018, we started to see some pretty good efficiencies within that spend. We talked about efficiencies as how much pipeline we build and ultimately how much bookings we get out of a demand dollar spent. And we saw some pretty good efficiencies there in 2018.

***Now, looking back at it, we probably over rotated a bit to the existing customer base and large customers there, where those efficiency dollars are easier to get and probably underspent a little bit on new customers, which those efficiencies are little tougher to get on new customers.***

**Dheeraj Pandey**

I think one other thing I'd also add to this is that, it's like building this business is like building a software. There is who'd would market it like an operating system and things emerge, ***like in the last three months, we saw the aspect of the business around how we needed to have actually spent on demand gen in 2018 to have made these new customers as existing customers of 2019.*** And as you know from the last 2 years of a lot of our go-to-market has been around, making our existing customers even more successful, and ***it camouflaged some of the things that we needed to do, in terms of adding to the cohort of existing every year, so that next year you can go, reap that customer base itself.***

**Duston Williams**

So, ***we took some action in December and we reallocated dollars in December. We did the same thing in January, and we're doing the same thing now in Q3 and we'll repeat that in Q4, reallocating more dollars to demand gen and some away from non-sales hiring***.

205.     Defendant Pandey also admitted that the Individual Defendants were aware that slowing demand spend results in adverse results from a dry sales pipeline, because the Individual Defendants had taken this action in the past and seen this same result.  In particular, defendant Pandey stated:

- 59 -

**Rod Hall**

Okay, okay. And then, my follow-up to that thanks for that and I wanted to, I guess, follow-up and see NetApp called out this weakness in January. And I'm wondering if you if there is any possibility in your mind that this lead generation deficiency as you perceive it, might be due to external factors like competition or maybe demand disruption as a result of the trading the other issues, the government shutdown etcetera, do you think that there's any external forces that might be affecting what you're seeing?

**Dheeraj Pandey**

Yes, I mean obviously, the things that we don't know that we don't know, but based on everything that we analyze in this business. We first look internally and it's about inputs and outputs, and *we ended up focusing too much on outputs in 2018, based on what we are getting from our existing customers*. So, we went back and did some first principles thinking to say, hey, why was 2017 like that, *because in 2016 we had slowed down quite a bit in demand spending too*, because of those three quarters of macro issues with China and oil crisis and Brexit and everything. So, 2016 with a slow year for us *and then we woke up in 2017 and said, we got to do this thing around demand as well, and that really helped us in 2017 and 2018.*

*       *       *

**Duston Williams**

*I think* ultimately, *Rod, we squeeze too hard on lead generation spend and we shouldn't have done that,* and we've corrected *that*.

206.    In response to a question concerning where Nutanix reallocated the lead generation spend, defendants Williams explained that it went to engineering for new products:

**Matt Hedberg**

Great, thanks. I want to dig in a little bit more on the sort of the questions that were just asked. I'm curious what areas did you reallocate capital to versus lead-gen? And is the plan sort of beyond this Q3 to increase the overall level of spending or is it just reallocating back? And then maybe secondarily, is this primarily a U.S. issue, given your comments on EMEA, and the sales commentary as well, the sales head commentary?

*       *       *

**Duston Williams**

On the expenses, *we reallocate clearly to headcount, a lot went to engineering, some new products and things like that*[.]

207.    Concerning sales representatives' productivity, defendant Pandey stated that "productivity is still a derived variable.…  It's not the real input.  *The inputs are salespeople and pipeline spend, the*

*demand gen spend that we talked about a little while ago*."   On sales representatives' productivity, defendant Pandey further stated:

> Yes, I think you know it starts with – as I said, two simple inputs, *it's time and money and time is what sales force actually puts in, and money is what we give them to go and do all sorts of events and how do you set up meetings*. So, we start looking at these different tiers of the funnel starting from marketing qualified leads to meeting setup to opportunities created to things below that in the funnel itself. And in that sense, I don't think the methodology has changed. It's just that the input which is the most basic input is dollars and that has to be the certain formula to that how those dollars convert to leads and to meetings and to opportunities and things of that nature. So, I think we are dispersing a lot of this stuff across the world in like 17 different regions of the world and it's very similar to what we did almost 18 months ago.

208.    On this news, Nutanix stock declined nearly 33%, from a closing price of $50.09 per share on February 28, 2019, to a close of $33.70 per share on March 1, 2019.

209.    Noting the severe negative impact of Nutanix's failure to adequately invest in demand generation activities and hire sales force, analysts downgraded the Company's stock.  For instance, on February 28, 2019, Wells Fargo Securities downgraded Nutanix, citing "the company's disappointing outlook reflective of sales under-investment" and noting that "the productivity ramp of new sales hires take time (4-8+ quarters)."

210.    Another financial analyst expressed concern that "*the magnitude* of the near-term revenue reset and the associated negative leverage on margins and cash flow is *alarming*" and the "impact of underinvesting in demand generation activities and under hiring is *severe*."

211.    As Wells Fargo Securities later summarized: "Nutanix [ ] highlighted execution issues related to (1) lead generation spending, and (2) sales hiring and sales execution issues in Americas as resulting a forward pipeline decline."[5]

212.    Given the magnitude and severity of the issues, analysts concluded that they must have "been building up for several quarters" and finally "came to a head" in Q2 FY2019.  For instance, in a March 1, 2019 report, William Blair stated that "we believe these events have to some extent *overwhelmed the salesforce, impacting productivity and efficiency and impairing new customer acquisition.  We*

---

[5] *NTNX: Disappointing Results/Guide As Subscription Transition Accelerations*, Wells Fargo (May 30, 2019).

1    *believe these issues must have been <u>building up for several quarters</u>*, and in this past quarter they came

2    to a head, as seen by the dramatically reduced pipeline."

3    213.   On March 1, 2019, Jefferies reported that an "imbalanced spending on lead generation

4    earlier in the year as well as slower than expected sales hiring … impacted the sales pipeline."  JMP

5    Securities similarly report that same day that the money Nutanix should have spent on lead generation

6    was deflected to product development:

> Management under invested in new account lead generation, as the company directed
> spending to other areas, such as product development. ***Pipeline generation activities, such
> as CIO events, digital marketing, branding campaigns, and seminars have been
> underfunded***, as greater priority was placed on other business segments. Management
> suggested it believed it was achieving greater efficiency with expanding the company's
> brand awareness, as well as greater awareness of HCI (hyper converged infrastructure) in
> general.

12   214.   On March 11, 2019, Nutanix announced the departure of Attanasio, effective March 8,

13   2019.  RBC Capital Markets pointed out that "***Mr. Attanasio's departure shouldn't be a surprise*** and was

14   a further fallout from last quarter's poor execution," and noted that ***Defendant Pandey's appointment to***

15   ***interim CRO "makes a lot of sense given how active he is in the sales process***."[6]

16   215.   Notwithstanding the forgoing, thereafter, the Individual Defendants continued to mislead

17   the market and downplay the consequences of their underinvestment in market and sales activities and

18   personnel.  For instance, while Nutanix had been observing setbacks and the depletion of its sales pipeline

19   since fiscal 2017, during the Company's earnings call on February 28, 2019, defendant Williams assured

20   analysts and investors that the lack of lead generation spending only "***pushed things a quarter or two***,"

21   and stated:

> In fiscal 2018 I'm sorry, in fiscal 2017 we had increased lead generation spend by 75%
> over the prior year. ***This increase drove strong pipeline generation*** of fiscal 2017 and
> ***fiscal 2018, as well as improved efficiencies within the lead generation spend during
> fiscal 2018***.

---

[6] Matthew Hedberg, *Nutanix Inc. Thoughts on Nutanix's CRO departure*, RBC Capital Markets (Mar. 11, 2019).

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

216.    In addition, the Individual Defendants falsely stated that Nutanix did not begin seeing issues with its lead generation spend or sales pipeline until Q2 FY2019:

> *But the company was doing fine in FY 2018 and then we go into FY 2019 and we have a lot of spending demands and a lot of pressure on spending and a lot of people looking for leverage, and we made a decision at that point that we figured those efficiencies would not only continue, but increase in FY 2019* and we reallocated spending away from demand gen to a certain degree into headcount.

217.    On April 22, 2019, Nutanix announced the resignation of its VP of Global Channel Sales, Rodney Foreman, after just fifteen months at the Company.

**Defendants Finally Reveal the Impact of Nutanix's Underinvestment in Lead Generation and Under Hiring of Sales Personnel is Far Worse than Previously Disclosed**

218.    On May 30, 2019, after the market closed, Nutanix issued a press release announcing its dismal financial results for fiscal third quarter 2019.   Notwithstanding the Individual Defendants' assurances that Nutanix's underinvestment in lead generation and sales personnel would not impact the Company, Nutanix reported it had failed to meet its revenue targets for the second quarter in a row as a result of these issues:

**Q3 Fiscal 2019 Financial Highlights**

- *Revenue: $287.6 million (at 77.1% non-GAAP gross margin), down from $289.4 million (at 68.4% non-GAAP gross margin) in the third quarter of fiscal 2018*
- **Billings**: $346.0 million, down from $351.2 million in the third quarter of fiscal 2018
- **Net Loss**: GAAP net loss of $209.8 million, compared to a GAAP net loss of $85.7 million in the third quarter of fiscal 2018; Non-GAAP net loss of $103.0 million, compared to a non-GAAP net loss of $34.6 million in the third quarter of fiscal 2018
- **Net Loss Per Share**: GAAP net loss per share of $1.15, compared to a GAAP net loss per share of $0.51 in the third quarter of fiscal 2018; Non-GAAP net loss per share of $0.56, compared to a non-GAAP net loss per share of $0.21 in the third quarter of fiscal 2018[.]

219.    The fiscal third quarter 2019 results of $287.6 million in revenue fell well short of the $290 to $300 million revenue target the Individual Defendants set just one quarter before.

220.    Later that day, Nutanix held a conference call with analysts and investors to discuss the Company's disappointing financial results.   During the call, defendant Pandey disclosed that the Company's troubles relating to underspending on sales hiring and lead generation were far from over:

Looking back, Q3 was a mixed quarter for us as we delivered better-than-expected gross margins and EPS and strong growth in our subscription-based revenues indicating an acceleration of our business model transition, while also delivering billings and revenue below our guidance range. ***As you may recall our guidance last quarter was less than expected as we needed to rebuild our pipeline by doubling down on lead generation and increasing our focus on sales hiring and execution, especially in the Americas.***

*       *       *

During Q3, we executed well on our strong plan to ramp lead generation and thus improve sales execution.

221.   Despite the Company's representations that it was actively increasing lead and hiring headcount, during the question and answer portion of the call, defendant Williams revealed that not much progress had been made.  The following exchange took place:

**Alex Kurtz**

Yes, thanks, guys for taking a clarification and a question. Just looking back at the quarter, Duston, do you feel like -- you gave a bunch of reasons about what impacted the top-line and billings from the subscription change, I just want to be really clear. Where you guys on plan for the quarter as far as what you expected to hit just from a transaction perspective outside of all these changes that we are doing to subscription.

**Duston Williams**

Well, ***clearly the quarter should've been better overall***, some of this again was impacted. We on the software or the subscription transition, we outperformed what we originally thought by well over 25%. So that clearly had some impacts there. ***But clearly, we've got some issues we're working through and the pipeline we said we're going to work on that***. That's up 40% quarter-over-quarter, we said we're going to work on sales hiring. That's improved substantially quarter-over-quarter, we've got some leadership changes we're working through and that's clearly impacted the Q3 and it will, as I said, impact also Q4.

222.   On this news, Nutanix's stock price plummeted more than 14%, to $28.07 per share on May 31, 2019, from its previous close of $32.67 per share on May 30, 2019.

223.   Analysts also reacted to Nutanix's lower than expected third fiscal quarter earnings. Morgan Stanley downgraded Nutanix from "overweight" to "equal weight" and cut the Company's price target from $53 to $37 per share.  Piper Jaffray also downgraded the Company's stock from overweight to neutral, and cut their price target from $47 to $28, noting that "***It is clear this model is unsustainable, requiring massive amounts of spending just to support modest revenue growth,*** which ***we believe is***

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   *attributable to competition*."  Piper Jaffray further noted that "[t]he company continues to struggle with

2   execution issues."  Stifel commented that "[c]haos still reigns."

3       224.    On May 30, 2019, Nutanix's Chief Product Development Officer, Potti, resigned.

4              **INSIDER SALES BY THE INDIVIDUAL DEFENDANTS**

5       225.    Rather than providing the market with correct information, the Insider Selling Defendants

6   —defendants Parks, Vadakkedath, Williams, Sangster, Attanasio, Long, Scarpelli, McAdam, Wall, and

7   Gomo—used and acted on their knowledge of Nutanix's material, nonpublic information by selling their

8   personal Nutanix holdings while the Company's stock was artificially inflated.  As officers and/or directors

9   of Nutanix, the Insider Selling Defendants were privy to material, nonpublic information about, among

10   other things, the true health and condition of the Company's business and business prospects.  While in

11   possession of this "inside" knowledge:

12       226.    Defendant Parks sold 2,319,681 shares of his personally held Nutanix stock for proceeds

13   of over $87.8 million.  Defendant Parks' sales were timed to maximize profit from Nutanix's then

14   artificially inflated stock price.  Defendant Parks' sales are also suspicious given that his stock sales

15   represented over 98% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 2,469,642 |
| Shares Sold During Sales Period ("SP") | 2,319,681 |
| Shares Disposed (Other) During SP | 2,200 |
| Total Shares Held During SP | 2,363,385 |
| Shares Remaining SP | 41,504 |
| **Total Proceeds from Sales** | **$87,879,845.78** |
| **% of Total Ownership Sold During SP** | **98.15%** |

21       227.    Defendant Vadakkedath sold 620,000 shares of his personally held Nutanix stock for

22   proceeds of over $26.9 million.  Defendant Vadakkedath's sales were timed to maximize profit from

23   Nutanix's then artificially inflated stock price.  Defendant Vadakkedath's sales are also suspicious given

24   that his stock sales represented over 56% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 485,830 |
| Shares Sold During SP | 620,000 |
| Shares Disposed (Other) During SP | 34,784 |
| Total Shares Held During SP | 1,101,830 |
| Shares Remaining SP | 447,046 |
| **Total Proceeds from Sales** | **$26,998,868.00** |
| **% of Total Ownership Sold During SP** | **56.27%** |

228.    Defendant Williams sold 600,000 shares of his personally held Nutanix stock for proceeds of over $26.8 million.  Defendant Williams' sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Williams' sales are also suspicious given that his stock sales represented over 67% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 88,227 |
| Shares Sold During SP | 600,000 |
| Shares Disposed (Other) During SP | 80,467 |
| Total Shares Held During SP | 891,096 |
| Shares Remaining SP | 210,629 |
| **Total Proceeds from Sales** | **$26,846,206.38** |
| **% of Total Ownership Sold During SP** | **67.33%** |

229.    Defendant Sangster sold 237,845 shares of his personally held Nutanix stock for proceeds of over $11.6 million.  Defendant Sangster's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Sangster's sales are also suspicious given that his stock sales represented over 78% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 237,845 |
| Shares Disposed (Other) During SP | 50,199 |
| Total Shares Held During SP | 302,894 |
| Shares Remaining SP | 14,850 |
| **Total Proceeds from Sales** | **$11,693,612.60** |
| **% of Total Ownership Sold During SP** | **78.52%** |

230.    Defendant Attanasio sold 134,499 shares of his personally held Nutanix stock for proceeds of over $5.5 million.  Defendant Attanasio's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Attanasio's sales are also suspicious given that his stock sales represented nearly 54% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 134,499 |
| Shares Disposed (Other) During SP | 115,501 |
| Total Shares Held During SP | 250,000 |
| Shares Remaining SP | 0 |
| **Total Proceeds from Sales** | **$5,559,951.34** |
| **% of Total Ownership Sold During SP** | **53.80%** |

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

231.     Defendant Long sold 152,002 shares of his personally held Nutanix stock for proceeds of over $7.2 million.  Defendant Long's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Long's sales are also suspicious given that his stock sales represented nearly 52% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 204,038 |
| Shares Sold During SP | 152,002 |
| Shares Disposed (Other) During SP | 11,716 |
| Total Shares Held During SP | 293,534 |
| Shares Remaining SP | 129,816 |
| **Total Proceeds from Sales** | **$7,299,107.52** |
| **% of Total Ownership Sold During SP** | **51.78%** |

232.     Defendant Scarpelli sold 200,000 shares of his personally held Nutanix stock for proceeds of over $8.4 million.  Defendant Scarpelli's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Scarpelli's sales are also suspicious given that his stock sales represented over 96% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 0 |
| Shares Sold During SP | 200,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 208,165 |
| Shares Remaining SP | 8,165 |
| **Total Proceeds from Sales** | **$8,401,602.25** |
| **% of Total Ownership Sold During SP** | **96.08%** |

233.     Defendant McAdam sold 45,000 shares of his personally held Nutanix stock for proceeds of over $2 million.  Defendant McAdam's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant McAdam's sales are also suspicious given that his stock sales represented over 45% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 37,187 |
| Shares Sold During SP | 45,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 99,024 |
| Shares Remaining SP | 54,024 |
| **Total Proceeds from Sales** | **$2,041,353.93** |
| **% of Total Ownership Sold During SP** | **45.44%** |

234.     Defendant Wall sold 46,276 shares of his personally held Nutanix stock for proceeds of over $1.8 million.  Defendant Wall's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.  Defendant Wall's sales are also suspicious given that his stock sales represented over 49% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 0 |
|---|---|
| Shares Sold During SP | 46,276 |
| Shares Disposed (Other) During SP | 47,474 |
| Total Shares Held During SP | 94,366 |
| Shares Remaining SP | 616 |
| **Total Proceeds from Sales** | **$1,878,259.85** |
| **% of Total Ownership Sold During SP** | **49.04%** |

235.     Defendant Gomo sold 5,312 shares of his personally held Nutanix stock for proceeds of $278,908.68.  Defendant Gomo's sales were timed to maximize profit from Nutanix's then artificially inflated stock price.

236.     In sum, the Insider Selling Defendants sold over $178 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **ATTANASIO** | 12/19/2018 | 95,314 | $41.20 | $3,926,822.42 |
| **Former Chief Revenue Officer** | 12/19/2018 | 39,185 | $41.68 | $1,633,128.92 |
| | **Total Shares:** | **134,499** | **Total Proceeds:** | **$5,559,951.34** |
| | | | | |
| **GOMO** | | | | |
| **Current Director** | 9/18/2018 | 5,312 | $52.51 | $278,908.68 |
| | **Total Shares:** | **5,312** | **Total Proceeds:** | **$278,908.68** |
| | | | | |
| **LONG** | 1/2/2018 | 60,000 | $35.87 | $2,151,930.00 |
| **Former Chief Accounting** | 3/14/2018 | 32,002 | $54.36 | $1,739,657.52 |
| **Officer, Vice President,** | 4/4/2018 | 30,000 | $50.22 | $1,506,513.00 |
| **and Corporate Controller** | 6/13/2018 | 30,000 | $63.37 | $1,901,007.00 |
| | **Total Shares:** | **152,002** | **Total Proceeds:** | **$7,299,107.52** |
| | | | | |
| **MCADAM** | 9/10/2018 | 8,146 | $51.15 | $416,666.27 |
| **Former Director** | 9/10/2018 | 6,854 | $51.83 | $355,262.70 |
| | 12/3/2018 | 12,967 | $44.52 | $577,351.78 |
| | 12/3/2018 | 1,933 | $45.22 | $87,409.68 |
| | 12/3/2018 | 100 | $46.53 | $4,653.00 |
| | 3/20/2019 | 15,000 | $40.00 | $600,010.50 |
| | **Total Shares:** | **45,000** | **Total Proceeds:** | **$2,041,353.93** |
| | | | | |
| **PARKS** | 1/16/2018 | 94,449 | $37.75 | $3,564,977.51 |
| **Current Director** | 1/16/2018 | 33,289 | $37.75 | $1,256,493.31 |
| | 1/16/2018 | 38,704 | $37.75 | $1,460,882.48 |
| | 1/23/2018 | 141,776 | $37.55 | $5,323,688.80 |

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 1/23/2018 | 49,971 | $37.55 | $1,876,411.05 |
| | 1/23/2018 | 58,098 | $37.55 | $2,181,579.90 |
| | 1/23/2018 | 20,502 | $37.51 | $769,030.02 |
| | 1/23/2018 | 7,226 | $37.51 | $271,047.26 |
| | 1/23/2018 | 8,402 | $37.51 | $315,159.02 |
| | 3/2/2018 | 1,054,873 | $37.94 | $40,021,881.62 |
| | 3/2/2018 | 371,803 | $37.94 | $14,106,205.82 |
| | 3/2/2018 | 432,275 | $37.94 | $16,400,513.50 |
| | 12/17/2018 | 8,313 | $39.93 | $331,975.50 |
| **Total Shares:** | | **2,319,681** | **Total Proceeds:** | **$87,879,845.78** |
| | | | | |
| **SANGSTER** **Current Chief Operating Officer** | 12/19/2017 | 5,892 | $36.32 | $213,995.67 |
| | 3/12/2018 | 40,049 | $49.63 | $1,987,695.95 |
| | 3/12/2018 | 27,422 | $50.70 | $1,390,325.56 |
| | 3/12/2018 | 32,611 | $51.34 | $1,674,144.38 |
| | 3/15/2018 | 4,900 | $53.56 | $262,453.80 |
| | 3/19/2018 | 6,625 | $52.66 | $348,859.91 |
| | 4/2/2018 | 7,017 | $47.94 | $336,374.63 |
| | 4/2/2018 | 900 | $48.80 | $43,923.96 |
| | 5/1/2018 | 5,088 | $50.73 | $258,105.08 |
| | 5/1/2018 | 2,829 | $51.73 | $146,339.64 |
| | 6/1/2018 | 2,529 | $54.41 | $137,591.26 |
| | 6/1/2018 | 1,801 | $55.44 | $99,843.30 |
| | 6/1/2018 | 3,586 | $56.60 | $202,978.00 |
| | 6/19/2018 | 700 | $60.03 | $42,024.01 |
| | 6/19/2018 | 5,084 | $61.00 | $310,124.51 |
| | 6/19/2018 | 2,582 | $61.62 | $159,094.58 |
| | 6/19/2018 | 500 | $62.95 | $31,474.00 |
| | 7/2/2018 | 1,133 | $50.92 | $57,689.30 |
| | 7/2/2018 | 5,409 | $51.60 | $279,100.61 |
| | 7/2/2018 | 1,375 | $52.27 | $71,869.05 |
| | 8/1/2018 | 7,417 | $49.30 | $365,634.37 |
| | 8/1/2018 | 500 | $49.83 | $24,914.00 |
| | 9/4/2018 | 2,000 | $54.94 | $109,886.00 |
| | 9/4/2018 | 5,916 | $56.02 | $331,420.24 |
| | 9/18/2018 | 1,500 | $49.13 | $73,696.05 |
| | 9/18/2018 | 6,771 | $49.94 | $338,173.53 |
| | 9/18/2018 | 100 | $50.57 | $5,057.00 |
| | 10/1/2018 | 7,617 | $43.50 | $331,344.07 |
| | 10/1/2018 | 300 | $44.12 | $13,236.51 |
| | 11/1/2018 | 2,001 | $41.40 | $82,845.20 |
| | 11/1/2018 | 2,500 | $42.41 | $106,037.00 |
| | 11/1/2018 | 3,415 | $43.35 | $148,036.84 |
| | 12/3/2018 | 7,317 | $44.55 | $325,974.55 |
| | 12/3/2018 | 500 | $45.53 | $22,766.00 |
| | 12/3/2018 | 100 | $46.54 | $4,654.00 |
| | 12/19/2018 | 3,211 | $40.12 | $128,836.56 |
| | 12/19/2018 | 4,598 | $41.33 | $190,018.79 |
| | 12/19/2018 | 300 | $41.80 | $12,540.00 |
| | 1/2/2019 | 3,150 | $41.45 | $130,559.63 |
| | 1/2/2019 | 4,767 | $41.97 | $200,088.15 |
| | 2/1/2019 | 7,716 | $51.65 | $398,516.74 |
| | 2/1/2019 | 200 | $52.10 | $10,419.00 |
| | 3/11/2019 | 7,017 | $35.92 | $252,028.19 |
| | 3/11/2019 | 900 | $36.58 | $32,922.99 |
| **Total Shares:** | | **237,845** | **Total Proceeds:** | **$11,693,612.60** |
| | | | | |

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| **SCARPELLI** Former Director | 12/7/2017 | 55,300 | $35.16 | $1,944,613.44 |
| | 12/11/2017 | 94,700 | $35.98 | $3,407,523.81 |
| | 6/20/2018 | 50,000 | $60.99 | $3,049,465.00 |
| | **Total Shares:** | **200,000** | **Total Proceeds:** | **$8,401,602.25** |
| | | | | |
| **VADAKKEDATH** Former President | 12/11/2017 | 50,000 | $35.01 | $1,750,500.00 |
| | 12/12/2017 | 40,000 | $35.63 | $1,425,200.00 |
| | 12/26/2017 | 50,000 | $34.35 | $1,717,500.00 |
| | 1/8/2018 | 40,000 | $36.87 | $1,474,800.00 |
| | 1/22/2018 | 40,000 | $35.52 | $1,420,800.00 |
| | 2/5/2018 | 40,000 | $30.35 | $1,214,000.00 |
| | 2/20/2018 | 40,000 | $33.94 | $1,357,600.00 |
| | 3/5/2018 | 40,000 | $38.73 | $1,549,200.00 |
| | 3/19/2018 | 40,000 | $52.37 | $2,094,800.00 |
| | 4/2/2018 | 40,000 | $48.28 | $1,931,200.00 |
| | 4/16/2018 | 40,000 | $53.58 | $2,143,200.00 |
| | 5/7/2018 | 40,000 | $54.19 | $2,167,600.00 |
| | 5/21/2018 | 40,000 | $58.41 | $2,336,400.00 |
| | 6/4/2018 | 20,000 | $56.44 | $1,128,868.00 |
| | 6/18/2018 | 20,000 | $60.66 | $1,213,200.00 |
| | 7/6/2018 | 40,000 | $51.85 | $2,074,000.00 |
| | **Total Shares:** | **620,000** | **Total Proceeds:** | **$26,998,868.00** |
| | | | | |
| **WALL** Current Chief Legal Officer | 12/28/2018 | 34,144 | $40.36 | $1,378,113.30 |
| | 3/25/2019 | 12,132 | $41.23 | $500,146.55 |
| | **Total Shares:** | **46,276** | **Total Proceeds:** | **$1,878,259.85** |
| | | | | |
| **WILLIAMS** Current Chief Financial Officer | 12/14/2017 | 150,000 | $35.40 | $5,309,430.00 |
| | 12/14/2017 | 150,000 | $35.33 | $5,299,200.00 |
| | 5/31/2018 | 167,600 | $53.56 | $8,976,421.36 |
| | 6/1/2018 | 56,662 | $54.40 | $3,082,288.14 |
| | 6/1/2018 | 75,738 | $55.18 | $4,178,866.87 |
| | **Total Shares:** | **600,000** | **Total Proceeds:** | **$26,846,206.38** |
| | | | | |
| | **Total Shares:** | **4,360,615** | **Total Proceeds:** | **$178,877,716.33** |

237.   The Insider Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, nonpublic information about the business of Nutanix (including, *inter alia*, the Company's inadequate investment in the sales and marketing activities needed to support the transition to a software-centric subscription model) that caused the price of the Company's stock to trade at artificially inflated prices, while at the same time they were disposing of nearly 200 million dollars' worth of Company stock, in violation of the law and the Company's own insider trading policies.

238.   Thus, the Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, nonpublic information concerning Nutanix's business operations, financial condition,

1   and prospects.  In breach of their respective duties, the Insider Selling Defendants sold shares at artificially

2   inflated prices in order to reap hundreds of millions of dollars in illicit personal profits.

3   ## DAMAGES TO NUTANIX

4   239.   As a result of the Individual Defendants' improprieties, Nutanix disseminated improper,

5   public statements concerning the Company's sales and marketing efforts and improved business prospects.

6   These improper statements have devastated Nutanix's credibility, as reflected by the Company's almost

7   $4.3 billion, or 51.42%, market capitalization loss after the truth emerged.

8   240.   Nutanix's performance issues also damaged its reputation within the business community

9   and in the capital markets.  In addition to price, Nutanix's current and potential customers consider a

10  company's ability to accurately value its business prospects and evaluate its sales and growth

11  potential.  Businesses are less likely to award contracts to companies that are uncertain about their own

12  financial conditions.  Nutanix's ability to raise equity capital or debt on favorable terms in the future is

13  now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because

14  the improper statements and misleading projections disseminated by the Individual Defendants have

15  materially increased the perceived risks of investing in and lending money to the Company.

16  241.   Further, as a direct and proximate result of the Individual Defendants' actions, Nutanix has

17  expended, and will continue to expend, significant sums of money.  Such expenditures include, but are

18  not limited to:

19          (a)      costs incurred from defending and paying any settlement or judgment in the federal

20  securities class actions; and

21          (b)      costs incurred from compensation and benefits paid to the defendants who have

22  breached their duties to Nutanix.

23  242.   In addition, since the Insider Selling Defendants utilized the Company's nonpublic

24  information to sell their stock, they must disgorge any profits from these sales back to Nutanix.

25  ## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

26  243.   Plaintiffs bring this action derivatively in the right and for the benefit of Nutanix to redress

27  injuries suffered, and to be suffered, by Nutanix as a direct result of the Individual Defendants' Breach of

28  Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, violations of Section 14(a) of the

Securities Exchange Act, and violations of Section 10(b) and 21D of the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants. Nutanix is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

244. Plaintiffs will adequately and fairly represent the interests of Nutanix in enforcing and prosecuting its rights.

245. Plaintiff Bhonagiri has continuously been a stockholder of Nutanix since June 6, 2018. Plaintiff Juneja has continuously been a stockholder of Nutanix since September 17, 2018. Plaintiff Park has continuously been a stockholder of Nutanix since October 2016.

246. The Board of Nutanix at the time this derivative litigation was commenced was comprised of the following nine individuals: defendants Bostrom, Conway, Gomo, Mhatre, Pandey, Parks, Scarpelli, and McAdam, and non-defendant Brian Stevens. Plaintiffs did not make any demand on the Board to institute this action because such a demand would have been a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

247. As alleged above, demand is excused as to all Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, thereby further rendering them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other Director Defendants.

248. Defendants Gomo, Parks, and Scarpelli, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.

- 72 -

1   Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith

2   because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants

3   face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is

4   futile and is excused.

5        249.    Defendants Gomo, McAdam, Parks, and Scarpelli each sold Nutanix stock under highly

6   suspicious circumstances.  As members of the Board, including members of the Audit Committee, at all

7   relevant times, these defendants possessed material, nonpublic Company information and used that

8   information to benefit themselves.  These defendants sold stock based on their knowledge of material,

9   nonpublic Company information regarding the Company's reduction in sales and marketing spending and

10  the impending decrease in the value of their holdings of Nutanix.  Accordingly, defendants Gomo,

11  McAdam, Parks, and Scarpelli face a substantial likelihood of liability for breach of their fiduciary duty

12  of loyalty.  Any demand upon these defendants is futile.

13       250.    Additional reasons that demand on defendant Pandey is futile are as follows: defendant

14  Pandey cofounded the Company in September 2009 and has since served as the Company's CEO and

15  Chairman of the Company's Board.  Thus, as the Company admits, he is a non-independent director.  The

16  Company provides defendant Pandey with his principal occupation, and he receives handsome

17  compensation, including $11,202,225 which was paid to him during Nutanix's fiscal year ended July 31,

18  2018, and $6,943,333 which was paid to him during Nutanix's fiscal year ended July 31, 2019.  Defendant

19  Pandey was ultimately responsible for all of the false and misleading statements and omissions that were

20  made during the relevant time period, including those contained in the 2018 10-K, and quarterly reports

21  filed on Form 10-Q with the SEC for the second and third quarters of FY2018, and for the first quarter of

22  FY2019, which he signed and also signed certifications for pursuant to the Sarbanes-Oxley Act of 2002.

23  As the Company's highest officer and as a trusted Company director, in violation of the Company's Code,

24  he conducted little, if any, oversight of the Company's engagement in the scheme to make false and

25  misleading statements, consciously disregarded his duties to monitor such controls over reporting and

26  engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover,

27  defendant Pandey is a defendant in numerous, related federal securities class action lawsuits.  For these

28

1  reasons, too, defendant Pandey breached his fiduciary duties, faces a substantial likelihood of liability, is

2  not independent or disinterested, and thus, demand upon him is futile and should be excused.

3      251.    Additional reasons that demand on defendant Bostrom is futile are as follows: defendant

4  Bostrom's occupation is serving as a professional board member.  She currently sits on the boards of six

5  companies—Anaplan, Cadence Design System, Druva, GitLab, Nutanix, and ServiceNow—and holds no

6  executive positions.  Since retiring from her position at Cisco Systems in 2011, defendant Bostrom has

7  also served as a director of Apttus, Spredfast, Marketo, Rocket Fuel, and Varian Medical Systems.  In

8  2018, alone, defendant Bostrom earned over $1.5 million in compensation from her directorship positions.

9  Given the lucrative compensation defendant Bostrom earns from these directorships and her lack of any

10  other employment, defendant Bostrom will not take steps that will jeopardize her chances to serve on

11  boards, whether currently or in the future.  One such action would be initiating litigation against the

12  Individual Defendants, including Company cofounder, defendant Pandey.  A reputation for willingness to

13  sue founders of companies or other fiduciaries will make it less likely that defendant Bostrom will be

14  selected to serve on boards in the future, jeopardizing her substantial and, on information and belief,

15  primary source of income.  Furthermore, defendant Bostrom signed, and thus personally made the false

16  and misleading statements in the Company's 2018 10-K.  Accordingly, there is no reason to *not* doubt

17  defendant Bostrom's ability to disinterestedly and independently consider a demand.  For these reasons,

18  too, defendant Bostrom breached her fiduciary duties, faces a substantial likelihood of liability, is not

19  independent or disinterested, and thus demand upon her is futile and should be excused.

20      252.    Additional reasons that demand on defendant Mhatre is futile are as follows: defendant

21  Mhatre has served as a Company director since July 2010 and is the Board's Lead Independent Director.

22  He serves as the Chairman of the Nominating and Corporate Governance Committee and as a member of

23  the Compensation Committee.  Defendant Mhatre signed, and thus personally made the false and

24  misleading statements in the Company's 2018 10-K.  Significantly, defendant Mhatre is also the Founding

25  Partner and Managing Director of Lightspeed Venture Partners ("Lightspeed"), a global technology

26  venture capital firm.  Lightspeed was one of Nutanix's earliest investors, participating in each of Nutanix's

27  Series A, B, and C financing rounds prior to the Company's initial public offering ("IPO"), and was

28  Nutanix's largest stockholder as of October 18, 2018. At the time of Nutanix's IPO, Lightspeed's stake in

1  Nutanix was worth approximately $1 billion, a more than hundred-fold return on its investment.

2  Additionally, immediately prior to the Company's IPO, Nutanix acquired software company PernixData,

3  Inc., a Lightspeed portfolio company.  Lightspeed received additional Nutanix equity in Nutanix's

4  acquisition of PernixData, Inc.  Accordingly, defendant Mhatre has made or stands to make a substantial

5  amount of money from Lightspeed's investment in Nutanix.  This investment was made possible by

6  defendant Pandey, the Company's cofounder.  Defendant Mhatre will not vote to initiate litigation against

7  defendant Pandey because defendant Pandey is responsible for defendant Mhatre's company, Lightspeed,

8  making hundreds of millions of dollars.  Additionally, an action against defendant Pandey could likely

9  cause reputational damage to Lightspeed.  If defendant Mhatre, and, as a result, Lightspeed, acquired a

10  reputation for suing founders, it would dissuade founders of other companies from partnering with

11  Lightspeed.  This loss of business is too great a risk for defendant Mhatre.  For these reasons, too,

12  defendant Mhatre breached his fiduciary duties, faces a substantial likelihood of liability, is not

13  independent or disinterested, and thus demand upon him is futile and should be excused.

14  253.   Additional reasons that demand on defendant Gomo is futile are as follows: defendant

15  Gomo has served as an advisor to Nutanix since January 2015 and as a Company director since June 2015,

16  with memberships on both the Audit Committee and Nominating and Corporate Governance Committee.

17  As a Company director, in violation of the Company's Code, he conducted little, if any, oversight of the

18  Company's engagement in the scheme to make false and misleading statements, consciously disregarded

19  his duties to monitor such controls over reporting and engagement in the scheme, and consciously

20  disregarded his duties to protect corporate assets.  Defendant Gomo signed, and thus personally made the

21  false and misleading statements in, the Company's 2018 10-K.  For these reasons, too, defendant Gomo

22  breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested,

23  and thus demand upon him is futile and should be excused.

24  254.   Additional reasons that demand on defendant Conway is futile are as follows: defendant

25  Conway has served as a Company director since October 2017 and is a member of the Nominating

26  Committee.  As a Company director, in violation of the Company's Code, he conducted little, if any,

27  oversight of the Company's engagement in the scheme to make false and misleading statements,

28  consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme,

1   and consciously disregarded his duties to protect corporate assets. Defendant Conway signed, and thus

2   personally made the false and misleading statements in, the Company's 2018 10-K. For these reasons,

3   too, defendant Conway breached his fiduciary duties, faces a substantial likelihood of liability, is not

4   independent or disinterested, and thus demand upon him is futile and should be excused.

5       255.   Additional reasons that demand on defendant McAdam is futile are as follows: defendant

6   McAdam has served as a Company director since August 2015 and was a member of the Compensation

7   Committee. As a Company director, in violation of the Company's Code, he conducted little, if any,

8   oversight of the Company's engagement in the scheme to make false and misleading statements,

9   consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme,

10  and consciously disregarded his duties to protect corporate assets. Defendant McAdam signed, and thus

11  personally made the false and misleading statements in the Company's 2018 10-K. For these reasons, too,

12  defendant McAdam breached his fiduciary duties, faces a substantial likelihood of liability, is not

13  independent or disinterested, and thus demand upon him is futile and should be excused.

14      256.   Additional reasons that demand on defendant Parks is futile are as follows: defendant Parks

15  has served as a Company director since December 2013 and is the Chairman of the Compensation

16  Committee and a member of the Audit Committee. As a Company director, in violation of the Company's

17  Code, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and

18  misleading statements, consciously disregarded his duties to monitor such controls over reporting and

19  engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant

20  Parks signed, and thus personally made the false and misleading statements in the Company's 2018 10-K.

21  For these reasons, too, defendant Parks breached his fiduciary duties, faces a substantial likelihood of

22  liability, is not independent or disinterested, and thus demand upon him is futile and should be excused.

23      257.   Additional reasons that demand on defendant Scarpelli is futile are as follows: defendant

24  Scarpelli has served as a Company director since December 2013 and is the Chairman of the Audit

25  Committee. As a Company director, in violation of the Company's Code, he conducted little, if any,

26  oversight of the Company's engagement in the scheme to make false and misleading statements,

27  consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme,

28  and consciously disregarded his duties to protect corporate assets. Defendant Scarpelli signed, and thus

1    personally made the false and misleading statements in the Company's 2018 10-K.  For these reasons, too,

2    defendant Scarpelli breached his fiduciary duties, faces a substantial likelihood of liability, is not

3    independent or disinterested, and thus demand upon him is futile and should be excused.

4        258.    The Director Defendants' conduct described herein and summarized above could not have

5    been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or

6    disloyal misconduct.  Thus, none of these defendants can claim exculpation from their violations of duty

7    pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the directors

8    face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and

9    cannot be presumed to be capable of exercising independent and disinterested judgment about whether to

10   vigorously pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is

11   excused as being futile.

12       259.    The Director Defendants may also be protected against personal liability for their acts of

13   mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance

14   if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging

15   to the stockholders of Nutanix.  If there is a directors' and officers' liability insurance policy covering the

16   Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by

17   the Company against these individuals, known as, *inter alia*, the "insured-versus-insured exclusion."  As

18   a result, if the Director Defendants were to sue themselves or certain of the officers of Nutanix, there

19   would be no directors' and officers' insurance protection.  Accordingly, these defendants cannot be

20   expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought,

21   such insurance coverage (to the extent it exists) will provide a basis for the Company to effectuate a

22   recovery.  Thus, demand on the Director Defendants is futile and should be excused.

23       260.    If there is no directors' and officers' liability insurance coverage, then the Director

24   Defendants will not cause Nutanix to sue the Individual Defendants named herein, since, if they did, they

25   would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

26       261.    Nutanix has been and will continue to be exposed to significant losses due to the

27   wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against

28   themselves or any others who were and who remain responsible for that wrongful conduct to attempt to

1   recover for Nutanix any part of the damages Nutanix suffered and will continue to suffer thereby.  Thus,
2   any demand upon the Director Defendants would be futile.

3      262.   Plaintiffs have not made any demand on the other stockholders of Nutanix to institute this
4   action since such demand would be a futile and useless act for at least the following reasons:

5         (a)   Nutanix is a publicly held company with over 185 million shares outstanding and
6   thousands of stockholders as of May 31, 2019;

7         (b)   making demand on such a number of stockholders would be impossible for
8   Plaintiffs who have no way of finding out the names, addresses, or phone numbers of stockholders; and

9         (c)   making demand on the other stockholders would force Plaintiffs to incur excessive
10   expenses, assuming all stockholders could be individually identified.

11                           **COUNT I**

12      **Against the Individual Defendants for Breach of Fiduciary Duty**

13      263.   Plaintiffs incorporate by reference and reallege each and every allegation contained above,
14   as though fully set forth herein.

15      264.   The Individual Defendants owed and owe Nutanix fiduciary obligations.  By reason of their
16   fiduciary relationships, the Individual Defendants owed and owe Nutanix the highest obligation of good
17   faith, fair dealing, loyalty, and due care.

18      265.   The Individual Defendants violated and breached their fiduciary duties of candor, good
19   faith, and loyalty.

20      266.   The Officer Defendants either knew, were reckless, or were grossly negligent in not
21   knowing that: (i) the Company did not intend to heavily increase its investments in sales and marketing
22   during the relevant time period; (ii) the Company's lead generation spending remained flat or decreased
23   during the relevant time period; and (iii) the Company's higher gross margins were driven by the
24   reallocation of lead generation spending, rather than improved business operations.  Accordingly, the
25   Officer Defendants breached their duty of care and loyalty in connection with their improper statements
26   detailed above.

27      267.   The Director Defendants, as directors of the Company, owed Nutanix the highest duty of
28   loyalty.  These defendants breached their duty of loyalty by at least recklessly issuing the improper

statements detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) the Company did not intend to heavily increase its investments in sales and marketing during the relevant time period; (ii) the Company's lead generation spending remained flat or decreased during the relevant time period; and (iii) the Company's higher gross margins were driven by the reallocation of lead generation spending, rather than improved business operations.  Accordingly, these defendants breached their duty of loyalty to the Company.

268.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

269.    The Insider Selling Defendants breached their duty of loyalty by selling Nutanix stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was material, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Nutanix common stock.

270.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nutanix has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

271.    Plaintiffs, on behalf of Nutanix, have no adequate remedy at law.

## <u>COUNT II</u>

### Against the Individual Defendants for Waste of Corporate Assets

272.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

273.    As a result of Individual Defendants' failure to properly supervise and monitor the adequacy of Nutanix's disclosure controls and procedures, the Individual Defendants have caused Nutanix

to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties to the Company and its shareholders.

274.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

275.    Plaintiffs, on behalf of Nutanix, have no adequate remedy at law.

### COUNT III

### Against the Individual Defendants for Unjust Enrichment

276.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

277.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Nutanix.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Nutanix.

278.    The Insider Selling Defendants sold Nutanix stock while in possession of material, nonpublic information that artificially inflated the price of Nutanix stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

279.    Plaintiffs, as stockholders and representatives of Nutanix, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

280.    Plaintiffs, on behalf of Nutanix, have no adequate remedy at law.

### COUNT IV

### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14A-9 for Causing the Company to File a Materially Misleading Proxy Statement

281.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein, except as to any allegations relating to recklessness and knowing conduct on the part of any defendant.

282.   This claim for relief is not based on any allegations of knowing or reckless conduct by any defendant.  This claim does not allege, and does not sound in fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

283.   On November 5, 2018, the Director Defendants caused Nutanix to file the 2018 Proxy Statement.  The 2018 Proxy Statement violated Section 14(a) and SEC Rule 14-a-9 because it extolled the Company's "focus on ... continued investment in acquiring new end customers" while failing to disclose that Defendants were in fact underspending on lead generation and under-hiring sales personnel.  By not disclosing the stock promotion scheme in the 2018 Proxy Statement, the Individual Defendants were able to retain their positions with the Company, allowing them to raise tens of millions of dollars, limit the dilution of their own holdings in the process, and secure their positions as directors within the Company.

284.   In the exercise of reasonable care, the Individual Defendants should have known that by failing to disclose this material fact, the statements contained in the 2018 Proxy Statement were materially false and misleading.

285.   The misrepresentations and omissions in the 2018 Proxy Statement were material to Plaintiffs and every other Nutanix shareholder in voting on the 2018 Proxy Statement.  Revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and/or the Company's compensation policies.

286.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

## <u>COUNT V</u>

**Against Defendants Pandey and Williams for Contribution for
Violations of Sections 10(b) and 21D of the Exchange Act**

287.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

288.   Defendants Pandey and Williams are named as defendants in the Securities Action.  The misconduct by these defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws.

289.     Nutanix is named as a defendant in the Securities Action which alleges and asserts claims arising under Section 10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If Nutanix is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

290.     As officers, directors and otherwise, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Nutanix's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

291.     Defendants Pandey and Williams are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

292.     Defendants Pandey and Williams have damaged the Company and are liable to the Company for contribution.

293.     No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

294.     Plaintiffs, on behalf of Nutanix, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Nutanix, demand judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breach of fiduciary duty, waste of corporate assets, unjust enrichment, violation of Section 14(a) of the Exchange Act, and violations of Sections 10(b) and 21D of the Exchange Act;

B.      Directing Nutanix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nutanix and its

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to control insider selling;

2.      a proposal to strengthen the Company's oversight of its disclosure procedures concerning the Company's sales and marketing initiatives;

3.      a proposal to strengthen the Board's oversight of new business initiatives, including lead generation;

4.      a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

5.      a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

6.      a proposal to ensure the accuracy of the qualifications of Nutanix's directors, executives, and other employees; and

7.      a provision to permit the stockholders of Nutanix to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of Nutanix have an effective remedy;

D.      Awarding to Nutanix restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: June 17, 2020

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS

*/S/ Shane P. Sanders*
SHANE P. SANDERS

5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        ssanders@robbinsllp.com

*Lead Counsel for Plaintiffs*

JOHNSON FISTEL, LLP
Frank J. Johnson
Chase M. Stern
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
E-mail: frankj@johnsonfistel.com
        chases@johnsonfistel.com

*Co-Counsel for Plaintiffs*

LAW OFFICES OF TIMOTHY L. MILES
TIMOTHY L. MILES
124 Shiloh Ridge
Hendersonville, TN 37075
Telephone:  (855) 846-6529
E-mail: tmiles@timmileslaw.com

*Counsel for Plaintiff Ashwin Juneja*

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses on the Electronic Mail Notice for this action.


_/S/ Shane P. Sanders_
SHANE P. SANDERS

1449398

VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

<u>VERIFICATION</u>

I, Aravind Bhonagiri, hereby declare as follows:

I am a plaintiff in the within entitled action. I have read the Verified Consolidated Amended Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, Violation of the Securities Exchange Act of 1934, and Contribution ("Consolidated Amended Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Consolidated Amended Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 05/13/2020

ARAVIND BHONAGIRI

<u>VERIFICATION</u>

I, Ashwin Juneja, hereby declare as follows:

I am a plaintiff in the within entitled action. I have read the Verified Consolidated Amended Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, Violation of the Securities Exchange Act of 1934, and Contribution ("Consolidated Amended Complaint"). Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Consolidated Amended Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____5/8/2020_____

_____
ASHWIN JUNEJA

<u>VERIFICATION</u>

I, TJ Park, hereby declare as follows:

I am a plaintiff in the within entitled action.  I have read the Verified Consolidated Amended Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, Violation of the Securities Exchange Act of 1934, and Contribution ("Consolidated Amended Complaint").  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Consolidated Amended Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____5/11/2020_____

_____
TJ PARK